*Angstman:*       I will call Miss King from the lobby— and we're stopping at noon is that correct, Your Honor?

*Judge:*       Yes pretty close to that because I have the 12:45, I need to get some lunch because I haven't had breakfast yet, I'd be too cranky if I went all day without something.

*Angstman:*       And have we determined the afternoon schedule yet?

*Judge:*       What I'm going to do is to allow you to come back at 1 o'clock and give some priority to this case, see if we can finish it up. Hopefully I can get the other matter in, if not, it'll be the trailer.

*Angst man:*       Miss King, you may go forward and be sworn. Go forward to the witness—

*Judge:*       Actually she needs to stand in front of the clerk to be sworn as a witness.

*Angstman:*       Oh, I'm sorry.

*Clerk:*       Do you solemnly swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

*Cali King:*       I do.

*Clerk:*       Thank you and have a seat up there. And ma'am for purposes of the record could you please state your full name, spelling your last and then give your city and state of residence.

*Cali King:*       My name is Cali King, K-I-N-G, and I am a Denali, Alaska resident.

*Clerk:*       And for the record could you also spell your first name, since it's different.

*Cali King:*       C-A-L-I.

*Clerk:*       Thank you.

*Angstman:*       Ms. King, Ms. King you've been asked to testify in this case involving your dad who's sitting here. Tell me who's in your family besides you and your dad.

*Cali King:*       I have 2 sisters, they're both younger than me, Tessa and Ellen.

*Angstman:*       And what's your current position in life?

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 1 of 118

*Cali King:*　　I just graduated from college last May and I don't really have any other position, I've been travelling.

*Angstman:*　　Okay, do you help with the family business?

*Cali King:*　　I do.  That has been my summer job for the last 10 years.

*Angstman:*　　Okay, and this summer as well?

*Cali King:*　　Yes.

*Angstman:*　　Okay.  We've been talking before you arrived about an event that happened a little less than a year ago in the area in the north boundary of Denali National Park.  Do you know the incident I'm speaking of?

*Cali King:*　　I believe I do.

*Angstman:*　　Okay, it's a hunting incident involving you and your father and I want to find out from you how that transpired.  First of all, are you a hunter yourself?

*Cali King:*　　Not exactly, I would say no.

*Angstman:*　　Do you go along in hunting trips occasionally?

*Cali King:*　　Regularly.

*Angstman:*　　And for what reason?

*Cali King:*　　The camping aspect of the outing, usually.

*Angstman:*　　Okay, usually with your family?

*Cali King:*　　Yes.

*Angstman:*　　Okay and were you making a plan to go on a hunting trip with your dad last September?

*Cali King:*　　Yes.

*Angstman:*　　And did you go?

*Cali King:*　　Yes.

*Angstman:*　　Where did you go?

*Cali King:*　　We went to the Rock Creek area, yeah, I don't know—you drive north from Healy a ways and park the truck.

Case 4:08-cr-00008-JDR　　Document 43-3　　Filed 09/13/08　　Page 2 of 118

*Angstman:*      How did you travel to that area?

*Cali King:*      We took an Argo in.

*Angstman:*      Alright and we've heard about an Argo, is that a vehicle owned by your family?

*Cali King:*      Yes.

*Angstman:*      Is it one you know how to drive?

*Cali King:*      Yes.

*Angstman:*      Okay. And do you take all your gear on an Argo, is that how it works?

*Cali King:*      Yes.

*Angstman:*      How far in did you go, roughly?  Do you have any idea?

*Cali King:*      Not exactly, I think it's approximately 4 or 5 miles.

*Angstman:*      Had you ever been there before?

*Cali King:*      Yes.

*Angstman:*      Okay hunting, on a hunting trip or just a tour?

*Cali King:*      Mostly a tour.

*Angstman:*      Okay.  And did you establish camp with your dad?

*Cali King:*      Yes, we did.

*Angstman:*      Alright, when you got to camp the first day, was there any hunting done that day?

*Cali King:*      The first day is when we started hunting, yes.

*Angstman:*      Okay, and how did you accomplish that?  Where did you go from camp, do you recall?

*Cali King:*      Yeah, after we set up camp we travelled back along the ridge towards the direction we had come in and we were just looking to see if we spotted any moose and ended up on a ridge, on that ridge stopping, and we spotted several.

*Angstman:*      Were there discussions at that time or any time before about where the boundary was at that location?

*Cali King:*     Yes.

*Angstman:*     And what were those discussions?

*Cali King:*     Well I, upon arrival, was curious just exactly how we were supposed to know where the park boundary was because I could definitely not see any markers, I had heard tale there were some there so I, out of curiosity, asked my dad where the boundary was and he explained to me from his past knowledge hunting out there where the boundary was.

*Angstman:*     Okay and did this first discussion occur at the camp?

*Cali King:*     Yes, before we had started.

*Angstman:*     Did you get some general idea from him at that time where the park boundary was from camp?

*Cali King:*     Yes.

*Angstman:*     And what did he describe for you as his understanding of the boundary?

*Cali King:*     Looking from our camp you could see the creek and he explained that the boundary ran up the creek a little ways and then sort of cutting across the ridge that was at that point to our left and ended up on the top of the ridge and continued on.

*Angstman:*     Okay if I can approach Your Honor?

*Judge:*     Yes.

*Angstman:*     I'll hand you what's been marked exhibit U, and if you hold it up, I don't think this is large enough to—alright can you see that from your seat properly?

*Cali King:*     Mm-hmm.

*Angstman:*     Okay do you recognize the location of that photo?

*Cali King:*     Yes.  I believe that's taken from the spot where I was sitting while my dad was hunting.

*Angstman:*     Okay, I believe your dad will testify that it's taken from the campsite.

*Cali King:*     Okay.

*Angstman:*   Alright, is

*Cooper:*   Is that one I've seen before?

*Angstman:*   It is.  What's the—U?

*Clerk:*   Oh, no I'm sorry, yes, U.

*Cali King:*   That was definitely the ridge I was just mentioning.

*Angstman:*   Okay if I were to present to you that was a picture taken at the campsite, does that ring a bell for you?

*Cali King:*   That could be right, yeah.

*Angstman:*   Alright, you see myself standing in that photo?

*Cali King:*   Yes.

*Angstman:*    I wasn't there on the camping trip though, was I?

*Cali King:*   No.

*Angstman:*   Okay I'm pointing to an area and there'll be later testimony to why I'm doing that, but, in relation to the area that you see my hand pointing, where could you describe the boundary as your dad explained it to you before you went hunting?

*Cali King:*   It was—it run right across the top of that ridge.

*Angstman:*   Okay, in the general location where my hand is pointing?

*Cali King:*   Yes.

*Angstman:*   Okay, now, off to the right of that picture, are you able to see anything there that as far as you knew at that time you started to hunt, represented the boundary?

*Cali King:*   No because the creek that I referred to is not in that photo.

*Angstman:*   Okay, and that's fine.  Alright when you back to the—now let's go back to the area where you saw the moose.  From the place you saw the moose, was this same ridge visible?  The same ridge that I'm pointing to in that photo?

*Cali King:*   Yes we were just a little nearer to it.

*Angstman:*   Alright and when you saw the moose--was there 2 moose?

*Cali King:*        Yeah we saw 3 actually.

*Angstman:*        Were all 80 of those moose in what you understood to be the area where the park boundary was?

*Cali King:*        Yes.  The moose that we first saw was definitely in the park as far as I knew the boundary to be—

*Angstman:*        In other words, somewhere on the ridge or beyond?

*Cali King:*        Yeah, it was on the ridge.

*Angstman:*        Alright, and the other 2?

*Cali King:*        We saw a cow just below the hill and the bull that we ended up getting with was also just below the hill.

*Angstman:*        Alright and this was bull season as far as you knew?

*Cali King:*        Mm-hm.

*Angstman:*        Alright.  What plan did you and your dad come up with in regard to the moose you saw?

*Cali King:*        We watched the bull for quite some time.  He was obviously moving towards the cow, they were in the general area, obviously communicating.  I, not having a hunting license and not being along for the hunt, stayed up on the hill to watch from above and my dad started hiking down through the brush towards—

*Angstman:*        Okay and were you able to see him from your vantage point all the time or part time?

*Cali King:*        Only part of the time.  The brush is very tall, on occasion I could see it moving and I would assume that's where he was but only on occasion would he break into a clearing.

*Angstman:*        Okay and how about the moose?  Could you see the moose at all time or only part time?

*Cali King:*        Only part of the time.

*Angstman:*        And this is the bull we're referring to now?

*Cali King:*        Yeah.

*Angstman:*        Alright at any time did you see anything happen with regard to the moose and your dad?

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 6 of 118

*Cali King:* Yes, I—by the time my dad got into position where he could see the moose from the bottom of the hill, they were both in a relatively clear area so I could see both of them.

*Angstman:* Okay and did you ever hear a shot?

*Cali King:* Yes. My—once they reached—once my dad got into a position I could see well enough to see that he was setting up and he shot once, the cow, who was next to the bull at this point ran, the moose startled—the bull jumped and started running down hill and my dad had to reposition, and shot again.

*Angstman:* Okay, now when you say reposition do you mean just shift his position in his location or did he walk some place?

*Cali King:* No, he had to walk through the brush again.

*Angstman:* Okay and did the bull do the same?

*Cali King:* Yes.

*Angstman:* And were you able to see your dad the entire time he was repositioning?

*Cali King:* No, because again he had to go through some very tall brush.

*Angstman:* Okay, how long do you suppose he was out of your sight?

*Cali King:* I don't know exactly, it was definitely more than 30 seconds, probably less than 2 minutes.

*Angstman:* Okay, and during that time did you see the moose the entire time?

*Cali King:* No, definitely not.  I did see it reappear about the same time, it looked like my dad could see the moose as well.

*Angstman:* Did you hear the other shot?

*Cali King:* Yes.

*Angstman:* And what happened after the second shot?

*Cali King:* The moose dropped on the second shot.

*Angstman:* Alright and what was your next step?

*Cali King:* Well being, never being on a moose hunt before I was very excited so I jumped in the Argo and started driving downhill where my dad was.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 7 of 118

*Angstman:*     Okay and did you get to his location?

*Cali King:*     Yes, I picked him up and we continued to the location where the moose had fallen.

*Angstman:*     Alright.  What was the rest of the events that at the sight of the moose kill that evening?

*Cali King:*     We stayed to gut the moose, it was getting dark so we decided to return the next day to quarter and return with the meat.  So, we gutted the moose, got back in the Argo, and returned to camp that night.

*Angstman:*     I take it you had normal camp that night?  You refreshed yourself and rested and came back the next day?

*Cali King:*     Yes.

*Angstman:*     Alright we'll pick up the story when the officer here showed up at your camp, we've heard testimony before you got here that he came to your camp, do you remember that?

*Cali King:*     Yes, I do.

*Angstman:*     Alright what time of the day was that, roughly?

*Cali King:*     I think it was early afternoon, just after lunch.

*Angstman:*     Okay, and do you remember he arriving with another gentlemen?

*Cali King:*     Yes, the trooper.

*Angstman:*     Alright, tell me what you recall from the conversations that occurred while the ranger was in your camp?

*Cali King:*     Upon arrival they were basically making small talk, they saw that we had brought a moose back to our camp so they did ask my dad about his tags and wanted to see his license and then we were just chatting and I offered them coffee so they were standing while I made the coffee and talking about swimming dogs, and we also talked about the boundary because—

*Angstman:*     Did you hear any—oh excuse me.

*Cali King:*     I had been very curious to hear from a—somebody who would know for certain where exactly those markers were located so I was interested to hear from the ranger and the trooper.

*Angstman:*    Did you hear either officer ask Mr. King where he harvested the moose?

*Cali King:*    I don't recall that, no.

*Angstman:*    Okay.  And did you hear any discussion about where the visible markers might be?

*Cali King:*    Yes, because my—I do recall them referring to a marker to the southeast that on sunny days sometimes glinted in the sun.  That was the—

*Angstman:*    Okay we've had this happen before in this case where people have said 1 direction and upon reflection they said another direction.  I want you to think back and remember carefully—are we talking about southeast or not? Left or right?

*Cali King:*    Well—

*Angstman:*    Okay, let's talk about it this way—

*Cali King:*    Yeah, please.

*Angstman:*    Okay let's say you're standing on the campsite with the ranger, there, and you're looking down into the gulley below you. Are you picturing this?

*Cali King:*    Yeah.

*Angstman:*    Did they point with their left hand back up towards where you had come from or with their right hand to where you had not gone to yet?

*Cali King:*    I don't know as though I remember anymore because—

*Angstman:*    That's a fine answer if you don't remember, I'm not going to bug you anymore.

*Cali King:*    I know that they made reference to a marker—maybe it was not a visible one, there was several referred to—I don't remember which one might have been referred to.

*Cooper:*    Can I—I guess it's been asked and answered but I'm not sure if it was clear what the question referred to—was he referring to where the kill site was or where a boundary was?

*Angstman:*     Okay, I'll restate it just so we don't have any confusion.  My question meant if you were pointing towards a place where a visible marker was and is that what your answer referred to?

*Cali King:*     Yes.

*Angstman:*     Are we clear now?  Alright, did you ever see or hear your dad refer to the site of your recent kill site and point to it?

*Cali King:*     No.

*Angstman:*     Okay.  Did you ever hear the ranger describe anything where he thought the trail—excuse me—the boundary was in relation to the ridge that I'm pointing to on that picture?

*Cali King:*     Yes.

*Angstman:*     And what did you hear?

*Cali King:*     He, as far as I was concerned, confirmed exactly what my father had told me.

*Angstman:*     And what was that?

*Cali King:*     That the boundary intersected the top of that ridge.

*Angstman:*     And did he point at it?

*Cali King:*     Yeah, I believe so because I remember the conversation lasted a couple of moments.

*Angstman:*     Did you know that your kill site was over towards that ridge from your camp?

*Cali King:*     Yeah, because we had had to travel along the ridges towards that ridge to get there.

*Angstman:*     When he confirmed what you believed, that the boundary went over the ridge—was that comforting to you?

*Cali King:*     Yeah, it was.

*Angstman:*     Alright, did you leave the area then?

*Cali King:*     We were packing up camp that evening—we decided to spend 1 more night out there because we had planned for several and then we returned the next day.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 10 of 118

*Angstman:*    Okay, and do you recall making any arrangements to dispose of bones from the boning process?

*Cali King:*    Yeah because we had seen a bear across the valley and was kind of headed our direction. We weren't very excited about leaving bones from the quarters behind because there was a chance that we might want to use that camp in the future and we didn't want the bears to end up there. So we did—we loaded the bones and what was left from the boning process back into the Argo and took them along the ridge, disposed of them in an area we believed that no one was camping and that was out of sight.

*Angstman:*    Okay. Was there any discussion about whether or not that was an attempt to hide the bones from the law enforcement in any way?

*Cali King:*    Absolutely not.

*Angstman*:    Okay. We have nothing further, Your Honor, with this witness, thank you. Mr. Cooper will have—

*Judge:*    Mr. Cooper, you may inquire.

*Cooper:*    Thank you. How many hunts have you accompanied your father on?

*Cali King:*    I would say this is probably the third.

*Cooper:*    And in how much—in how long a time? In 3 years?

*Cali King:*    Probably within 5 years.

*Cooper:*    And were any of the others in this particular area?

*Cali King:*    No, I had never been hunting in this area before, I had just been there.

*Cooper:*    Do you if he had been hunting in that area before?

*Cali King:*    Yes, regularly.

*Cooper:*    For what period of time do you think it was that he had been hunting there?

*Cali King:*    Probably the last 5 years.

*Cooper:*    Okay, like, just 1 year after another or?

*Cali King:*    For several years he was going year after year, yep.

*Cooper:*  Okay.  And so you drove the Argo all the time when you were out there or?

*Cali King:*  Definitely not the entire time but I have to admit that I'm not as eager to be a passenger as I am to be the driver so I wasn't about to let him drive the entire time.

*Cooper:*  Was it kind of bouncy?

*Cali King:*  The, I'm sorry?

*Cooper:*  Was it kind of a bouncy ride?

*Cali King:*  Yes it's a very jerky right.

*Cooper:*  Yeah, this thing isn't very hard to drive is it?

*Cali King:*  No.

*Cooper:*  So was it a wheel or a stick or what does it have for control on it?

*Cali King:*  You know I don't know the exact terms, all I know is that it's a lot like a—

*Cooper:*  4-wheeler?

*Cali King:*  No, it's not like a 4-wheeler.  It's got a steering stick, essentially, and to turn the vehicle has to be stopped.  So, it rotates like a tank.

*Cooper:*  I see, kind of brakes—wheels on one side.  How many wheels are on it?

*Cali King:*  I think it's 8 wheels.

*Cooper:*  4 on the side, then.

*Cali King:*  4 on each side.

*Cooper:*  Okay, so how long have you had that Argo?

*Cali King:*  You know I don't know the answer to that, several years.

*Cooper:*  You've been on it before, I take it?  Before—

*Cali King:*  On the Argo before?

*Cooper:*  Yeah

*Cali King:*  Yes.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 12 of 118

*Cooper:*          Okay, so you were out there—nobody else, just you and your father?

*King:*          Mm-hm.

*Cooper:*          And did you see any other hunters when you were out there?

*Cali King:*          We did.  We saw a couple other hunters, they were—couple other hunters were camped where we had originally planned to camp so we stopped and talked to them for awhile and then moved on.  We saw a couple other hunters going by.

*Cooper:*          And did you chat with them about anything?

*Cali King:*          Yeah, not much.  They were a little embarrassed to be caught in our what had been an established camp but they were very nice and had been there for some time, we didn't expect them to leave at all so that's mostly what the discussion was about, the guy was eager to ask my dad about dogs. That's about it.

*Cooper:*          So was that camp, that wasn't the one you ended up using was it? That was before you got to the one you used?

*Cali King:*          It's actually past it—

*Cooper:*          Oh, it's past it.

*Cali King:*          We had to backtrack.

*Cooper:*          I see, so that was the next one that—does the name Olsen ring a bell to you?

*Cali King:*          I'm not going to remember their names, I'm sorry.

*Cooper:*          Okay.  Alright, so you went up there, he was there, and you came back to this other one where you eventually used—settled, set down, set your camp up in that location—

*Cali King:*          Yeah, great view from that location.

*Cooper:*          And that view was toward the south, right?

*Cali King:*          Yes, well, you, yes.

*Cooper:*          And west?

*Cali King:*          Yeah.

*Cooper:*      Was you're looking out towards the Park - - -? Towards that creek at the bottom?

*Cali King:*      Yeah, you could see Mckinley's through the—

*Cooper:*      You could see Mckinley's? Okay.  And you could see the Teklanika River, too couldn't you?  Over there on your right?

*Cali King:*      Probably.

*Cooper:*      Alright, so, you say that's the first time you'd been to that camp, right?

*Cali King:*      Right, so we never camped in that specific location before.

*Cooper:*      Is it the first time you'd been on the Rock Creek trail?

*Cali King:*      No.

*Cooper:*      How many times had you been out there before?

*Cali King:*      I'd been out there once before.

*Cooper:*      And was that at the other camp?  The one that was west of where you settled this time?

*Cali King:*      I did see that camp, it was a day trip when I went before so we didn't actually camp at that location.

*Cooper:*      Oh okay.  Was that also a hunting trip with your father?

*Cali King:*      A 6-wheeler had broken down up there, of ours, he needed assistance in repairing it and that's what I went out for.

*Cooper:*      Oh, I see, okay.  So now you described the scene there, apparently, from the camp and observed your father's movements during his stalk of the particular moose, the one he eventually got, is that right?

*Cali King:*      I was not sitting at our camp while I was observing my father, no.

*Cooper:*      Oh, where were you then?

*Cali King:*      I was farther down the ridge, we travelled back towards the way we came in.

*Cooper:*      Oh, okay so you were more in that direction, okay.

*Cali King:*      Farther to the left if you're facing the valley from our camp.

*Cooper:*        Would you say you were anywhere near the place where those bones had been dropped on your way out?

*Cali King:*        I was relatively—I was probably about halfway between our camp and where the bones were when they were dropped, yeah.

*Cooper:*        Maybe as much as a half a mile then from camp—

*Cali King:*        Yeah, could have been.

*Cooper:*        Assuming it's about a mile between the camp and the bone pile.

*Cali King:*        I don't know those figures.

*Cooper:*        Okay, alright.  So from that point anyway, you were able to see the moose most of the time?

*Cali King:*        Yeah, a majority of the time.  It was easier to see him than my father.  Obviously he's taller and his antlers were white, it was easier to spot him:

*Cooper:*        Sure.  Now I'm trying to see if I've got it right.  Correct me if I'm wrong but you saw this moose on the downslope that slopes away from the ridge down towards the creek and you saw your father going down after it?

*Cali King:*        Right, so the moose was nearer to the bottom where the cow was down there and he—I couldn't see him while he was going down the hill—I only saw him once he appeared at the bottom because of the angle of the slope, I couldn't see him in the brush until he reached the bottom.

*Cooper:*        Your father or the moose?

*Cali King:*        My father.

*Cooper:*        Yeah, okay, but you did see the moose and you knew—you saw your father start out to go after it, I guess, right?

*Cali King:*        Yes.

*Cooper:*        Did you have any conversation with him about that before he left?  Did he say anything like, you see that moose, I'm going to try to go after it or something?

*Cali King:*        Yeah we decided that after discussing that we had seen the moose well, we thought was too close to the park boundary that this one

was well enough away that it was legitimate hunt so we decided that that would be a good challenge.

*Cooper:* Okay. That was based on the conclusion that the boundary followed the creek as it comes up from your right, followed the creek, until it got to where that little low ridge was, then it went up on the top of that ridge and went along that ridge?

*Cali King:* Essentially, yes.

*Cooper:* So it's closer to you than the creek was at that point, right?

*Cali King:* Yes, yes.

*Cooper:* So in other words the creek was on the other side of that ridge, right?

*Cali King:* Yes.

*Cooper:* May I approach to look at the exhibit, Your Honor?

*Judge:* Yes. We'll go to about a quarter after and then we'll take a lunch break.

*Cooper:* Sure. Okay. Wonder if I might have the witness exactly the ridge—

*Judge:* Are you standing in front of a mike?

*Cooper:* I'll try to get this one. If I might have the witness identify which ridge is being identified as where the boundary of the park went?

*Angstman:* May I approach Your Honor? Could I ask that—

*Judge:* Yes, you can repeat the answer.

*Cali King:* Yes, this is the ridge here.

*Angstman:* Okay, thank you.

*Cooper:* She's indicating the one that's green all the way across, with a little bald spot, maybe about the center? Is that the one?

*Cali King:* No that looks like it's back behind but the low ridge that you're referring to nothing is in the back here and the creek is going back behind.

*Cooper:* Creek goes behind it— and the other ridges we're looking at are all partly bald, is that right?

Case 4:08-cr-00008-JDR    Document 43-3    Filed 09/13/08    Page 16 of 118

*Cali King:*   Yes.

*Cooper:*   Or this is all green?

*Cali King:*   Yeah.

*Cooper:*   Alright.

*Judge:*   And that's exhibit U?

*Cooper:*   U, yes.

*Clerk:*   Ms. King if you could pull that microphone so it's—thank you.

*Cooper:*   Now your testimony is that your father also believed that to be the location?

*Cali King:*   Yes.

*Cooper:*   And excuse me—and that was the—as far as you and he were concerned that was believed to be the boundary, is that right?

*Cali King:*   Yes because my dad had been out there several years before with his, with several other hunters.  That was the commonly known area of the boundary, yes.

*Cooper:*   And were you going to say with his GPS?

*Cali King:*   His—yeah his, yeah they've been out there with GPS before although—yes, yeah.

*Cooper:*   And did he—is that what he told you?  That he had been out there before with a GPS and knew that that's where the boundary was?

*Cali King:*   That—I don't remember him telling me that specifically, I just assumed that him being out there before that he knew very well where the boundary was.  I didn't question how he knew.

*Cooper:*   How he knew.  So you're not sure whether he had a GPS on that previous occasion or not?

*Cali King:*   I don't know that he didn't know.

*Cooper:*   In other words he didn't say I've been out there—he didn't tell you that I've been out there before and I had a GPS or my buddy did and we know—

*Cali King:*   No I didn't ask and he didn't volunteer any information.

*Cooper:*  Did you ever hear him say that to anyone else?  That he had been out there before and had a GPS.

*Cali King:*  I don't know what circumstance that would have come up in that I would have overheard that.

*Cooper:*  You don't recall it?

*Cali King:*  No.

*Cooper:*  Okay, did he have a GPS on this trip?

*Cali King:*  Nope.

*Cooper:*  Did not have one?

*Cali King:*  Not that I'm aware of.  He may have in his bag, I never saw one.

*Judge:*  We've reached a quarter after time, so we'll recess this case until about 1 o'clock and again you can leave items here.

*Cooper:*  Very well, Your Honor.  Thank you, Your Honor, I was going to ask that.

*Clerk:*  All rise.  This matter stands in recess until 1pm.

*Clerk:*  All rise.  This honor of the court, this United States District Court is again in session, please be seated.

*Judge*:  Alright, you were conducting examination of a witness, Mr. Cooper.

*Cooper:*  Yes, Your Honor.

*Judge:*  You ready to continue that examination?  Alright Cali King if you'll return to the witness chair.  You're still under oath, consider your testimony as such.

*Cooper:*  Okay I'd like to call your attention to a subject that we were just on about the time we took a break or shortly before that.  And you had pointed out on that picture in front of you there where that greenish ridge is that you believe the boundary to have been over there.  And was it your testimony that you knew it to be there because your dad told you that that's where he knew it to be?

*Cali King:*  Yes.

*Cooper:*      Right. You never saw a boundary marker yourself, you don't believe, do you?

*Cali King:*      No, I never saw any markers of any kind.

*Cooper:*      Okay. And were you aware that he had seen one? Did he indicate to you that he had seen one on that particular trip?

*Cali King:*      Oh, no not on that trip.

*Cooper:*      Oh, okay not on that trip. And when? On some other trip, was it, that he told you he saw one?

*Cali King:*      Yeah I'm assuming it was on another trip out there because he did know where there were a couple but he knew them to be several miles apart.

*Cooper:*      And when was it that he told you this?

*Cali King:*      It may have been after we spoke the trooper and the ranger.

*Cooper:*      Oh, okay so it was on this trip but after that contact probably? Okay. And you were giving some testimony on direct when Mr. Angstman was questioning you and a question arose about somebody pointing in some direction and you weren't sure—

*Cali King:*      Yeah.

*Cooper:*      It ended up that you didn't know which direction he pointed, right?

*Cali King:*      Yeah at the time I was not paying very close attention to which way every person moved at the time so I honestly can say I don't remember which direction they were pointing to because I wasn't paying that close attention at the time.

*Cooper:*      Oh, I see, but you believe that they were—

*Cali King:*      They were gesturing—

*Cooper:*      Pointing to where a marker was or?

*Cali King:*      Yeah that was the discussion.

*Cooper:*      And was your father the one that was pointing to where the marker was?

*Cali King:*      I don't remember that.

*Cooper:*        Don't know that, okay.  And you don't recall hearing that your father spoke to them about where the kill site was?

*Cali King:*        Not that year's kill site.  Past seasons he mentioned where they had gotten mooses before.

*Cooper:*        But not the moose you had in camp at that time?

*Cali King:*        No.

*Cooper:*        And you're sure of that?

*Cali King:*        I'm quite sure, yes.

*Cooper:*        I think your testimony was that you didn't hear him telling them about the location of the kill site of this year's moose, right?

*Cali King:*        Yes.

*Cooper:*        Okay.  Did he ever tell you where this other marker was that he had seen?

*Cali King:*        You mean like I referred to you just a couple minutes ago that he told me that there were 2 that he was aware of within a couple miles?  So, yeah.

*Cooper:*        I'm not sure, did you tell me that?

*Cali King:*        Yes.

*Cooper:*        That he knew of 2 markers?

*Cali King:*        That were a couple miles apart in the area.

*Cooper:*        And where was that? Did he tell you where they were?

*Cali King:*        No.  You couldn't see them from camp anyway so there was no way for to point directly to them.

*Cooper:*        So you didn't see anything from camp and from what he told you there was no marker that he could see from camp, right?

*Cali King:*        No, there was a marker that he said he had some years been able to see if the sun was right, glinting in the bushes somewhere.

*Cooper:*        You don't know where that was?

*Cali King:*        No, I'm sorry.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 20 of 118

*Cooper:*        Did he say he saw it on that trip when you were there?

*Cali King:*     No.

*Cooper:*        Okay.  Did he ever tell you that he had only seen 1 marker?

*Cali King:*     I think I just said that he knew of 2 markers.

*Cooper:*        Right, you did say that.  But I wondered if he ever told you that any other time that he had only seen 1 marker.

*Cali King:*     I don't think we've ever discussed the park boundary every before I was on this trip with him.

*Cooper:*        Before that trip? Okay.  So he told you that he saw 2 markers on some previous trip?

*Cali King:*     Or he knew—I said he knew of 2 markers.

*Cooper:*        Knew of.  Hadn't necessarily seen them?

*Cali King:*     I don't know that for sure.

*Cooper:*        Oh okay, did he know where they were? Did he tell you that?

*Cali King:*     No.

*Cooper:*        I'm sorry?

*Cali King:*     No he did not.

*Cooper:*        Okay and what was the—what was the outcome of that conversation?  That he knew where the boundary was or he didn't know where it was?

*Cali King:*     He was quite certain of where the boundary was having been there in years past and he told me where it was and that was later confirmed by the ranger in our camp, there was no confusion at all about that.

*Cooper:*        So you knew exactly where the boundary was as far as you were concerned?

*Cali King:*     Yes.

*Cooper:*        And that—and from knowing that when you saw this moose drop, you saw that it being shot the second time and being dropped right where it was shot that time—

*Cali King:*        Yes.

*Cooper:*           You knew, in your mind anyway, that that was outside the park because it was outside the area that your father had indicated where the boundary was?

*Cali King:*        Yes.

*Cooper:*           And then when the ranger, you say, confirmed it, I think your testimony was you were comforted by that.

*Cali King:*        Yeah because we knew we were close, I know that whole area is near the boundary and I was very confused why there weren't any markers, for me that was comforting of course.

*Cooper:*           You just said you had no question about it and it was clearly outside the park?  And now you were comforted by it?

*Cali King:*        But he's the ranger for Pete's sake, he knows exactly where the park boundary is.

*Cooper:*           What is it that he told you?  That comforted you like that, what was it?

*Cali King:*        He just pointed to exactly where my father had pointed to and we even described the terrain so there was no confusion and I thought whoa.

*Cooper:*           Now wait a minute, I thought you said you didn't know where your father had pointed.

*Cali King:*        No I didn't ever say that, I said my dad never pointed to the markers and I never knew where the markers that he had referred to in the past were, we didn't see them on that trip.  He knew where the boundary was and he told me where it was—it was exactly where the ranger said it was.

*Cooper:*           But your testimony, both on direct and just a minute ago to me, wasn't it that you couldn't remember which way he pointed when he was telling the rangers where the markers were.

*Cali King:*        No, that's not what I'm referring to.  I'm talking about when I asked my dad when I went out there, where the boundary was. And when he told me—I'm not—you were requesting that I ask— or answer the question with regards to pointing to a boundary marker.  I'm talking about a different situation.  We were talking about where the boundary actually was, not the boundary markers. And I asked the ranger and we discussed where that was and he

pointed to the ridge just as in this photo and as my dad had done when he explained to me where the park boundary was.

*Cooper:*            Oh, okay.

*Cali King:*         They're different situations.

*Cooper:*            Right so when your dad was talking to the rangers about where he had seen a marker that's the part you don't recall where he pointed.

*Cali King:*         Right because—

*Cooper:*            But—

*Cali King:*         Because I might not have even been facing their direction, I could have been making coffee that's something that I was doing.

*Cooper:*            Sure, right.  Understand.  But he did point out to you prior to that before the ranger and the officer got there, but then you're telling us this, is it true that he told you where the boundary was?  He didn't point out a marker to you but he pointed out where he thought the boundary was?

*Cali King:*         That's exactly what I'm saying because once we arrived at camp I wanted to know where it was for myself, he described it.  And it was the next day that we were in camp with the ranger and the trooper  discussing markers.  That I do not have—

*Cooper:*            So did he ever say to you that he had no indication of where that boundary was out there?

*Cali King:*         No.

*Cooper:*            Did he ever say to you that he only knew of 1 boundary marker out there?

*Cali King:*         You already asked me that, I'm pretty sure I said no.

*Cooper:*            Alright.  Do you recall ever hearing him tell anyone else that he had no indication of where the boundary line is out there?  You ever heard him tell that to anyone else?

*Cali King:*         If by indication you mean markers—visible markers, I had never— okay so like I said before we have never discussed the park boundary before I went on this trip and I never overheard him discussing it before we went on this trip.

*Cooper:*            Okay.  And after being on the trip?

*Cali King:* After being on the trip it was discussed because of the current situation that was brought up.

*Cooper:* Did you hear him say after that trip to anyone, I have no indication of where that boundary line was.

*Cali King:* I've heard that he had several indications of where the boundary line was but they just don't all match up.

*Cooper:* You heard him say that to someone?

*Cali King:* Not in those exact words, but yes.

*Cooper:* Okay. Were you present when the same state trooper and park ranger were there for the search warrant?

*Cali King:* No.

*Cooper:* Okay and did you ever hear him since the time of the hunt tell anyone else that he found 1 marker but no more than 1?

*Cali King:* No.

*Cooper:* Okay. Now, you indicated that he didn't have a GPS on that particular trip—

*Cali King:* Not that I was aware of.

*Cooper:* Okay, but did he own a GPS?

*Cali King:* Yes we own—he owns a GPS.

*Cooper:* But whether he brought it on that trip, you saw no indication that he did?

*Cali King:* No.

*Cooper:* Did he bring a compass on that trip?

*Cali King:* I'm not aware of either because he had been out there before, was familiar with the trails and knew where the boundary was because of past experiences and he was travelling with someone else, he wasn't going to need a GPS—this is my speculation, I don't actually know—to navigate through the deep brush which is what it's used for when we go out there.

*Cooper:* What? The GPS or the compass?

*Cali King:* The GPS.

Case 4:08-cr-00008-JDR Document 43-3 Filed 09/13/08 Page 24 of 118

*Cooper:*          GPS.

*Cali King:*       Because in the deep brush that's about the only time that you could get truly lost out there because on the ridge it's very easy to tell which direction is which and there's a trail.

*Cooper:*          Correct.  Understand.  So, did he have a map?

*Cali King:*       We didn't look at a map while we were out there so I don't know if he had one.

*Cooper:*          Oh, okay.  You didn't see one at all at any time? Okay.  So as far as you know no GPS, no compass, no map, that were in use at least?

*Cali King:*       Yes.

*Cooper:*          To your knowledge at least?

*Cali King:*       Not on that trip.

*Cooper:*          On that trip, right.  On previous trips had there been any of those?

*Cali King:*       We had used the GPS when we went out there, the one other time I went out to Rock Creek we had a GPS but my little sister was the one that most frequently travels with him out there.  This was only my second time so I don't know—

*Cooper:*          How many other of the hunting trips that you've been on with him did he take a GPS?

*Cali King:*       I don't know.  I don't know the answer to that.

*Cooper:*          Had he had a GPS on any of the other trips besides the one previous to Rock Creek that you mentioned, if you can recall.

*Cali King:*       I don't remember.

*Cooper:*          That's alright.  And I understand distances are sometimes difficult.  You've indicated that you believed you might have been roughly halfway between the camp and where the bones were eventually dropped off when you observed the stalk of your dad stalking the moose?

*Cali King:*       Right.

*Cooper:*          And correct me if I've got it wrong, did you say you saw the moose for part of the time and then you lost sight of it and then for

|  |  |
|---|---|
|  | the final shot you did see it, it was in the clear where you could see it? |
| *Cali King:* | Yeah so I saw it during the first shot and it went down the slope and into the brush again and it reappeared into the clearing and I saw it again there. |
| *Cooper:* | I see. Okay. Could it have been that you were a little closer to the bone pile eventually was than you were to the camp? I'm trying to figure out where's a good place along that ridge to get a view from— |
| *Cali King:* | Well if I took you out there I could show you where we were but I honestly don't remember how far between— |
| *Cooper:* | Okay. So the moose was—he shot—you don't know whether he hit that moose the first time do you? |
| *Cali King:* | I don't know the moose jumped— |
| *Cooper:* | And ran. |
| *Cali King:* | And ran, so it could have been shot and ran or it could have been startled and ran, I don't know that information. |
| *Cooper:* | So it took off running down— |
| *Cali King:* | Down the hill. |
| *Cooper:* | And out of sight then back into sight again and stopped, apparently. |
| *Cali King:* | Yes. |
| *Cooper:* | It did stop? |
| *Cali King:* | Yes, sir. |
| *Cooper:* | Okay. And when it was hit the second time it fell—it was stopped, it wasn't still running? |
| *Cali King:* | It wasn't running, no. It had come into a clearing and was looking around, so, it was not still running. |
| *Cooper:* | Shot it and it hit the ground, right? |
| *Cali King:* | Yes. |

Case 4:08-cr-00008-JDR    Document 43-3    Filed 09/13/08    Page 26 of 118

*Cooper:*    Okay.  Did you drive that Argo, I think maybe I've got the answer right here—you didn't drive the Argo the whole time when you were out there?

*Cali King:*    Yes I did already answer that.

*Cooper:*    Okay and that means your dad drove it part of the time?

*Cali King:*    Yeah.

*Cooper:*    Would you say 50% of the time? Or?

*Cali King:*    Probably around there, just like I said I don't enjoy being a passenger and he doesn't as much either so we were trying to trade off pretty fairly.

*Cooper:*    Sure, and you're pretty good at it?

*Cali King:*    I wouldn't say that.  I'm sufficient at it.

*Cooper:*    Okay.  Who drove it down to the moose kill site?

*Cali King:*    During my—speaking earlier, I did and I drove it back.

*Cooper:*    So he didn't drive it either way?

*Cali King:*    Because his hands were all bloody and I didn't want him touching the steering wheel that I was using it with my bare hands.

*Cooper:*    And the purpose of driving down there was to get the moose meat and bring it back, right?

*Cali King:*    To pick him up, we gutted the moose, and return to camp.  I don't know who drove it the next day, I don't remember.

*Cooper:*    And it took more than one trip to get all the meat out or did it?

*Cali King:*    Just 1 trip on the second day.

*Cooper:*    Second day? That's—

*Cali King:*    So I'm saying there were 2 trips to the moose—1 the first night after it got shot, we gutted it and the next day we returned for the meat and returned to camp.

*Cooper:*    And who drove that time?

*Cali King:*    That I don't remember.

*Cooper:*        Okay so it could have been either one of you that drove down and drove back?

*Cali King:*     Yeah, except for I mean—yeah reasonably if his hands were bloody I probably would have been the one driving back because the night before that's what I had requested—

*Cooper:*        So you were driving down—

*Cali King:*     I don't remember.

*Cooper:*        Don't recall that— and it was to pick up the rest of the moose meat—in other words you didn't get it all the first load.

*Cali King:*     We didn't bring any back with us the first load.

*Cooper:*        No the first load you just brought him back.

*King:*          We just gutted the moose—

*Cooper:*        Gutted it out, brought him back.

*Cali King:*     And brought him back to camp, we didn't bring anything with us it was dark.

*Cooper:*        Oh, yeah.

*Cali King:*     We didn't want to stay down there.

*Cooper:*        Alright.  But the purpose of taking the Argo down to that kill site was to get the moose meat, right?  And to get him?

*Cali King:*     The reason I went down after he shot the moose was to pick him up and then to continue on to the kill site to gut the moose otherwise it would have rotted.

*Cooper:*        Sure. And then—

*Cali King:*     And then the second day, yes, the reason we went down was to get the meat.

*Cooper:*        And had that just happened shortly before the ranger and the officer got there?

*Cali King:*     Yeah that happened—I recall them coming early afternoon.  I recall us getting up for breakfast and then going down and we did have the moose meat in our camp when they arrived.

*Cooper:*      I believe that's all the questions I have for the witness, Your Honor.

*Judge:*      Redirect?

*Angstman:*      Just a couple questions, Your Honor. If your dad had—first of all let me ask you if you knew the direction from camp, the kill site was when the ranger was there—

*Cali King:*      Yes.

*Angstman:*      If your dad had misled or tried to fool the ranger on what direction the kill site was from camp, would you have noted that? Would that be something that you would have noticed?

*Cali King:*      Yes.

*Angstman:*      And would you remember it today?

*Cali King:*      Yes.

*Angstman:*      And why would you have remembered it today?

*Cali King:*      Because as most parents do—my parents taught us not to lie and therefore if he were lying I would definitely remember I would have called him on it.

*Judge:*      Re-cross ___?

*Cooper:*      Just briefly, Your Honor. You just testified that you were not looking at him when he pointed in the direction so you don't know when he pointed, how would you have known?

*Cali King:*      Right so if I had turned around and they had been discussing it, then yeah, if I had seen—he asked if I had seen them misleading them then if I would have noticed and I would have—now I'm telling you that if they were gesturing directions and talking about markers then I probably wouldn't remember it. If my dad has gestured a direction that was the wrong direction and claimed that's where he shot the moose, I would definitely remember that.

*Cooper:*      Even if you hadn't seen it?

*Angstman:*      Your Honor, there's a confusion here. He's talking about 2 separate incidents. I only inquired on redirect about the incident, the alleged incident of pointing to a kill site. She has never testified that such an incident occurred so he is confusing her by asking her questions about another incident, the direction that was

Case 4:08-cr-00008-JDR    Document 43-3    Filed 09/13/08    Page 29 of 118

pointed when they were discussing some trail markers, some boundary markers somewhere.

*Judge:*        Well it should be limited to the kill site for re-cross, but you may ask questions—

*Cooper:*       Alright, my understanding is, she's testifying, you testified that you didn't observe or hear him saying anything about where the kill site was.

*Cali King:*    Right.  So what I'm saying is if he had and had misled someone, I would definitely remember that.

*Cooper:*       If you had heard it or seen it.

*Cali King:*    But—

*Cooper:*       But you didn't.

*Cali King:*    But they are separate instances.

*Cooper:*       But you didn't hear or see any such thing.

*Cali King:*    I never remembered the rangers asking where our current kill site was—

*Cooper:*       You have no recollection of that—

*Cali King:*    But if they had and—we were all in a 10 foot square area, it's not like I wouldn't have heard what was going on.  If they had asked I probably would have heard it and I would have looked at my dad.  Had he gestured in the wrong direction I would definitely have remembered that and would have called him on it.

*Cooper:*       Are you saying that they didn't ask where the kill site was?

*Cali King:*    I don't remember them asking that.

*Cooper:*       That's what I think your testimony was before.

*Cali King:*    Yes.

*Cooper:*       That's all I have.

*Judge*:        You may step down.

*Angstman:*     Your Honor, the U.S. Attorney has kindly agreed that Mr. King's daughter can stay in the room now that she's testified.  Is that alright with the court?

| | |
|---|---|
| *Judge:* | Yes. |
| *Angstman:* | And we'll call Mr. King. |
| *Clerk:* | Sir do you solemnly swear that the testimony you are about to give is the truth, the whole truth, and nothing but the truth so help you God? |
| *Jeff King:* | I do. |
| *Clerk:* | Thank you, please have a seat. And, sir, for the record could you state your full name, spelling your last and give your city and state of residence. |
| *Jeff King:* | Jeff King, K-I-N-G, Denali Park, Alaska. |
| *Angstman:* | Mr. King, of course you've been present throughout these proceedings I don't have to introduce what we're doing here for you, but I do want to introduce you to the court. How long have you lived in Alaska? |
| *Jeff King:* | Since 1975. |
| *Angstman:* | And has that been in the Denali Park area most of the time? |
| *Jeff King:* | The entire time. |
| *Angstman:* | And what kind of occupation do you have? |
| *Jeff King:* | I've had several occupations in the Denali Area from changing beds at the park hotel in 1975 to a general contractor through the 80s, early 90s, I've always had a passion for the outdoors and dogmushing and got good at it and my career now has been revolving around owning and racing sled dogs and sharing them through a family business in the Denali area. |
| *Angstman:* | Besides yourself, which of your family members take part in that business? |
| *Jeff King:* | All 3 daughters and my wife. |
| *Angstman:* | Can you tell the court about your educational background? |
| *Jeff King:* | If you mean a formal education, I graduated from high school, went on to a junior college in Northern California, I was on my summer vacation from my freshman year of college when I came to Alaska. |

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 31 of 118

*Angstman:*     And you never went home?

*Jeff King:*     Not yet.

*Angstman:*     Okay.  There's always time.  Have you been an outdoors person in regards to hunting and fishing as well as in dog-related activities?

*Jeff King:*     Yeah ever since I was a small boy in California I have been an avid hunter, trapper, and fisherman.

*Angstman:*     Okay and have you continued that in the Denali area?

*Jeff King:*     Yes.

*Angstman:*     Alright did that start in 75 or 6 ____?

*Jeff King:*     One doesn't just start or stop this, it's a way of—it's how you spend your spare time.  I remember my first summer in Alaska, every weekend, being on the Denali highway with a canoe, packing it in to go lake trout fishing.

*Angstman:*     Okay when did you first go to the Rock Creek area and hunt?

*Jeff King:*     I was a landowner in Rock Creek.  The first piece of property I bought at Denali was from the Rock Creek Subdivision.  I bought a piece of property there and built a log cabin on it, I'm quite sure it was the 1977, but I had—so and I ran a trapline there, short, and I hunted in that region as well, that was what motivated me every day.  I was single, my dog team was my family and the outdoors was my lover.

*Angstman:*     Okay and did you continue through the years from that time until this year, have you continued to hunt the Rock Creek area at least on regular intervals?

*Jeff King:*     I don't know what a regular interval is.  My dogracing career is my family business, and raising a family, some years I've been way more avid and made more time than others.

*Angstman:*     But you have gone there throughout the years?

*Jeff King:*     Throughout the years.

*Angstman:*     Alright.  Let's turn our attention to the hunting trip that brings us here to this courtroom if we could.  Your daughter testified that the two of you planned to hunt on the Rock Creek trail or near it in September, a year ago, she's accurate about that I assume?

*Jeff King:*     Yes.

*Angstman:*     Alright tell me what your plan was before you left home.

*Jeff King:*     Well it's not every day I get my daughters to agree to make time to go hunting with me.  This is very much a bonding experience.  It's clear that of the 3, 1 is more of a hunter than Cali and one less but I was thrilled that she wanted to go with me, she was about to head back to college.  I knew that this trip needed to be not too unfun, by going deeper into a bog or a mosquito-ridden area that other places, quite frankly, our youngest daughter thrives while accompanying me.

*Angstman:*     So you picked Rock Creek then for what reason?  Is it comfortable there to hunt?

*Angstman:*     Well there's several reasons.  Mainly, my—the man who most recently introduced me to the spot since a man whose family has daughters of similar ages, Lynn Thompson and his family—his whole family—would go out there, he hunted that area in the mid-90s, the early 90s I believe.  My time there, prior, was in 1977, 1978 I moved down closer to the Denali Area to a piece of property I have lived ever since.

So there was a big span between the years I avidly hunted the Rock Creek area because of the proximity to my new home.  But when Lynn Thompson and his family invited my daughter and I to accompany him, I jumped at the chance.  He was the person who originated the camp site that Cali and I were headed back to on this time.  We had camped there many years with my youngest daughter and his entire family.  We had bagged several moose.  A couple of years we were unsuccessful.

When I say we bagged a moose I mean either he or I shot a moose successfully, often it took more than 1 trip out there because the kids had something they needed to get back into Healy for or your need more ice pops—you know they had forts there, tree forts—so the only other time I recall Cali being there before this time was one of our earlier trips when our youngest daughter was quite small, we bagged a moose on the north side of the area where Mr. Leonard indicated to the north you can't see very far, he's accurate about that, at our campsite, however the other campsite you can see dramatically to the north and we—and she went out there to help me retrieve an ATV.

*Angstman:*     Okay, let's focus on the question, Mr. King, though.  Why did you want to take her there this time?

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 33 of 118

*Jeff King:* She was just days away from leaving to college, it's an absolutely spectacular spot, the weather was good, she got time off from work from her parents to go and she was willing to go and I wasn't about to miss it.

*Angstman:* Okay. Is this a hunting spot that's, you know, 1 of dozens you have or is it 1 of a very few that you go to on a regular basis?

*Jeff King:* It is only 1 of 2 that since I've been a parent I have repeatedly gone to and the other one is an absolute march that takes more than hours to get there, more likely 2 days and it actually ends up in the same area but we take off from the Rex Trail, go out and cross the Teklanika and come back south—

*Angstman:* Okay tell me about the trip in then, how did you travel from your home to the camp site?

*Jeff King:* We loaded an Argo on the trailer, we had camp supplies—Cali took care of the gear, I took care of the things I would need in the event of successful hunting and we drove to the pullout or up onto the power line that Mr. Leonard has referred to, depending on the year I don't remember whether we parked on the highway or in the brush, loaded up and had an uneventful—and it's very noteworthy to say it was uneventful because this trail is not easy and more times than not some events occur just getting through the bogs in the lower portion and so we got off to a great start, it was a beautiful night.

We were disappointed when we found somebody in my camp, but as disappointed as I was, it wasn't anyone I knew. They did hem and haw, offer to leave and, "Oh, this is your firewood and your tent frame?" and I go, "Yeah, I've been here for years but, you know, it's a beautiful night, we got a pop-up tent, we're going to go back up the trail."

*Angstman:* Okay and you picked a spot that's been discussed by the ranger and by your daughter, I take it?

*Jeff King:* Yes.

*Angstman:* Is that the spot that's pictured on the exhibit right next to you right now and I can't see the exhibit number but you can.

*Jeff King:* This one?

*Angstman:* Yeah.

*Jeff King:*        I don't believe so, this is from the spot where we spotted the moose.  Our campsite was down the ridge further.

*Angstman:*        Okay.  Did you go hunting that day?

*Jeff King:*        We did.  We set up camp, I recall taking a nap, Cali taking lots of pictures, pictures you directed me not to share because they were family photos of mountains and her and I eating some ores around a little campfire in a pan, I suspect Mr. Leonard remembers.  We drove up the—up the ridge, we didn't want to go down the ridge because there's people down there.  The reason Lynn Thompson never goes there anymore is because of the number of people there, he's a way more avid hunter than me and he had declined to go anymore and he said you know we had been there a couple years before when he said you know I've had it, there's 4-wheelers all over the place I don't want to stay here.

*Angstman:*        Okay.  Did you quickly find a moose?

*Jeff King:*        We did find the moose incredibly quickly.

*Angstman:*        And what did you do with the moose—tell me how the hunt developed.

*Jeff King:*        Well it was really disappointing—exciting because it had great— the place we set our camp, this whole ridge we've called the honey hole.  Many moose have been taken here by my family and by Lynn Thompson's family.  Commonly referred the honey hole—it is stretches over about a mile, couple miles.  We spotted a moose that was outside the honey hole on the edge of this ridge, I can point exactly to where I saw this moose.

*Angstman:*        Okay, re-repoint for the prosecutor please.  Alright and what was that, a bull or a cow?

*Jeff King:*        It was a bull.

*Angstman:*        Is it bull season?  Was that an animal you were going to go after?

*Jeff King:*        No.

*Angstman:*        And how come?

*Jeff King:*        Because it was too close to my clear understanding where the park boundary was.

*Angstman:*        Okay we'll get into that in awhile as why that was your clear understanding.  Did you see other critters there?

Case 4:08-cr-00008-JDR    Document 43-3    Filed 09/13/08    Page 35 of 118

| | |
|---|---|
| *Jeff King:* | Not at first, but after sitting and watching him and we had spotted him quite quickly, it wasn't horribly long within 10 or 15 minutes I'm guessing of glassing, maybe less, we spotted a cow about half the distance from that moose, in the very lowest part of this—the center of this photograph, stepped out of the willows and was eating.  Now that one's closer and that one isn't in the park, but it's a cow. |
| *Angstman:* | Okay, did you find another bull? |
| *Jeff King:* | Yes, we did.  We sat and watched the 2 for awhile.  I'm pretty sure I even made a few lame moose grunts trying to get the young bull to come towards the cow, didn't work, frustrated but it was—I bet we watched those 2 for 20 minutes, maybe as much as a half an hour before we got a glimpse of a paddle of white to the right in the brush. |
| *Angstman:* | Okay, so then you realized it was a bull?  Alright, did you at that time did you believe both animals were out of the park as you were watching the cow and the bull? |
| *Jeff King:* | Yes. |
| *Angstman:* | So did you make a plan to go shoot that bull? |
| *Jeff King:* | Not before I asked Cali to sit and watch.  I wanted to get my spotting scope to familiarize myself with the animals and the area, they didn't appear to be going anywhere, I got in my Argo, went back to the camp which was very close, I had not brought the spotting scope with me.  I brought it back, set it up, and tried to scope that moose. |
| *Angstman:* | Okay and after that did you decide to try to hunt that moose? |
| *Jeff King:* | We talked about it a lot but the only consideration we had was not at all to be worried about where it was but the time of day.  The sun was going down, we hadn't even left home until noon, we set up camp at 4:30 or 5, had dinner, took a nap—this is probably 7, 8 o'clock at night.  We just went for a little evening stroll, which is why I didn't have my spotting scope but this was too good to be true—to find a moose the first night, I thought let's go look at it, so when we came back, I watched it, saw it, it appeared to be attracted to the cow.  They kind of went towards each other, and I told Cali, you know, I think I'd be a fool not to go after this moose tonight, and that's when I left. |
| *Angstman:* | Okay, you walked down the hill towards it, I take it? |

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 36 of 118

| | |
|---|---|
| *Jeff King:* | There's a couple of benches there, Mr. Leonard referred to them as well.  They're very small, maybe 20 yards wide, flat, and then dips again in very heavy brush.  It is amazing how things disappear when you step in this brush. |
| Attorney: | Okay, did you eventually spot the moose down the ridge a ways? |
| *Jeff King:* | Yes. |
| *Angstman:* | And did you shoot at it? |
| *Jeff King:* | Yes. |
| *Angstman:* | Okay and at the time you shot at it, how far away was it? |
| *Jeff King:* | I'm a pretty conservative shooter, not known for being a great shot, Lynn will attest to that as I emptied my gun a couple times at a moose we both shot at in the previous year.  It was probably about 125 yards. |
| *Angstman:* | Alright and what happened after you shot? |
| *Jeff King:* | He disappeared, was not a very clear shot of the whole body, there was brush everywhere, but I had a solid shot, I leaned on a little tree, I'd been there since and it disappeared, I followed it the way it disappeared which was—it was coming from the right to the left, I was moving more from the center slightly to the right but basically downhill. |
| *Angstman:* | Okay and so it went downhill and you went downhill after the first shot? |
| *Jeff King:* | That's correct. |
| *Angstman:* | And how long of a time did you travel before you encountered the moose again? |
| *Jeff King:* | Avid hunter or not, I still get excited.  It's hard to imagine the time, I know that I had to relocate, my best guess would be a minute, maybe two. |
| *Angstman:* | Okay and during that time were you able to see the moose any of the time? |
| *Jeff King:* | No.  I mean I was searching—from getting a clear view through the brush again and I was very worried that I was not going to get to see it again but—and when I did see it again, it had stopped, it did exactly what Cali said it turned and looked like where the noise |

had come from and where the noise was coming.  I shot again.  It lunged, but it appeared to me—even though it immediately disappeared from sight—I could see it lunge but it disappeared instantly.  The lunge really made me think I walloped him.

*Angstman:*  Okay and did you eventually then go to where the moose was?

*Jeff King:*  That's correct.

*Angstman:*  And did you find a dead moose?

*Jeff King:*  I did.

*Angstman:*  And we've heard that you _____ that night in terms of gutting it, is that an accurate report?

*Jeff King:*  Yes it is.

*Angstman:*  And did you travel back to camp, then?

*Jeff King:*  Yes, we did.

*Angstman:*  And the next day, we've heard, that you quartered and completed the butchering process, is that an accurate report?

*Jeff King:*  Yes.

*Angstman:*  And then back to camp with the butchered animal, is that accurate?

*Jeff King:*  Yes.

*Angstman:*  Okay let's get then to the arrival of officers in your camp, you remember when they came of course?

*Jeff King:*  Yes.

*Angstman:*  Describe the conversations that you had with the officers when they got to your camp?

*Jeff King:*  You know, it has been a long time, I do recall welcoming them—I recall Mr. Leonard and the trooper introducing themselves, and for the request for me—probably some indication that ohh you've got a moose and I go yeah, we did.  So they were acknowledging the moose was right there, pretty proud of myself actually, it had been very good hunt.  Then they asked for my validation ticket and I thought crap, I know I hadn't chipped out the little thing, I can tell you in all the years I've been in Alaska it was the first time I had ever seen a wildlife officer in the woods and I've always done my

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 38 of 118

tag but in fact by trooper Lowy's acknowledgement, it's not particularly uncommon to be covered in blood and not have that be the first thing, regardless of the fact he chose to say please do that now and I recall, I don't remember maybe something to make me remember that who said what, but I know that I was frustrated people were in my camp, 4-wheelers going around, was very happy about the moose, but I'm sure that I mentioned that I was not very impressed with the park marks the boundary and that this gets really tough and where do you think it is, Ranger Lowy, or Leonard? I remembered, what a great opportunity, he's here.

*Angstman:*      Did he inform you where he thought the boundaries where?

*Jeff King:*      We had discussions—several sentences, I mentioned the 1 nearby marker and judge I'd like to point out what I felt was misrepresented among other things is that—

*Judge:*      Why don't you wait until the next question unless it responds to the last question?

*Angstman:*      Is this a response to my question?

*Jeff King:*      Yes it is. The marker that is in close proximity to our camp I have seen. I do know of a second marker, it is several miles away and I know that I recall clearly speaking about them. The second marker, 5 miles away, the trail goes right next to it.

*Angstman:*      Okay and do you remember pointing to any marker at all?

*Jeff King:*      Absolutely.

*Angstman:*      And which one did you point to?

*Jeff King:*      To the one to the southwest that is we occasionally see glimmer in the sun.

*Angstman:*      Okay and that's a visible—at least potentially visible from where you camped that night?

*Jeff King:*      Yes.

*Angstman:*      You've seen it from that area but you didn't see it that night?

*Jeff King:*      You rarely see it and I've never gone to it. I have no interest in going right up to a park marker or a suspected park marker. But to see something bright and silver, after having seen one exactly alongside the trail in another area I knew what to look for from a distance, it's a large, silver triangle.

*Angstman:*    Okay, now how about the ridge that I'm pointing to in the exhibit next to you there, was that ever discussed with regard to the boundary of the park with Officer Leonard?

*Jeff King:*    Mr. Leonard and the trooper had just come from that direction, the markers that I have seen are to the southwest and to the west, one 5 miles away, one fairly close. Absolutely no way to see between them, therefore I have been quoted as saying there's only 1 marker meaning there's only 1 marker within any reasonable distance for me to make a line to confirm the local lore that has it going over that ridge. I pointed, I know that Mr. Leonard has mentioned it in his testimony, as have I will repeat we pointed to this ridge, he acknowledged—my perception was he acknowledged that yeah, well, okay there's one more thing that makes us believe that that's the ridge ___ was easier to really be sure.

*Angstman:*    Okay. Had others besides Officer Leonard, hunting partners, or anyone advised you that they thought the ridge was the boundary, Lynn Thompson for instance?

*Jeff King:*    I don't remember that, no.

*Angstman:*    Okay, had you ever gone through the area with a GPS and tried to pick out landmarks that you could later use based on what you thought the boundary was at that time?

*Jeff King:*    I accompanied Lynn, he is further to the west, we had hunted the early years with the kids, we typically went the other direction because there's foliage that way, coming back up, getting forced out of my camp up the other way, you pretty quickly run out of moose turf, however it's been very good turf but I have never operated the GPS for coordinates to try to find the park boundary. I have accompanied a long time friend and hunter who has and we have shared information.

*Angstman:*    Okay. After you talked about where the boundaries were with the officers, was there discussion of where the kill site was?

*Jeff King:*    No.

*Angstman:*    Did they ask you where the kill site was?

*Jeff King:*    There's no way that I would not remember.

*Angstman:*    And did you tell them where your kill site was?

*Jeff King:*    No.

*Angstman:*     Is that a common thing, to discuss just in a campsite setting, hey where'd you kill your moose?

*Jeff King:*    That's the last thing I want to tell anybody unless they ask.

*Angstman:*     Is that common in hunter's camps, as far as you know?

*Jeff King:*    I know that Lynn Thompson wouldn't tell me where he was hunting sheep last week.

*Angstman:*     Okay.  When the officer was there, was your moose in camp?

*Jeff King:*    Yes.

*Angstman:*     All the parts of the moose?

*Jeff King:*    All the salvageable human consumption meat was in camp.

*Angstman:*     And did you eventually bone out that meat in camp?

*Jeff King:*    Yes.

*Angstman:*     And what'd you do with the bones?

*Jeff King:*    We loaded them in the Argo, went back up to the ridge, as close to the kill site as possible to the least steep bank that made it reasonable to drive down.  And we also were interested because we had watched while boning the moose, for several hours, a large, dark grizzly bear, distant on the other side of our vantage point. We watched him and it reminded just how wild the country is.

*Angstman:*     Okay and what was the reason that you unloaded these bones away from your camp?

*Jeff King:*    To keep bears out of camp and to the possibility of another one of my daughter's being willing to go hunting with dad.  This was very early in the season and I wasn't sure Ellen wouldn't want to go with me and I wanted to make sure that I had a clean camp and had no chance that I had spoiled a wonderful spot by leaving bones there.

*Angstman:*     Okay you travelled then out of the park, out of the area when you were done hunting and done boning your meat, you went home?

*Jeff King:*    Yes, we spent one more night.  Both of us were having a blast and we chose to not try to hurry but in fact spend another night and go out the following morning.

*Angstman:*  Alright when's the next time you heard anything from anyone concerning this case after you left the hunting area?

*Jeff King:*  Police report, the day they came for a search warrant is the day that I first—anything else happened.

*Angstman:*  Okay and we've heard the transcript of that so I won't ask you what was said because the court has a copy of what was said.  I will ask you just a couple things that were not said.  If they not had a search warrant, would you have given them the moose meat?

*Jeff King:*  Absolutely.

*Angstman:*  And if they would have asked would you have given them your GPS?

*Jeff King:*  Absolutely.

*Angstman:*  Would they have had to tear your house apart to get it?

*Jeff King:*  No.

*Angstman:*  And the Argo, was that there at the camp, at your house, would you have showed it to them if they'd asked?

*Jeff King:*  Absolutely.

*Angstman:*  Okay for the most part on the tape you sound relatively cooperative.  At the end you sound perhaps a little worked up, is that—at that point were you worked up?

*Jeff King:*  Absolutely.

*Angstman:*  Okay, I'm going to go through a series of exhibits now and the goal here will be for you to identify them as to where they came from so the court can determine if it's something that the court can look at as evidence. Judge if I might approach Your Honor?

*Judge:*  You may.

*Angstman:*  So what you've got in front of you right now is—

*Judge:*  That's U.

*Angstman:*  U.  And, you recognize what that was and when it was taken?  You don't have to have exact dates but—

| | |
|---|---|
| *Jeff King:* | This is when you accompanied me to the site as I had began investigating, trying to develop this, a defense to these charges and I had you point to the ridge that the ranger Leonard and I had both pointed to but from a different spot, that's what that picture is. |
| *Angstman:* | Okay, now is this before—excuse me? |
| *Clerk:* | Mike? |
| *Angstman:* | I need to follow the rules here too.  Was that before or after you had discovered that there was a silver marker on top of that ridge? |
| *Jeff King:* | This is before that. |
| *Angstman:* | Okay but can you testify whether I'm pointing generally at where that silver marker is? |
| *Jeff King:* | Almost exactly. |
| *Angstman:* | Alright and does this accurately represent the area that's depicted on there, at least generally so from the way it was during the time that you hunted there, understanding it was a different time of year. |
| *Jeff King:* | Yes. |
| *Angstman:* | We'll move for the admission of U, Your Honor. |
| *Cooper:* | No objection to U, Your Honor. |
| *Judge:* | This is noted. |
| *Angstman:* | Okay I will approach with X if I may, Your Honor? |
| *Judge:* | Yes. |
| *Angstman:* | And this is exhibit X, can you tell me what you see on that? |
| *Jeff King:* | That is a steel pipe in the grounded, painted orange at the top. |
| *Angstman:* | Who took the picture? |
| *Jeff King:* | I did. |
| *Angstman:* | And where did you take that picture? |
| *Jeff King:* | At a trail out of Cantwell, just outside of the Cantwell Community. |
| *Angstman:* | Was that picture taken in anticipation of this trial, sometime in the last couple months? |

Case 4:08-cr-00008-JDR      Document 43-3      Filed 09/13/08      Page 43 of 118

*Jeff King:*    Yes it was.

*Angstman:*    And does it accurately reflect what you say when you went there and looked for markers on the park boundary?

*Jeff King:*    Exactly.

*Angstman:*    And that was you understood to be the park boundary?

*Jeff King:*    Yes, right behind it there's some markers that have that written on it.

*Angstman:*    Okay we'll move for the admission of X, Your Honor.

*Cooper:*    I don't see its relevance, Your Honor.

*Angstman:*    Your Honor it's a demonstration of how the park service does mark its boundaries in some areas and the reasonableness of doing so—

*Judge:*    That may be but it doesn't speak for itself, so far it's painted orange, steel pipe, picture taken, trail out of Cantwell, it's all noted.

*Angstman:*    Okay and pertaining—were there other markers in the very close vicinity of that that identified where you were and what you were doing?

*Jeff King:*    Yes this is a close-up picture of that marker.  There are 2 orange markers nailed within 15 feet on each side of it that say Denali National Park Boundary.

*Angstman:*    Re-move for admission, Your Honor?

*Cooper:*    Well the picture—the evidence is the park signs, not this Your Honor.  And it still—

*Jeff King:*    This was put in by the park, so I'm told.

*Cooper:*    It's far away from the area in question, I don't see a significant relevance Your Honor.

*Angstman:*    The relevance is Your Honor—the question is whether or not it's feasible to mark a trail, one of the questions in this case—

*Clerk:*    Sir, you need to either be—

| | |
|---|---|
| *Angstman:* | Was it feasible to mark a trail—boundary in such a way that it's visible easily visible by travelers in the area.  This is a scheme that the park has used, an apparently successful Mr. King was able to find the boundary in that area and take a picture of it and the court ought to be able to look at the fact that the park not only is able to but chooses to mark the boundary in areas where people may come into contact with the boundary, I think it's very relevant to our notice issue. |
| *Judge:* | I'd like to see the exhibit before I rule upon it. |
| *Cooper:* | I have further comment on that Your Honor. |
| *Judge:* | I'm sorry, I didn't hear you. |
| *Cooper:* | I have further comment on that. |
| *Judge:* | Go ahead. |
| *Cooper:* | It's a different kind of country as well that's not—as far as any indication in the picture itself is concerned, that's not a boundary the park put in.  If the park nailed a park sign to a tree where a trail crosses into the park near Cantwell, that's one thing.  But if you're in relatively treeless country and the trail doesn't cross over in park boundary into the park, where is the park supposed to put up a sign and certainly that pipe is not evidence of the park having used that means of marking anything similar to the area in this case. |
| *Judge:* | What I'm going to do is let the testimony stand but not the exhibit come in.  I don't think there's any real question about being able to put up a sign, it's a question of a particular location what the sign is supposed to do note where it's this is generally park area or whether this is the boundary of the park.  Anyway, that's my ruling at this point. |
| *Angstman:* | Thank you.  We'll approach with W with the court's permission. |
| *Judge:* | Yes. |
| *Angstman:* | I'll ask you if you recognize W? |
| *Jeff King:* | I do. |
| *Angstman:* | And what is that? |
| *Jeff King:* | That is 1 of several signs along the Rock Creek Trail that Wayne Velco uses to mark his trap line. |

*Angstman:*     Okay, you heard the testimony of the ranger that people destroy or somehow deface park signs as soon as or shortly after they're put up.  Have you seen this marker there for a period of years?

*Jeff King:*     Yes.  I've never not seen them.

*Angstman:*     Okay, how far in the trail is this?  The Rock Creek Trail?  How far in from the road, roughly?

*Jeff King:*     The very first one is right at the beginning, right when you leave the power line, the parking area, is the first one and as you proceed down the trail you will run into many more.

*Angstman:*     Okay so this is just 1 of many?

*Jeff King:*     Yes.

*Angstman:*     And does it appear to be defaced?

*Jeff King:*     No.

*Angstman:*     I believe the ranger testified that he saw this on the way into the Rock Creek Trail, on the Rock Creek Trail as well, didn't he?

*Jeff King:*     I did hear that.

*Angstman:*     We'll move for admission of that exhibit, Your Honor.

*Cooper:*     Again, Your Honor, that's not relevant to the hunting site in question.  It's not a park sign, it's in timbered area versus the open area where the camp and hunting took place in this case.  It's nailed onto a tree.  There's significant differences between that sign and whatever the park could use in the area in question.  It has no relationship to what the park might be able to do to notify people of the location of the boundary where this hunt took place?

*Judge:*     May I see the exhibit?

*Angstman:*     Yes.

*Judge:*     Alright I understand the government's point about the difference and the question is adequate notice—not what really can be done or what should be done by the park but what was done, whether there was adequate notice of the boundary.  One of the reasons for this being offered that signs survive some time period out in the wilderness and I'll let it in and decide how much weight to give to it.  I understand the differences in that trap line and marking a boundary of the park.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 46 of 118

| | |
|---|---|
| *Angstman:* | If I could approach with CC, Your Honor?  I'm going to withdraw, Your Honor.  But, I will approach with Z, Your Honor.  And what is Z, Mr. King? |
| *Jeff King:* | This is in immediate proximity to the steel pipe that was just recently discussed and it shows 2 boundary markers in the Cantwell area. |
| *Angstman:* | Okay and can you read what's on the marker? |
| *Jeff King:* | U.S. Park Boundary—closed to off-road vehicles and sport hunting. |
| *Angstman:* | Okay, we'll offer this for admission Your Honor and I anticipate an argument, I will just briefly mention that I believe this is important to show what an actual park boundary marker looks like because we have heard testimony in this case that these caps, the metal caps, are park boundaries that don't say anything about national park service in fact, the park service has and utilizes markers that actually do say something about whose property is marked and that's why we offer this. |
| *Judge:* | Mr. Cooper, you seen it? |
| *Cooper:* | I'd like to take another look at it. |
| *Judge:* | And if you'll kindly show it to me. |
| *Cooper:* | Object on the basis of there's no indication that this is—there's no indication of where this is in relation to any trail that may have been used or gone across the boundary at that point.  That's more typically what the evidence shows, where a sign would be used they would use, in fact did use signs on the stampede trail where crossed or was about to cross into the park but to pick a random area along a boundary of many miles of ___ and then put a sign up, that's not quite the same as what we have here.  So, this is not comparable to the situation out there.  It's also nailed to a tree and there's nowhere out there along the boundary that something similar could have been done and combined with the fact that nobody would be likely to cross wherever they might put it up out in the area that Mr. King was hunting in.  Makes it dissimilar to what's being offered here and that's not relevant to the present case. |
| *Judge:* | Any response? |
| *Angstman:* | Yeah I would hope that the marker—mentions it we don't know where it's located—I guess I sincerely hope it's on the boundary, |

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 47 of 118

that would be my hope in this case.  What it displays is that the park service has a method of conveying information, we understand there are geographical differences, but as you can see from the exhibit on the ground there, Your Honor, there are trees in the area and while there may not be one exactly every place where the boundary might be, if you look you can find a place to nail a marker if you try and I will assert too, Your Honor, that the boundary of the national park as represented by the government passes somewhere between the photo taker and the helicopter rotor you see in the middle of the screen, somewhere in there is the boundary and there are enough trees that a trail marker could find a place to nail up a marker.

*Judge:*        The court will admit exhibit C, I think the dissimilarity and the matters will go to the weight to give to it.  We're talking about marking park boundary and the sign purports to be US park boundary, I can see enough of the terrain in the Cantwell area, of course it was a little different than we were talking about here, but I'll let it in.  Z is admitted.

*Angstman:*        Okay the next is a series, Your Honor, and because the arguments, I'm sure, if any will be all similar—this is H—G,H,I,J, and L and if I could approach and pass those to the witness, Your Honor?

*Judge:*        You may.

*Angstman:*        Discuss those—we don't need that.  Look at each of those in order, Mr. King, and just very briefly describe for the court what each one is, identifying them by letter as you talk, please.

*Jeff King:*        Letter L is a closeup of the section marker closest to my kill site while investigating my defense.

*Angstman:*        And is that known as B0014 in other locations?

*Jeff King:*        Yes.

*Angstman:*        And move on to the next one.

*Jeff King:*        Letter G is 2 flags that I put in facing slightly west, northwest.  I climbed a tree outside the marker there, you notice I climbed up there, put some flags on it because I wanted to be able to re-find the spot.  It was an exhaustive search to find it and the 2 stakes are representing where the actual monument is and where the large steel triangle is.

*Angstman:*        Okay, and the next one?

| | |
|---|---|
| *Jeff King:* | H is a different vantage. This one is mostly east, it is extremely similar, just slightly further away than the prosecution's photo of the same spot. The bushes in the background could be seen and it's a demonstration of how difficult this was to see. |
| *Angstman:* | Backing up 1 picture is there a spruce tree nearby the B0014? |
| *Jeff King:* | Yes, I took the time to flag it. |
| *Angstman:* | Have you ever marked a trail? |
| *Jeff King:* | I most certainly have. |
| *Angstman:* | Could you find a place on that spruce tree to put a boundary marker if asked? |
| *Jeff King:* | I did. |
| *Angstman*: | Well—one of the park services official or—could you also find a place for that if asked? |
| *Jeff King:* | Yes. |
| *Angstman:* | Okay, on to the next picture please. |
| *Jeff King:* | J is a closer picture yet in proximity to the aluminum marker and the section corner. |
| *Angstman:* | The next one? |
| *Jeff King:* | I is how close I needed to get to see the large, aluminum triangle at all. This picture was taken just at just a couple of feet. |
| *Angstman:* | And do you have one more, or is that it? |
| *Jeff King:* | H, it is another picture eastward of the same spot. |
| *Angstman:* | Okay and taken as a collection—did you take these pictures? |
| *Jeff King:* | I did. |
| *Angstman:* | And what did you intend to show when you took those pictures? |
| *Jeff King:* | That those are not markers, they are monuments indicating something else, they were not designed to be seen. |
| *Angstman:* | Okay and how long did it take you to find that one marker? |
| *Jeff King:* | It was an all day project. |

*Angstman:*          Okay and when was that?  Was that in anticipation of this trial?

*Jeff King:*          Absolutely.

*Angstman:*          And how long ago?

*Jeff King:*          I believe it was the first of August.

*Angstman:*          Alright, we'll move for admission of that series, Your Honor.

*Cooper:*          I'd like to question the witness on that.

*Judge:*          You may.

*Cooper:*          When you took all day to look for that marker did you use a GPS?

*Jeff King:*          Yes, I did.

*Cooper:*          And did you have the coordinates of where that marker was supposed to have been located?

*Jeff King:*          Yes I did.

*Cooper:*          Where did you get those?

*Jeff King:*          Off of your website.

*Cooper:*          And is your GPS accurate?

*Jeff King:*          I had several readings, none of them were the same but they were all relatively close.

*Cooper:*          What is the error rate on your GPS?

*Jeff King:*          Mr. Cooper the error rate changes depending on the time of day.

*Cooper:*          You don't remember what it was then?

*Jeff King:*          No.

*Cooper:*          You say your testimony is it took you all day to plan this with the GPS—

*Jeff King:*          I started at my house and I returned to my house—it's a long way out there on foot or on a rig.

*Cooper:*          So it didn't take you all day to find it then, did it?

*Jeff King:*          The actual looking for the marker?

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 50 of 118

*Cooper:*　Yes.

*Jeff King:*　From the time I was in the proximity until I found it—hour and a half.

*Cooper:*　Do you mind showing me the one that you say was the one that was 2 feet away and that's how far you had to be to see it for the first time?

*Jeff King:*　I believe it's letter I.

*Cooper:*　Do you know if there was any difference in the foliage between what's in exhibit I and the others that you have there and the way it was on the day that you were out there for the moose hunt?

*Jeff King:*　Sure, it was early September when the moose hunt occurred.  I was here a month early.

*Cooper:*　Right, so the leaves are all green—

*Jeff King:*　Absolutely.

*Cooper:*　And none of them had started to fall yet?

*Jeff King:*　That's correct.

*Cooper:*　So there's going to be a difference between the way that it looked at the time of the hunt and the way it was in those pictures, correct?

*Jeff King:*　That is correct.

*Cooper:*　I have relevancy object on that ground, otherwise that's the extent of the objection.

*Angstman:*　Do you acknowledge that it is very difficult to replicate the foliage situation on the day of your hunt no matter when you went there?

*Jeff King:*　Yeah it strikes me as very unrealistic.

*Angstman:*　And do you think that the judge would be able to understand the difference between a month's time in terms of dropped leaves and what they might do to affect visibility?

*Jeff King:*　Yes.

*Angstman:*　I would move for admission Your Honor, the court can assess that and—

Case 4:08-cr-00008-JDR　　Document 43-3　　Filed 09/13/08　　Page 51 of 118

*Judge:*                    May I see exhibits G through L?

*Angstman:*                 I'll approach with—oh excuse me—

*Judge:*                    Why don't you assess the witness is not expected to have to step down—if you'll get up here and—

*Angstman:*                 Oh I'm sorry—I didn't hear what you said or I would have come up there—

*Judge:*                    That's fine.  Just give me a moment to look at them.  The objection is on relevancy grounds and basically the time of year, the difference in foliage.  That's something that needs to be brought to the attention of the court and I think it can be taken into account by the fact finder in assessing the value of these and the weights and they'll be admitted, G through L.

*Angstman:*                 Your Honor, I took the liberty while I was there of asking Mr. King the next exhibit, which was II, which has not been offered yet and I'm offering it now and I ask—do you have II in front of you, Mr. King?

*Jeff King:*                Yes, I do.

*Angstman:*                 And I'll pass a copy to the court.  What is that?

*Jeff King:*                It is the B0014 marker.

*Angstman:*                 And what's situated on that marker?

*Jeff King:*                It is my handheld GPS.

*Angstman:*                 And is that the one you used that day to find that marker?

*Jeff King:*                Yes.

*Angstman:*                 And did you photograph that marker with information displayed on your GPS?

*Jeff King:*                Yes.

*Angstman:*                 And what is that information?

*Jeff King:*                Elevation—

*Angstman:*                 You can skip the elevation not relevant to our case.

*Jeff King:*                North 63, 44, 321.

*Angstman::*　　　And that is—into the north or a west on that?

*Jeff King:*　　　North.

*Angstman:*　　　OKAY and what's the next one?

*Jeff King:*　　　West 148, 53.64

*Angstman:*　　　And that's the latitude?

*Jeff King:*　　　I don't even know which is called the which.

*Angstman:*　　　Okay now you've compared that, haven't you, with the numbers that show up on the website for that particular marker, B0014?

*Jeff King:*　　　That is correct.

*Angstman:*　　　This is the same marker that we were just looking at in the previous several exhibits that the court admitted, is that correct?

*Jeff King:*　　　That's correct.

*Angstman:*　　　And at the same time—

*Jeff King:*　　　Same day.

*Angstman:*　　　Okay and when you compared the latitude, longitude of your picture with the latitude, longitude for that sight on the parks service website, were you close?

*Jeff King:*　　　This one was way off, I did it several times.

*Angstman:*　　　And way off are we talking a few feet, a few yards, or even a couple miles?

*Jeff King:*　　　This one is more than a mile off.

*Angstman:*　　　Okay do you have any explanation for that?

*Jeff King:*　　　I do not.

*Angstman:*　　　Did you jimmy your machine somehow to make it do that?

*Jeff King:*　　　Absolutely not.

*Angstman:*　　　Do you know how to?

*Jeff King:*　　　No.

Case 4:08-cr-00008-JDR　　Document 43-3　　Filed 09/13/08　　Page 53 of 118

*Angstman:*      We'll move for the admission of II, Your Honor.

*Cooper:*      Your Honor, I would object to double I on several grounds. Number one, it has never been established that the point that's on the park website is B0014 is this specific boundary marker location. It has been assumed by defense counsel in questioning that it was, but there's nothing that puts it there. Secondly, that would at least mean that the latitude was probably fairly close to what's indicated there but we don't know what the latitude was specifically at the survey marker, which was nearest to the skill site unless we interpolate between points that are on this chart.

The problem—the bigger problem is that this GPS, and I don't know how this was possible, appears to be on that boundary marker which was nearest to the kill site, I mean it appears that way—I can't read everything that's on there but it looks like it— on the boundary line between Township 11 south and Township 10 south, what range it's on is a little harder to say but it's latitude is way off, it is off by a lot more than a mile because the latitude given for B0014 which is probably nearest, anyway, to that location is 63 degrees and 59.839 minutes, this is 63 degrees, 44 minutes and 21 seconds or the decimal point 21, I think it's decimal point 21, which is 15 minutes of latitude off and we have testimony that a minute of latitude is a nautical mile, this is 15 miles south of the location in question—that's what this reads.

There's no way that this could be the reading of a working GPS at that location, so for whatever reason, that GPS was not working, if it was at the site in question, which it appears to be at the site, which is nearest to the kill site, the boundary marker nearest the kill site. It's 15 miles off, it's not 1 mile, and so it's for reasons unknown relating to the operation of that GPS it's extremely far off and totally irrelevant to this case.

*Angstman:*      It's really difficult for me to listen to the government say that a GPS can be that far off after they just got done yesterday telling us how they're accurate within a few feet, very difficult for me to listen to the same argument—in some places they talk about that as speaking with a forked tongue, but, the notion is that I guess there is some suggestion of Mr. King phonying this up, went 15 miles away, and took a reading well that's—we'll talk about that a little more if the court wants us to, to get Mr. King to testify more about that—but the question of the accuracy of GPS' is an issue in this case and there's already testimony on the table that Mr. King used this GPS to find this marker and he said that there were various readings and it took him an hour and a half to get there, he said

he'd punch it up there'd be one reading, punch it up and there'd be a different reading.

And eventually he found the marker, course he had the advantage at this time of the government's discovery so he kind of knew the general area.  You and I would have a fighting chance based on what we've heard here, Your Honor, going on with finding that marker because we know the general area, we've got pictures and we would ___ to hold in a little bit and eventually he found it. Clearly, he's testified that it was fairly accurate some of the times but this time he punched in a number and it came up the wrong place.  He didn't punch in a number, he just asked it to tell him where he was and it asked him if he wanted to make it a waypoint—that's what GPS' do I guess.

And now because it shows an apparent malfunction in a GPS, his GPS, the government says that has to be excluded from evidence in this case where our position is that GPS machines are not always reliable and for a variety of reasons they're not always reliable, the first of which is they run on batteries.  But nonetheless, this clearly shows something that Mr. King is entitled to present in this case is that he has a GPS that occasionally registers a faulty reading and it's clearly relevant to the proceedings.  There is enough information on this to read where it is but more importantly, Mr. King has testified to where it is and that has not been contradicted. So, we urge admission if the court wishes more testimony from Mr. King, I'd be happy to produce it.

*Judge:*     I can't read the cap here, I can read the garmin, but not the cap.

*Jeff King:*     This one is quite a bit better.

*Angstman:*     Yeah, Your Honor could I hand you the original?  The larger one, I mean?

*Judge:*     Yes.

*Cooper:*     Can I have my copy that you took back here?

*Angstman:*     Yeah, here, I'm sorry.

*Judge:*     The cap doesn't, of course, give a GPS reading.  It gives township range information, it was out of its area that these caps were placed about a mile apart, I don't know—I'm not sure how to interpret the information of the GPS reading with this particular item here, to show that what the—as not accurate, what is accurate or not accurate.  I'm not clear on how you match it up.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 55 of 118

*Angstman:*     The GPS reading?  How to match them up with the website readings?  Is that the question Your Honor?

*Judge:*     No, no with what's been found here.

*Angstman:*     I could develop more testimony, then, if you would Your Honor?

*Judge:*     We could use it, but, again there it is.

*Angstman:*     I'll ask you—hang on.  I'll ask you to look at the information on the cap and read what you can for me off that cap.

*Jeff King:*     I believe I can see—clearly see the crosshair x that has been referred to several times and the upper left crosshair appears to be South 36, and the upper right I believe it to be South 41, the lower left South 1, and the lower right appears to be South 6, underneath that it is T, 11, S, 1981.

*Angstman:*     Do you recall what appears on the government's picture of the same, number 8, do we have there number 8?  If I could approach and find the exhibit, Your Honor.  _____

*Cooper:*     I would do the same thing you were doing, I think it's in there.  Oh, maybe it's up against the witness box.

*Angstman:*     Alright.  I'm showing you—I'm showing you exhibit 8, do you remember that from yesterday, Mr. King?

*Jeff King:*     Yes.

*Angstman:*     And I represent to you that I remember it being 0014 and represented to be that cap, the one closest to your kill site.  Do you remember it being the same?

*Jeff King:*     I do.

*Angstman:*     Can you read the information from that cap as you did from the picture you had in front of you?

*Jeff King:*     I can read the same portion that I can see in the photo is South 36, South 31 in the upper right, south 1 on the lower left, south 6, T, 11 south, 1981.

*Angstman:*     Okay, is it the same information?

*Jeff King:*     Yes.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 56 of 118

*Angstman:*    And it's your testimony that you were at that same spot when you took that picture of your GPS?

*Jeff King:*    I was.

*Angstman:*    Was your GPS registering other information that was closer to accurate as far as you knew that day?

*Jeff King:*    Absolutely.

*Angstman:*    I have nothing further, I want to re-submit.

*Cooper:*    If I could ask a couple more questions, Your Honor.

*Judge:*    Yes.

*Cooper:*    Do you know now what the latitude longitude were that you derived from the park website to try to find this marker?

*Jeff King:*    I'm kind of like Ranger Leonard, it's a little below 64.

*Cooper:*    A little below 64.  So you don't have the latitude number then, 63 and 59 point something, right?

*Jeff King:*    I believe that after the exhaustive research that I've done for this case, I could remember that the park brochure registers it at 63, 59, 839.

*Cooper:*    Right.  And there isn't anywhere along there where it registers a latitude of 63 degrees and 44 minutes like your GPS does there, is there?

*Jeff King:*    That's cor—I don't know, I don't—

*Cooper:*    It does say 64 doesn't it?  63 degrees and—excuse me 44 minutes of north latitude?

*Jeff King:*    Yes, it does.

*Cooper:*    And are you aware that minute of latitude is a nautical mile?

*Jeff King:*    No, I'm not.

*Cooper:*    You're not aware of that?  And that there's 60 miles, 60 minutes to a degree so there would be 60 nautical miles to a degree, you don't know that?

*Jeff King:*    I do not know that.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 57 of 118

*Cooper:*       And do you know that a nautical mile is 6,072 to 6,080 feet?

*Jeff King:*       No, I don't know that either.

*Cooper:*       So if that's correct, I would put this at 15 miles south of the boundary marker that's in exhibit 8.

*Jeff King:*       I don't know that either.

*Cooper:*       Have you ever known this GPS to be off that much?

*Jeff King:*       I haven't used it for this purpose at all.

*Cooper:*       To find a boundary, you never did use it?

*Jeff King:*       Not this GPS, no.

*Cooper:*       Where'd you get this GPS?

*Jeff King:*       Cabela's.

*Cooper:*       How long before you used it here?

*Jeff King:*       How long what?

*Cooper:*       Before you used it here?

*Angstman:*       Do you mean how long before the date that he used it in that picture?

*Judge:*       When did he purchase it?

*Cooper:*       That's correct, how long before did you get it from Cabela's?

*Jeff King:*       I have owned this thing for years.

*Cooper:*       Oh, okay. And you've never used it to find the park boundary in that area before?

*Jeff King:*       No.

*Cooper:*       Your Honor, for whatever reason it's 15 miles off and if the court would like we can submit proof of that fact and I don't know what caused it to be 15 miles off but there's no way that anybody can claim the accuracy range of a GPS would account for that, there's something else that's the problem here that makes this irrelevant.

*Judge:*       I understand your argument but I don't think the court has to find that it agrees with the government's theory or findings to be

admissible. In other words I don't have to determine that it's accurate, maybe that's what he did and maybe there's some fallacy in it but I'm going to admit it.

*Angstman:* We will stipulate by the way, he says it's 15 miles but we'll stipulate to that fact Your Honor. If I could approach with—

*Judge:* I'm going to take a recess at this time and—I'm going to need about 6 minutes—if you want more let us know.

*Angstman:* That's fine.

*Judge:* 6 to 10 minutes at the most, I need to make a phone call or 2.

*Clerk:* All rise. This matter is in brief recess.

*Clerk:* All rise. ____ the court, this United States District Court has reconvened, please be seated.

*Judge:* We'll continue—

*Angstman:* Okay I thought I was missing my client, Your Honor, I went into a panic and he's sitting up there.

*Judge:* Right where he's supposed to be.

*Angstman:* Exactly right. If I might approach with Q, Your Honor?

*Judge:* Yes and you can just note for the record that you're approaching, you don't need to ask for permission.

*Angstman:* Okay, thank you. Mr. King, could you identify Q if you can?

*Jeff King:* This is a picture taken from the ridge that I have been referring to that the moose was spotted from—this is taken of the ridge and it, with a 300 millimeter lens, I was able to spot this marker, we after exhaustive searching, found this marker and once I found it, I was able to readily spot it. It is a contrary to what Ranger Leonard said, it is quite different to the section markers and that it is about twice the size and I believe it is—I know that it's about twice the size and I know it's on a 2 inch pipe, where these appear to be on 3 quarter or maybe 1 inch pipe.

*Angstman:* Okay, could you—once you spotted it with a 300 millimeter what? Camera? A spotting scope?

Case 4:08-cr-00008-JDR    Document 43-3    Filed 09/13/08    Page 59 of 118

*Jeff King:*    We had a spotting scope, binoculars, and—the only way I had to record it from the ridge once spotted was through a 300 millimeter lens, nothing else would record it.

*Angstman:*    Okay, now, once you dropped those, are you testifying that you could or could not see anything on that ridge with a naked eye?

*Jeff King:*    Say that again.

*Angstman:*    With your naked eye, could you see that marker from the ridge?

*Jeff King:*    Once I knew where it was, I can—you most certainly can see it.

*Angstman:*    Okay, did you leave someone there to photograph you and then went across?

*Jeff King:*    Yes.

*Angstman:*    Who'd you leave?

*Jeff King:*    My daughter, Ellen.

*Angstman:*    With your camera?

*Jeff King:*    My camera.

*Angstman:*    Okay and did you walk towards the site that you could see the marker on?

*Jeff King:*    This was the day I spent researching this and I had previously been searching for the corner marker than the kill site for some recalculations and then I walked to this that's why I'm coming from this direction.

*Angstman:*    Okay and do you see yourself in that photo?

*Jeff King:*    I do.

*Angstman:*    And what's the depiction that you're looking at that tells you it's you?

*Jeff King:*    I am walking from the right to the left in a bright red suit, I had every intention of trying to make photographs that would, I had hoped could see me, or the marker, and that's why I wore a red jumpsuit.

*Angstman:*    Okay and can you see the marker in the photo?

*Jeff King:*    Yes, because I know where it is.

Case 4:08-cr-00008-JDR    Document 43-3    Filed 09/13/08    Page 60 of 118

| | |
|---|---|
| *Angstman:* | Would you hold it up and show the judge, generally, where you're looking?  And would you also point to where you see yourself on that photo?  Alright you can put the picture down and I will move for the admission of that, I believe it's Q, is that fair? |
| *Judge*: | That's correct. |
| *Cooper:* | Object as it does not have any bearing on what the condition of that marker was on the day of the hunt.  I can offer evidence that we were there probably 2 months before Mr. King was and that the tribal marker was the type that is on all these others but it was blown away by the wind and replaced it back in the area where the geostation marker was and so there's no telling where it was on the day of the hunt and this is no indication of where it was on the day of the hunt either. |
| *Judge:* | Do we have the date when this was taken, Q? |
| *Jeff King:* | August 1st. |
| *Judge:* | Of 08? |
| *Angstman:* | 08, are you asking? |
| *Judge:* | I'd like to see it.  It's a little dark and if counsel would bring it to me. |
| *Angstman:* | And if—I just have a chair on me. |
| *Judge:* | I'll hand it back to counsel and I'll just point out to both attorneys it looked like there's 2 bright marks here and I'd like to know what the second one is, Mr. Cooper you can look at the picture again before the questions are asked, on the left hand side.  It might be a defect in the photo or it might be something else. |
| *Angstman:* | Your Honor, I think we have agreed— |
| *Judge:* | You need to be in front of a microphone. |
| *Angstman:* | Counsel and I have agreed that the 3 marks you see are simply scratch marks or defects in the picture and represent nothing on the ground. |
| *Judge:* | Okay could you have the witness point out one more time the sign of the marker ___ and bring it to me—___ thank you.  Alright I'll rule upon Q, I have the date now and I'm going to rule it's admissible.  There may be some explanation of why it shows what it does, what was replaced, et cetera, but I think the evidence has to |

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 61 of 118

show all of that, I don't think that the witness is required to show more than when he went out in preparation for his case, this is what he saw and memorialized so I think it's admissible.

*Angstman:*  Thank you.  Counsel has agreed that the picture with the daughter goes in.

*Judge:*  If you could just hold it up, thank you. FF is admitted.

*Angstman:*  When you went to the geostation, Mr. King, did you see markers on it?  Information on the cab?

*Jeff King:*  Yes.

*Angstman:*  And what did it tell you?

*Jeff King:*  The most—90% of the information is U.S. Department of the Interior, Bureau of Land Management, Cadasteral Survey.  The difference from these was that there was a number stamped on it and some letters that I was unfamiliar with.

*Angstman:*  Okay, picture Q that we just looked at.  Had you been to the geostation at that time?

*Jeff King:*  No.

*Angstman:*  You were approaching it when the picture was taken?

*Jeff King:*  Yes, yes.

*Angstman:*  In what condition did you find the triangular piece of metal that we heard is a way of more easily identifying these geocaps.

*Jeff King:*  Could you repeat that?

*Angstman:*  What condition  did you find the triangular piece of metal when you arrived at the geostation?

*Jeff King:*  It was sitting oddly close to the post, right there and it's not attached.

*Angstman:*  Was it propped up or laying flat?

*Jeff King:*  It was laying flat.

*Angstman:*  Do you recall whether or not what you're looking there in Q, is the geocap or is it the triangular marker?

*Jeff King:*  It is the triangular marker.

Case 4:08-cr-00008-JDR  Document 43-3  Filed 09/13/08  Page 62 of 118

*Angstman:* Okay, did you further adjust the triangular marker after you had got to the site?

*Jeff King:* I did.

*Angstman:* And what did you do with it?

*Jeff King:* I put a stake—the same wooden lap I had been taking pictures of, I carried with me and then I tilted, because it was getting dark, I was aware that the only other markers of this style that I have seen were when they caught the sun and in an effort to—if it was not visible without being touched, I wanted to at least take a picture of it after I touched it and I set it up a couple inches, the triangular marker on top of the geostation cap.

*Angstman:* Is that to make it more visible to the next guy that comes along?

*Jeff King:* I honestly don't know that I left it that way.  I had a radio and I was talking to my daughter on the hillside and asking her to take pictures.

*Angstman:* Okay, and the picture that is Q, is before you tipped it up on the geostation, is that right?

*Jeff King:* Correct.

*Angstman:* Okay, I'll hand you what has been marked QQ, ask you to identify what you see there.

*Jeff King:* This is a close-up of the marker, I was worried about being criticized by the prosecution that I touched the marker that was designed to be seen and I wanted to show how I did it and I was just trying to gather some information and see how much this changed the visibility on the hillside.

*Angstman:* Okay, you're not asking the judge to understand that that's how you found it, this is an adjusted photo?

*Jeff King:* Correct.

*Angstman:* But the information on the geostation—were you able to look that up later on any records anywhere in the state of Alaska?

*Jeff King:* I have a couple of friends that are surveyors, they counseled me and immediately recognized it as what they called a geostation.

*Angstman:* Okay, we've already used P.  Do you have an objection to that?

*Cooper:*  No.

*Angstman:*  Okay this is—the government is not going to object to this but I will pass it to the witness.  What is P?

*Jeff King:*  This is a picture from the geostation tilted in the previous hue cue representation I laid on the ground and took a picture up to the hillside where my daughter was taking a picture that had the white specs on it.

*Angstman:*  Okay what kind of lens did you use for that?

*Jeff King:*  It is around a 120 millimeter.

*Angstman:*  Okay, as I indicated the government said they would not object—the admission for that—we move for admission.

*Judge:*  Is that correct, Mr. Cooper?

*Cooper:*  That's correct.

*Judge:*  P is admitted, you also moved—or are you moving for QQ?

*Angstman:*  Yes.

*Judge:*  Any objection to that?

*Angstman:*  Well, he noted your objection, I believe.

*Judge:*  What was your objection to QQ?

*Angstman:*  Oh, QQ, I'm sorry Your Honor.

*Cooper:*  QQ was the geostation.

*Judge:*  That's correct.

*Cooper:*  The court is holding up P I think, no QQ.

*Judge:*  I am holding up QQ, you can look at it closely.

*Cooper:*  I think I did not object to QQ.

*Judge:*  I think I will then let it in.

*Angstman:*  Mr. King, I'm holding up B and you are well aware that this is the disclaimer that was discussed yesterday found on a website, are you?

*Jeff King:*  Yes.

*Angstman::*  And can you describe for the court how you obtained this disclaimer?

*Jeff King:*  Again I've been pretty busy the last few weeks trying to understand how this could have happened, by pursuing the website I've searched many things, including finding  a disclaimer.

*Angstman:*  And on which website did you start?

*Jeff King:*  Denali National Park.

*Angstman:*  Did you see the word disclaimer anywhere on that page?

*Jeff King:*  As I spotted it once, I never saw any page as I went through the website that did not have a place to go to the disclaimer on the bottom of the page.

*Angstman:*  You're saying the disclaimer appeared on every page?

*Jeff King:*  Every page I can recall that while I was in the mode to be thinking about disclaimers, and I'm willing to bet it's on every page in the website.

*Angstman:*  Did you hit disclaimer then, with your mouse, or whatever you call it?

*Jeff King:*  Yes.

*Angstman:*  And is this the page that came up?

*Jeff King:*  I believe it is.

*Angstman:*  And this one says U.S. National Park Service disclaimer, it doesn't say anything about Denali—do you have any explanation why that would be what's under the disclaimer part of the Denali page?

*Jeff King:*  Because Denali National Park is a national park.

*Angstman:*  We'll move again for the admission of B, Your Honor.

*Cooper:*  I don't have any objection, Your Honor.

*Judge:*  No objection to B?

*Cooper:*  What is the number of that?

*Angstman:*  B.

Case 4:08-cr-00008-JDR   Document 43-3   Filed 09/13/08   Page 65 of 118

*Cooper:*              B?

*Angstman:*            GG is the Garmond warranty that we discussed yesterday, no that's a different one, we have 2 Garmond warranties—

*Judge:*               So that's BB—I mean B, the question is admission of exhibit B. And I understand there's no object to that.  That's the disclaimer from the national park, but not the Denali National Park website.

*Angstman:*            Right, but the testimony—

*Judge:*               I understand all that.  Mr. Cooper said that he did not have an objection, so I'll admit it.

*Angstman::*           Okay.  Exhibit E, Your Honor, I'll ask questions of that holding it here this calls itself a national—

*Judge:*               I think E is in already.

*Angstman:*            Is that accurate? Okay.

*Judge:*               If you want to ask more questions, help yourself.

*Angstman:*            I will ask a couple questions about that.  REI map.  Where do you buy your maps when you buy a map?

*Jeff King:*           REI, years ago, McCauley's reprographic, something like that, here in Fairbanks had the maps.

*Angstman:*            And you had this one sent to you?

*Jeff King:*           Yes.

*Angstman:*            You saw that it had some red lines on it that, yesterday the testimony was that those represent park boundaries.  Did you observe those red lines on this map?

*Jeff King:*           Yes.

*Angstman:*            And did you observe that those red lines did not extend into the area where your camp was?

*Jeff King:*           Yes.

*Angstman:*            Okay.  C, is that in, Your Honor?

*Judge:*               Yes.

*Angstman:*　　Mr. King, do you have the photo of you approaching the geosite in front of you?

*Jeff King:*　　Q?

*Angstman:*　　Q.  P, can you identify this from your seat, Mr. King?

*Jeff King:*　　What was that?

*Angstman:*　　Can you identify this from where you are?

*Jeff King:*　　Yes, that is 4 photographs that were taken of a panorama in the area in question.

*Angstman:*　　Okay and when did you take this, roughly?

*Jeff King:*　　Right after I was charged with this crime, I was very interested to go look at the site because I couldn't believe it.

*Angstman:*　　Okay, and now you know I'm obviously looking at a series of photos.  Did you or your family put this together in this fashion?

*Jeff King:*　　That's correct.

*Angstman:*　　And does it accurately represent what you saw when you went there that day?

*Jeff King:*　　Absolutely.

*Angstman::*　　Okay, I will— have you marked on that picture certain, the locations?

*Jeff King:*　　Yes, I did.  The ones I thought we would be talking about, for easy identification, I marked where I recall and am quite sure where the bone pile was placed, the ridge from which many of these pictures looking down were taken and in very close proximity to where we were when we first spotted and glassed the area for moose.  It also shows a marker of the ultimate kill site and it, you can spot the tree that is right next to the geomarker on the hillside to the south.

*Angstman:*　　Okay, and looking at that photo, does the geomarker appear, the marker that you put there for the geomarker, appear in the location that you generally understood the park boundary could be before this hunt?

*Jeff King:*　　Yes.

*Angstman:*　　Okay.  Any objection to O?

Case 4:08-cr-00008-JDR　　　Document 43-3　　　Filed 09/13/08　　　Page 67 of 118

| | |
|---|---|
| *Cooper:* | No |
| *Judge:* | Are you looking at exhibit O?  The platmap? |
| *Angstman::* | Yes. |
| *Judge:* | I show that in. |
| *Angstman:* | Okay, moving along |
| *Judge:* | Panorama P is— |
| *Angstman:* | I'll move into panoramic view T. |
| *Judge:* | T?  Any objection to T? |
| *Cooper:* | Let me take a look at it again, Your Honor. |
| *Angstman:* | Exhibit F, do you have it in Your Honor?  Oh, excuse me. |
| *Cooper:* | I'm not clear on whether the kill site is accurately located and the geostation marker is very generally located but with those variations I don't have an objection. |
| *Judge:* | Well, of course it's the defendant's exhibit so it doesn't mean you agree with it.  I think it's admissible.  What I'd like to have is a close date of when it was taken.  The information is dated April 7, 08.  The charging document, and you said it was after that but do you have some idea of what month, for example, it was taken? |
| *Jeff King:* | Absolutely April, we were rushing to get out there before the snow melted. |
| *Judge:* | Thank you, T is admitted. |
| *Angstman:* | And just 1 more question on that point, the location of the kill site the geostation—do you agree with Mr. Cooper that those are approximations? |
| *Jeff King:* | Within a few feet—I am extremely familiar with the area. |
| *Angstman:* | Okay, I'm looking at F does the court show that a not admitted yet?  It's the Denali Park purchased map? |
| *Judge:* | I show F in.  Does the clerk show that? |
| *Clerk:* | Yes. |

*Angstman:*     Okay.  LL.  We spoke of this yesterday, Mr. King, with another witness and this is something you had created so that you could demonstrate where the geostation—where was my?  Yeah, I'm sorry.  It shows the geostation placed on the map apparently accurately and the section corners in the moose kill site from the police report figures.  Did you instruct and assist in the preparation of this?

*Jeff King:*     Yes.

*Angstman::*     Does it accurately reflect information that you've provided to the person who drew the map?

*Jeff King:*     To the absolute best of my knowledge.

*Angstman:*     And did the map itself come from USGS sources?

*Jeff King:*     That's what he has written on there and that's what he told me, he is a licensed surveyor.

*Angstman:*     And then you told him, did you, from this corner you—from the Rock Creek Trail you could see this corner on occasion.  Is that the corner we're talking about?

*Jeff King:*     That is right.

*Angstman:*     And did you tell him that from the Rock Creek Trail area that you could see the geostation and that's what he recorded on here?

*Jeff King:*     That's correct.

*Angstman::*     And then the moose kill site was drawn in there to reflect where it was in relation to those 2 spots?

*Jeff King:*     That's correct.

*Angstman:*     Okay, we'll move for the admission of LL as they demonstrate on a map to the information that he has testified to.

*Cooper:*     I have no objection to that, Your Honor.

*Judge:*     LL is admitted.

*Angstman:*     Were there other markers in the vicinity of the geostation?

*Jeff King:*     Yes there were.

*Angstman:*     And what where they?

*Jeff King:*　　　　A taller aluminum stake to the west.

*Angstman:*　　　　Okay, did you photograph that?

*Jeff King:*　　　　Yes, I did.

*Angstman:*　　　　Is that SS that you're looking at?

*Jeff King:*　　　　Yes, it is.

*Angstman:*　　　　And what does it—what do you see when you look at that?

*Jeff King:*　　　　I put one of the flags that I was carrying to make it easier to see if I walked away from it and I believe it was about 20 feet to basically the west of the geostation.  I had no idea what it was but it was obviously manmade so I decided to document it.

*Angstman:*　　　　Did it look like it had been there awhile?

*Jeff King:*　　　　Oh, yeah.

*Angstman::*　　　　And if you lined up over that—from the geostation to that—what direction would you had been facing?

*Jeff King:*　　　　It appeared to be west.

*Angstman:*　　　　Okay we'll move for the admission of that for as well.

*Cooper:*　　　　May I ask ascertain to which marker this is supposed to be?

*Angstman:*　　　　Well it's—this is the stake that he tetsified that he saw west of the geostation—how far?

*Jeff King:*　　　　About 20 feet.

*Angstman:*　　　　20 feet, that's 20 feet west.

*Cooper:*　　　　No objection, Your Honor.

*Judge:*　　　　I'm not sure what it shows other than there's a marker out there 20 feet from the geo.

*Angstman:*　　　　And what it shows, Your Honor, is that there's something there that seems to describe an east, west line and if so someone in the area—

*Judge:*　　　　Well, you may be reading that into it, I don't know if that's the case—I don't know what it's there for, I don't know who put it there, why it was there, when it was put there—

*Angstman:* We'll withdraw, Your Honor.

*Judge:* Withdrawn.

*Angstman:* Defendant's RR is a letter to the parks service from the governor's staff assistant—did you receive a copy of this letter?

*Jeff King:* Yes, I did.

*Angstman:* And we've already read it into the record, do you know why you were sent a copy along with Lisa Murkowski?

*Jeff King:* I asked for her consideration in my complaint.

*Angstman:* We'll move for the admission of the letter, Your Honor, it shows that others have complained at the lack of markers at the national park.

*Cooper:* Insofar as it does that, Your Honor, it's offered for hearsay and we object do that hearsay, we do not believe it to be accurate and it's also hearsay.

*Judge:* Exhibit RR will not come in.

*Angstman:* Now, Mr. King, oops hang on—

*Judge:* Let me answer this note to the clerk before you ask the next question.

*Angstman:* I'm showing what has been marked as VV. Do you know what that is?

*Jeff King:* It is an explanation between some GPS terminology.

*Angstman:* And where did you get it from?

*Jeff King:* Throughout my research for evidence, it became clear that there is more than one mechanism used in mapping and GPS', for sure I heard NAD-27 and NAD-83 and this is a definition of those 2 things, I believe.

*Angstman:* And where did you get them?

*Jeff King:* I honestly don't know.

*Angstman:* Okay, can you read it to me please?

*Jeff King:* Comparisons between NAD-27 and NAD-83, the point having a given latitude and longitude in NAD-27 may be displaced on the

order of many tens of meters from another point having the identical latitude and longitude of NAD-83 so it is important to specify the datum along with the coordinates.  The North American Datum of 1927 is defined by the latitude and longitude of an initial point, Leeds's Ranch in Kansas.  The direction of a line between this point and a specified second point and 2 dimensions that define the spheroid.  The North American Datum of 1983 is based on a newer, defined spheroid, GRS80, it is an earth-centered datum having no initial point of initial direction.

*Angstman:*    Have you any idea whether your machines that you used, GPS', are one type or the other?

*Jeff King:*    No I don't.

*Angstman:*    Have you any idea whether the parks service uses one type or the other?

*Jeff King:*    I know that they have information on the GPS page that talks about this stuff.

*Angstman:*    But you don't know which one they use?

*Jeff King:*    No.

*Angstman:*    Okay.  Now let's go back to the hunting of this moose.  Do you know whether you hit that moose first, second, or both shots?

*Jeff King:*    I suspect I hit it on the first shot and I am positive I did on the second.

*Angstman:*    Okay and do you have any testimony about a hunter's obligation with regard to a moose that has been shot at in terms of what you must do next?

*Jeff King:*    I think it is clear practice that once a shot has been fired— especially where you can't see and at a reasonable range, that you are obligated to assume the animal has been hit.

*Angstman:*    And why is that?

*Jeff King:*    Because if it is, and you don't, it would suffer and also waste?

*Angstman:*    Okay and when you say if you don't, don't what?

*Jeff King:*    If you don't kill it, that's a possibility.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 72 of 118

*Angstman:*   Okay so that is a reasonable effort to kill it, there's no reasonable assurance that your next shot is going to hit is there?

*Jeff King:*   No.

*Angstman:*   Okay, I have nothing further, Mr. King, thank you.

*Judge:*   Cross-examination?

*Cooper:*   Yes, Your Honor.  Your Honor I'm not sure the status of that last document—

*Judge:*   Is this VV you're talking about?

*Angstman:*   I didn't move for admission, Your Honor.

*Judge:*   You did not move?

*Cooper:*   I ask that it be struck, it's hearsay.

*Judge:*   You are moving for admission?

*Angstman:*   Excuse me?

*Judge:*   I'm sorry, I didn't hear you move for admission for it.

*Angstman:*   I did not.

*Judge:*   That's the status.

*Cooper:*   Well it's strictly hearsay and I thought we were going to support this in some way and it would be offered and I was waiting for that I think that-

*Judge:*   Well it's not offered.  If you want to address it you can, he had it, he read it in, you didn't object to him reading it—it's part of his research, that's basically what it amounts to.

*Cooper:*   It's what?

*Judge:*   Part of the witness' research.

*Cooper:*   Yeah I think it should be struck, Your Honor, because I was expecting and he offered it.

*Judge:*   Well, you need to move more timely to strike it.  The testimony will stand.

*Cooper:* Now, Mr. King, I'd like to draw your attention to the day of the hunt, okay, you were out there with your daughter, is that correct?

*Jeff King:* The day of the hunt?

*Cooper:* Yeah.

*Jeff King:* Yes.

*Cooper:* You testified that you killed a moose and then that was the end of the day. Was it evening? And then what did you do? Gut it out at that point?

*Jeff King:* Yes, sir.

*Cooper:* And then what happened at that point?

*Jeff King:* We went home, cleaned up, and went to bed.

*Cooper:* You mean to the camp?

*Jeff King:* That's correct.

*Cooper:* And did you move any of the moose meat that evening?

*Jeff King:* It would have been very likely that I took a piece to have for breakfast, but I can honestly say that I do not know.

*Cooper:* So, the next day is the day you hauled the meat back to the camp, is that right?

*Jeff King:* Yes.

*Cooper:* And did you drive the Argo down to the kill site or back?

*Jeff King:* I do not remember.

*Cooper:* And when you got back, it was shortly after you got back with all the meat that you met the officers, is that right? The park ranger and the trooper?

*Jeff King:* That's correct.

*Cooper:* And didn't you tell the trooper that you had gotten the moose that day?

*Jeff King:* I believe what we told them is that we retrieved the moose that day.

*Cooper:*     But didn't he ask you when you got it?

*Jeff King:*     I don't remember that, no.

*Cooper:*     Well he wouldn't have known, would he?

*Jeff King:*     I don't understand the— relevance.

*Cooper:*     He would have had no way of knowing when you shot that moose, would he?

*Jeff King:*     No, no.  It was pretty fresh, we were bloody.

*Cooper:*     Right.  But, you led him to believe that you shot it on the same day that he was there in camp, didn't you?  In fact, that's when you notched the ticket wasn't it?  For that same day?

*Jeff King:*     I notched the ticket the day he came.

*Cooper:*     Were you afraid to tell him that you got it a day earlier?

*Jeff King:*     No.

*Cooper:*     You were already the doghouse a little bit for not having notched it before leaving the kill site, right?

*Jeff King:*     I didn't feel in the doghouse.

*Cooper:*     But you did mislead him, right?  You notched it on the wrong day?

*Jeff King:*     I notched the day it was—

*Cooper:*     And that was the wrong day—it wasn't the day of the kill, was it?

*Jeff King:*     We killed it the night before so, you have my harvest ticket.

*Cooper:*     So would you answer the question—you did notch it the wrong day, correct?

*Jeff King:*     I don't remember what day I notched it—I notched it for the day— it would make sense that it was the day after—the morning after the evening that we shot it, so yes.

*Cooper:*     So that was the wrong day?

*Jeff King:*     If that's what it says on the—I'm not sure that when he said it which day I notched it.  I hadn't notched it yet.

*Cooper:*     So now you don't know which day you notched it, is that correct?

*Jeff King:*      That's correct, I don't know but I suspect it was the day he was standing there.  It was all very—

*Cooper:*      Why did you mislead him?

*Jeff King:*      Cause that was the day he was standing there, I never thought to—they didn't ask anything about the hunt, they didn't ask where it was—we had just come back from camp with the meat.

*Cooper:*      You know the rule, don't you?

*Jeff King:*      Yes.

*Cooper:*      That you're supposed to notch it the day of the kill before you leave the camp site correct?  The kill site, rather.

*Jeff King:*      Yes.

*Cooper:*      Didn't you also mislead them when you pointed in the wrong direction as to where you had taken that moose?

*Jeff King:*      Absolutely not.

*Cooper:*      Okay, now you've heard the testimony of 2 people who don't know you, except by reputation, separately testified that you did that and you don't think that's correct?

*Jeff King:*      I know it's not correct.

*Cooper:*      Did they ask you where you killed it?

*Jeff King:*      Absolutely not.

*Cooper:*      Did you tell them where you killed it?

*Jeff King:*      Absolutely not.

*Cooper:*      Did the subject of where you killed it come up at all?

*Jeff King:*      Not that moose, no.

*Cooper:*      You would have had something to lose if they went and found that right at that time, wouldn't you?

*Jeff King:*      What would that be?

*Cooper:*      Well 600 feet south of that marker that you've since found that you put your GPS on.

*Jeff King:*      Repeat your question, I didn't hear a question.

*Cooper:*      You would have had something to lose if they had found that moose that day, wouldn't you?

*Jeff King:*      Yes.

*Cooper:*      So there was a good reason for not telling them where it was or pointing in the wrong direction?

*Jeff King:*      No, no.

*Cooper:*      You would agree that pointing westward was nearly the opposite direction from where the moose was from camp, wouldn't you?

*Jeff King:*      Yes, I would agree that pointing west would be opposite from where the moose was shot.

*Cooper:*      I think it's your testimony that you did not have a GPS out there, is that correct?

*Jeff King:*      This is an involved answer, Your Honor, may I? Alright, it's not—I don't know if it was with me. It was in my camp box, I think it's pretty common to have a camp box, binoculars, first aid kit, and if it was with me we hadn't used it and that's what I meant by no—I don't need a GPS if you're hunting in the same place and quite frankly I don't know how to use the GPS well in that way at all, it is used, you've been there—you've seen how deep the brush is—our GPS uses is when we have an ATV that breaks down, which has happened with Cali, we use it to push a mark and follow a line—it shows you where you've been when you can't see your way around.

               As you see on my photo of this GPS that in fact is off, on that photo, the longitude and latitude numbers are so teeny it was extremely frustrating with me that I didn't have one like the park had when I went out trying to find this stuff because mine—if it does it, I don't know how to do it. I could never get it to read longitude and latitude without asking it to mark and that's when I took the photo. Do you want to mark this spot? It's the only way I could get that thing to show me a longitude and latitude. It is beyond frustrating and our GPS uses—you have questioned me, or the fact that I had a GPS or said I did or said I don't. I own a GPS, I use it for speed and distance. I'm well known for training sled dogs, I want to know how far we go, how fast we go. They're very good at that and they're easy. They do a million things I don't know how they do.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 77 of 118

*Cooper:*　　　　Okay.  The question was, did you have a GPS?

*Jeff King:*　　　　I don't know if it was in the camp box for sure.

*Cooper:*　　　　Did you ever consider looking in there to see if it was there to help you locate the boundary?

*Jeff King:*　　　　No.

*Cooper:*　　　　Because you weren't interested in time and distance, is that the reason?

*Jeff King:*　　　　Because I wasn't interested—if I didn't use it to find the boundary it was because I had no reason to question where the boundary was.

*Cooper:*　　　　You had no reason to question where it was.  Do you recall a tape recorded conversation you had with Ranger Leonard on the day of the search warrant execution at your residence?

*Jeff King:*　　　　I do.

*Cooper:*　　　　That would have been, what about a month or two after the time of the hunt?

*Jeff King:*　　　　Yes, about one month.

*Cooper:*　　　　It was fresh in your mind.  Did you tell them that you'd been hunting there for years and never seen any kind of indication, meaning where the boundary was?

*Jeff King:*　　　　I heard the tape and I believe I said that.

*Cooper:*　　　　The bottom line is you knew it was close, you've always known it was close, you said that to him?

*Jeff King:*　　　　Yes.

*Cooper:*　　　　And you've been on the website and tried like hell to find GPS coordinates of the northern boundary, wanted to take a GPS.  Did you say all those things to the ranger at that time?

*Jeff King:*　　　　Yes.

*Cooper:*　　　　Isn't it fair to conclude that you presented to him, at that time, that you had a major problem telling where the boundary was, had no way of knowing, tried to find the coordinates on the website, couldn't, therefore didn't know what you would be looking for on

your GPS and had no indication of where the boundary was?  Isn't that the way you presented it to him at that time?

*Jeff King:*    Again you're misrepresenting my statement which was I found the website, but the information, I believe we—you have it—one of us has it in evidence that a stickline map of the 6 million acre park with dots around it and then 14 pages of typed text was beyond my ability or my ability to know how to put this together.

*Cooper:*    You did find those pages but you couldn't take the numbers by each dot and correlate them to the latitude longitude on the next page?  Is that your testimony?

*Jeff King:*    No.  My testimony is -- then what?

*Cooper:*    In other words you had the pages of latitude and longitude in front of you and the page of the points along the boundary that corresponded to those latitude and longitude readings, is that correct?

*Jeff King:*    Yes.

*Cooper:*    But you didn't know that taking a point on the park that's labeled B0014 or any other point you pick and following it across the page to the right to where the latitude and longitude are would give you the latitude and longitude of that point?

*Jeff King:*    I was preparing to go hunting with my daughter and if I was going to go anywhere different than I have ever gone before I would have done that and as a result of not feeling comfortable with understanding the information, nor my GPS, I chose not to use it and not go anywhere I've not gone before and stick with the landmarks familiar to me and an area that was familiar to me.

*Cooper:*    Alright I'd like to mark our exhibit next in order, whatever that would be I think it would be 32.  If I could get a number from the clerk as to what it's believed to be—

*Judge:*    There's a 31, so maybe 32's next.

*Cooper:*    I just handed you what's been marked exhibit 32, do you see the 2 pages there, Mr. King?

*Jeff King:*    Yes.

*Cooper:*    I think your testimony to the court is that you did see these pages on the website before you went out to the hunt that day?

*Jeff King:*      I believe I did.

*Cooper:*      And you see that the first page is a portion of the northeast corner of the park with a dot every so often along the line and a number beside each dot?

*Jeff King:*      Yes.

*Cooper:*      And the next page has those numbers in a column and a latitude and longitude for each number, do you see that?

*Jeff King:*      Yes, I do.

*Cooper:*      So is it your testimony that you saw that but didn't know that that gave the latitude and longitude of points along the boundary of where you were going?

*Jeff King:*      I took this information as quite foreign to me to go hunting with, information like this, so I chose not to go anywhere I have not gone before so I did not pursue it.

*Cooper:*      And you did not use your GPS to check to see if the latitudes and longitudes given on that chart were anywhere near you were planning to hunt?

*Jeff King:*      I did not.

*Cooper:*      And is it your testimony that you never have used a GPS to find the boundary line there where you were hunting?

*Jeff King:*      By longitude and latitude, only since the investigation of this case.

*Cooper:*      Not before?  And how many times have you hunted there before?

*Jeff King:*      I'm guessing in the neighborhood of -I can remember a half a dozen with my daughters and Lynn Thompson.

*Cooper:*      You see the map against the mall, which I think is JJ, the large map?

*Jeff King:*      Yes.

*Cooper:*      And you see that it shows the boundary line of the park in the area where you were travelling and hunting that day, doesn't it?

*Jeff King:*      I do see that.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 80 of 118

*Cooper:* And you have seen that it shows latitude and longitude along the boundaries, doesn't it?

*Jeff King:* I'm not a map—I don't do longitude and latitude because it's not—but I know that it's there, yes. 64 is the number that most of the maps—

*Cooper:* Show for the northern boundary?

*Jeff King:* That I have.

*Cooper:* Right and you've since learned that it's just a fraction of a minute of latitude south of that but it's for practical purposes just under the line of 64 degrees latitude?

*Jeff King:* That sounds accurate.

*Cooper:* Alright. And that's on the map that you have here, the JJ, correct?

*Jeff King:* It is a map that's here.

*Cooper:* It's a USGS map, correct?

*Jeff King:* Yes.

*Cooper:* And you obtained that from the national park service after the hunt, but before this trial, correct?

*Jeff King:* No.

*Cooper:* Oh, when did you get it from the park?

*Jeff King:* I did not get that big map from the park.

*Cooper:* That's the one with the confidential source, is that correct?

*Jeff King:* That's correct.

*Cooper:* Okay, not from a person who's connected with the park in any way either, is that right?

*Jeff King:* I'm quite sure that I'm comfortable telling you where the map come from since you think it's a big secret—it's Tom Walker.

*Cooper:* Is he connected with the park in any way?

*Jeff King:* Only in past, he's a well known photographer, writer, and he's been my neighbor for many years.

*Cooper:*     Okay.  Your Honor I'd like to show the witness this—.

*Judge:*      The exhibit letter on that, again?

*Cooper:*     That's JJ, Your Honor.

*Judge:*      Thank you.  That depends on what I need you do to do with it.

*Cooper:*     Do you see the hunting area on the upper right hand part of the map?

*Jeff King:*  Yes, I do.

*Cooper:*     Do you see Rock Creek up there?

*Jeff King:*  Yes, I do.

*Cooper:*     And do you see the ridge just west of that in the next township where your camp was?

*Jeff King:*  I see no ridge.

*Judge:*      You can point it out to him, Mr. Cooper.

*Angstman:*   May I approach with, Your Honor?

*Judge*:      Certainly.

*Cooper:*     Do you see the contour lines to the west of Rock Creek that give the shape of a ridge pointing westwardly just north of the park boundary?

*Jeff King:*  Yes.

*Cooper:*     And are they not at the place where Range 9 west and Range 10 west meet each other on that north-south line?

*Jeff King:*  Yes, I see what you're pointing at.

*Cooper:*     And are they also pretty near latitude 64 which is the diving line, approximately between Township 10 south and Township 11 south where it crosses those Range 9 and 10 lines?

*Jeff King:*  I see where you're pointing and I hear what you're saying and yes the area you're pointing to is between 10 and 9 and—

*Cooper:*     Townships 10 and 11?

*Jeff King:*  Okay.

*Cooper:*      Correct?  Is that also where the area of your camp was?

*Jeff King:*      It's very close.

*Cooper:*      And near where the kill site was, is that correct?

*Jeff King:*      That's correct.  May I put this down, Mr. Cooper?

*Cooper:*      Sure.  So now, do you have any doubt that the latitude and longitude readings are on that exhibit 32 that you have are discernible on this map that you just looked at?

*Jeff King:*      Through this exhaustive research program, I now recognize such things.

*Cooper:*      And these were—when did you acquire that map, by the way?

*Jeff King:*      This map?

*Cooper:*      Yes.

*Jeff King:*      6 weeks ago.

*Cooper:*      And it's a USGS map, is it not?

*Jeff King:*      Yep, it says so right on the top.

*Cooper:*      Okay.  And if you would—were to—you recall exhibit 8, I think your attorney may have showed you that it's the close-up of the survey marker nearest to your kill site—

*Jeff King:*      Yes.

*Cooper:*      Yes and it's the one that you put the GPS unit on—

*Jeff King:*      Yes.

*Cooper:*      And took the picture.  And you know that that is where the line that divides township 10 south from 11 south, that east-west running line, crosses the north-south running line that divides range 9 from range 10, you know that it's at that intersection, correct?

*Jeff King:*      Yes.

*Cooper:*      And you just identified that on your section as the area very near your camp and your kill site on the map that you produced as JJ, correct?

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 83 of 118

*Jeff King:*      Yes.

*Cooper:*      And I think you've acknowledged that the exhibit 32 that you have just identified for us is information that you had available relating to the latitudes and longitudes points on that line before you went hunting, is that correct?

*Jeff King:*      Um, I got this map 6 weeks ago.

*Cooper:*      No I was talking about the latitude-longitude chart even though you didn't know how to read it and how to correlate the point—the number of points on the boundary line to the latitude and longitude on the next page where the numbers are reiterated, you had that information before you went hunting, correct?

*Jeff King:*      I saw it on the webpage if you're talking about this stuff, is that correct?

*Cooper:*      That's correct.

*Jeff King:*      I've seen this stuff then and I—

*Cooper:*      I would offer 32 in as evidence, Your Honor.

*Angstman:*      I have no objection.

*Judge:*      32's admitted.

*Cooper:*      Aside from—let me ask you this.  Is it your position that you didn't know enough about how to use the GPS to get this kind of information off of it, the latitude and longitude that would be shown on the chart, on your map, JJ, or on the chart exhibit 32, you didn't know how to use the GPS to locate those spots on the ground?

*Jeff King:*      I have repeatedly said that the GPS is not my idea of a mechanism for travelling.  I use it for speed and distance with my dog team and when I saw what I take to be too complicated I chose to not go anywhere that would cause me concern.

*Cooper:*      Were you aware that Lynn Thompson had used a GPS to locate park boundary points?

*Jeff King:*      I don't know about points.  I know that he was familiar with the latitude or the longitude, the horizontal line, in that area.

*Cooper:*      That he used it in that way, to locate that line?

*Jeff King:*  At times, yes but it is—yes.

*Cooper:*  So you're not telling the court that you didn't know a GPS could be used that way?

*Jeff King:*  Absolutely not.

*Cooper:*  Are you saying that you just didn't know how to do it?

*Jeff King:*  I said I chose not to go anywhere that we have not confir—had not been that would make me need to spend the time to learn something that is not familiar to me.

*Cooper:*  Okay.  So evidently what happened, then, was he relied on what Lynn Thompson or someone else previously had told you about where that person thought the line was, and though you had the data in front of you to figure it out yourself, you were not going to do that, you chose not to?

*Jeff King:*  It was not in front of me while we were out there, this was a decision made in advance of our departure.

*Cooper:*  Right, what a day or two before you left?  A week before you left?

*Jeff King:*  I think it was more like a day or two.

*Cooper:*  It's not that you didn't—you said you chose not to do it.

*Jeff King:*  I believe you said that.

*Cooper:*  I think I'm using your word, is that not the right word?

*Jeff King:*  I think it's accurate, I chose not to see if I could see figure out how to make this information of any value to me by staying in an area on the trail.

*Cooper:*  Did you say, to Mr. Leonard, on the tape recorded statement at the time of the search warrant last fall at your house:  I tried like hell to find the GPS coordinates of your northern boundaries, I was on the internet before we went out there because I wanted to take a GPS because my friend wasn't going.  He had researched it.  You try and get on the Park Service's website right now and find that northern boundary.  There are lines drawn but just nowhere does it say what the—I couldn't find, certainly not readily available nor in the regs, they just draw this line up through there.  Did you say that?

*Jeff King:*  Yes, sir.

*Cooper:*  Is that inconsistent with what you just now told the court?

*Jeff King:*  Not to me, I thought it was exactly the same thing.

*Cooper:*  You chose not to use the GPS.  Here you say tried like mad to do it, to find the coordinates, you wanted to bring a GPS to find the line.  Isn't that what you're telling the ranger at the time of this tape recording?

*Jeff King:*  I heard that, yes, and I consider them so similar I didn't recognize the difference you're picking up.

*Cooper:*  Well, which was it?  Did you try like mad to find the boundary, the coordinates and you wanted to take a GPS to find them, to get yourself on the right side of the line and you couldn't find it, or is it you already found out from Lynn Thompson or someone else and believed that person and chose not to try to figure it out?

*Jeff King:*  All of that sounds accurate, Mr. Cooper.

*Cooper:*  The latter or the former?  They're two different—

*Jeff King:*  All of that sounds familiar.

*Cooper:*  Which one reflects—

*Jeff King:*  Well, if I gotta' choose I guess you gotta' say it again.

*Cooper:*  Sorry?

*Jeff King:*  If I need to choose something I need to have them delineated, I didn't really see the difference.

*Cooper:*  You don't see the difference between using—

*Jeff King:*  That's correct.  If you would repeat it, I'll try to do that.

*Cooper:*  I mean your testimony today, isn't it, is that you chose not to rehash this because you had learned the boundary from somebody else even though you saw the coordinates on the website?

*Jeff King:*  I believe I also said that I was interested in considering going somewhere different, and if I was going to go any closer towards the boundary to the east, to the west, I had to look into this. Lynn's not going to be there, I got this far and, in my opinion, yes tried like hell, maybe that's an exaggeration, going I don't think soo—this is not my idea of hunting, I think I'll just stay somewhere so I won't have to worry about that.

*Cooper:*     So it's not true what you told the ranger, that you could not find the coordinates of your northern boundary?

*Jeff King:*     Yeah, I guess that's similar to the helicopter thing.

*Cooper:*     No, it's not true, is it, Mr. King? What you told the ranger at that time?

*Jeff King:*     That I couldn't find the coordinates—

*Cooper:*     That's correct.

*Jeff King:*     That's true.  It is true that it's not accurate.  What I meant was I didn't know what to do with it when I got it.  I apologize for that.

*Cooper:*     And you told him that he could even go on there and look and you wouldn't be able to find them.  You try, get on the Park Service's website right now and find that northern boundary.  There are lines drawn but just nowhere does it say I couldn't find, certainly not readily available, in the regs, they just draw that line right up through there.

*Jeff King:*     I was referring to these lines sir.  I thought this was a pretty—this is not how I go hunting and so I didn't know how to use these lines—these were the lines I recall thinking when I said those lines, they're lines, they're not topomap, they don't show me the river, they don't show me anything that I'm familiar with looking at so I'm going to choose not to pursue learning this 2 days before I go hunting with my daughter.  I'll just go to the place we've always gone, there was someone there, we moved up the ridge a little bit.

*Cooper:*     Okay, you don't have any question about the fact that the line runs east-west in there, correct?

*Jeff King:*     That's correct.

*Cooper:*     It's true east, true west, right?  According to—you know the difference between true and magnetic in Alaska it's 25 to 30 degrees—

*Jeff King:*     No, I do not know that.

*Cooper:*     Oh, okay.  Do you know that maps show north, south, east, and west, correct?

*Jeff King:*     Yeah there's usually a little cross with the north on the top.

*Cooper:*   Right and you know that east-west is what the park boundary line runs, isn't that true?

*Jeff King:*   I don't know that, it would appear so—

*Cooper:*   It always has appeared that way to you, hasn't it?

*Jeff King:*   That it runs east-west?

*Cooper:*   Yeah.

*Jeff King:*   That section has appeared to go east-west, that's correct.

*Cooper:*   Correct and so you needed to stay north of that boundary, you knew that much?

*Jeff King:*   I did know that much.

*Cooper:*   And therefore you also knew that, didn't you, the important factor for you was where is this east-west line that is just south of my camp?  That was the question that you needed to be sure of, correct?

*Jeff King:*   That's correct.

*Cooper:*   And you had the data in front of you and chose not to pursue it, is that also correct?

*Jeff King:*   I did not have—that is what I said and I'll elaborate because you're trying to make it sound different than the meaning—was that I can't even set the alarm on my cell phone, much less take this and be of any value.  My daughter set my cell phone alarm last night.  I will say, in reference to my inability to take this and when I was upset with Mr. Leonard on this issue, I was saying that this is not the notice that I can use.  This is totally unrealistic to me, I've been in the woods for 30 years and this is not me, it's not anything I understand.

*Cooper:*   But you—

*Judge:*   Excuse me what's the exhibit ID on the document that you were holding up?

*Jeff King:*   This one is 32, judge.

*Judge:*   Thank you.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 88 of 118

*Cooper:*   And but you did know whatever the latitude numbers given on that document number 32 are, that they were, for all practical purposes, right real close to numbers latitude 64 on that map, is that right?

*Jeff King:*   You know what I remember, Mr. Leonard—

*Cooper:*   No, if you could tell me the answer to my question—

*Jeff King:*   Which is what, yes?

*Cooper:*   That you know that they're very close to latitude 34—64, which is a practical answer to what those numbers really are, right?

*Jeff King:*   Not when there is—no I don't know what 64 is—

*Cooper:*   Well didn't you just tell us that beforehand?  If you saw a map and you saw 64 degree latitude parallel, that that was a good indicator that you were at or about the park's northern boundary in that area, correct?

*Jeff King:*   That's correct.

*Cooper:*   Okay.  So wouldn't  a GPS at least show you whether you were going south of 64 or not if you carried it and looked for that only and nothing else?  Wouldn't that be—

*Jeff King:*   That's exactly how I done it in my research, to utilize that function on the GPS but I had no reason to do so on a well beaten trail in an area that I felt comfortable with from prior years.

*Cooper:*   Was there a trail running from the area that on the ridge to the kill site of that moose?

*Jeff King:*   No.

*Cooper:*   There was not?

*Jeff King:*   No.

*Cooper:*   The trail you're speaking of that is the Rock Creek Trail?  That's the one you were camped beside, right?

*Jeff King:*   Yes.

*Cooper:*   Is that the trail that you were speaking of that's a well beaten trail?

*Jeff King:*   Yes.

*Cooper:*   But you went south off of that towards this park—

*Jeff King:* As we have done many years, there's a lot of country between the ridge and Mr. Leonard testified that most of the creek is on the south side of the boundary line.

*Cooper:* In fact you had a conversation with Mr. Leonard on the subject of that creek, did you not?

*Jeff King:* Yes, we did.

*Cooper:* And didn't you tell him that the other side—that the—sorry let me find it here—that you knew that the park boundary came this side of the creek—this is on page 3 of the transcript of your tape—does that sound familiar to you and is one of the things you stated to Mr. Leonard

*Jeff King:* That would sound like the end of the conversation.

*Cooper:* More or less in the beginning, I knew that it came this side of the creek but I guess the bottom line is I knew it was close, I've always known it was close.  Is that what you told him?

*Jeff King:* I already answered that question.

*Cooper:* In the affirmative?

*Jeff King:* Yes.

*Cooper:* And then this geostation marker that's up on a ridge, that's also this side meaning north of the creek is it not?

*Jeff King:* Yes, it is.

*Cooper:* Did you also indicate to Mr. Leonard right at that same time that on the other side of the creek there's a big flat plateau, we've got several moose off that plateau.  Did you tell him that?

*Jeff King:* Yes.

*Cooper:* In other words you're admitting to him—you admitted to him that you've crossed what even you thought was the boundary, this creek, and what and got several moose off of that plateau?

*Jeff King:* No, no, that's not true at all.

*Cooper:* That is what you said, correct?

*Jeff King:* No, your implication is that it was close, I mean we hunt a large area.  There's a very large plateau.  That creek takes a little bit of a

swing to the south up under the hill I believe and drains out but the—you know I feel like you've been trying to put words in my mouth.  The second marker is down there on that plateau, I know that Mr. Leonard knows where that is—

*Cooper:*　　What second marker are you referring to?

*Jeff King:*　　The marker you said well first you say there's one marker then it's two.  The second one is really not in the proximity, it's quite a ways away.  I estimate about 5 miles and—

*Cooper:*　　5 miles which way?

*Jeff King:*　　To the west.

*Cooper:*　　And this was a—what kind of a marker was this?

*Jeff King:*　　It was a silver marker with the same appearance as these.

*Cooper:*　　Like the cap with the survey information on it?

*Jeff King:*　　That's correct.

*Cooper:*　　And that's about 5 miles west of your camp?

*Jeff King:*　　Yes, sir.

*Cooper:*　　When did you see that marker?

*Jeff King:*　　I have repeatedly said that I saw that marker in years gone by when we hunted further out the country, the trail continues out and it goes right by this marker.

*Cooper:*　　Have you presented to the court any map that plots the position of that marker?

*Jeff King:*　　I have not.

*Cooper:*　　You have presented to the court a map that plots the position of another marker a lot closer, like a mile west of your camp haven't you?

*Jeff King:*　　Yes.

*Cooper:*　　Have you seen that marker?

*Jeff King:*　　No—oh the mile west, from above yes—we—

*Cooper:*      No, I mean before you hunted. Before you hunted it last September.

*Jeff King:*      Last September? No, we did not spot it cause we—

*Angstman:*      I have to interrupt. The question was broken. And he said before you hunted and then there was a pause and then he said did you see the marker? And I know Mr. King is answering the last half of that question and I ask that it be repeated again.

*Cooper:*      Did you see that marker a mile west of your camp or kill site before you hunted last September?

*Jeff King:*      No.

*Cooper:*      Had you ever previously, prior to that time, ever seen that one a mile west?

*Jeff King:*      Yes.

*Cooper:*      How much earlier had you seen that one? When was the last time you saw the marker?

*Jeff King:*      Several times, I don't keep dates of such things in one of the previous hunting trips, looking down, glassing the hillside in the immediate area of where Cali and I chose to put the tent. There were times, it's remarkable because I always thought it was a moose antler cause they shine light and oh no—so you stay away from it. I've never been anywhere near down there. I can only assume what it was because the trail that goes all the way to the Teklanika goes exactly by the same type—or a marker that when I look down below going yeah, boy that one, that's probably just have reason to believe it's just like that one 5 miles away. There's trees and 5 miles of terrain between it's very difficult, my complaint to Mr. Leonard that the only 2 markers I know of are so far apart that basically I say well there's only 1 marker here to try to figure out where the boundary is, so is it that ridge?

*Cooper:*      With reference to your testimony that you knew the line ran east-west and you knew it was approximately on 64 degrees latitude, you see the marker that's in exhibit 8 that's enlarged quite a bit but it's the cap that's on the marker nearest to the kill site, right?

*Jeff King:*      You bet, you bet.

*Cooper:*      Alright and right in the middle of it, it has a cross and that cross divides the 4 section corners that come together and the 2 ranges and 2 townships that come together there, does it not?

*Jeff King:*     You have made that clear, yes.

*Cooper:*     So it's fair to say that looking at your own map, GG, JJ I think it is, is the also in front of you there—that this east-west running boundary line along the north side of the park is depicted by the east-west running line on the survey marker in the middle of that marker, is it not?

*Jeff King:*     You have demonstrated that.  It does not say north, south, east, or west on the survey marker, however, nor does it tell you if you're anywhere near the park.

*Cooper:*     But your map indicates the position of ranges 9 and 10 and townships 10 and 11 and—

*Jeff King:*     You're referring to a map I got 6 weeks ago that's representing an area the size of Georgia.

*Cooper:*     Is there any reason  that you didn't pick up a map like this before you went out there?  It has all the sections and townships on it, and ranges.

*Jeff King:*     That's correct, sir.

*Cooper:*     And the boundary line of the park and Rock Creek and the ridge you were camped on.  You chose not to get—is that another thing you chose not to do?  Was to not pick up a map?

*Jeff King:*     I didn't need a map to go where I've been going for many years.

*Cooper:*     Did you have reason to believe that the benchmark or survey marker that you saw, which is in exhibit 8, but was just the same thing only farther west by about 5 miles or—do you have any reason to think that didn't give you the alignment of where that boundary line was?

*Jeff King:*     A close inspection of that marker, sir, would show it laying flat.  It does not stand up.

*Cooper:*     Ah, I see.  So it's been displaced by the forces of nature.  What about the other one, say a mile, from your camp?  You knew they were along there periodically, didn't you?  You'd seen those 2 at least?

*Jeff King:*     From the top of the ridge we had spotted some silver in the brush on a number of occasions that we took to be and was in alignment with the maps whenever they were looked at in the early years of this hunt and we used it to correct and in absence of any other

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 93 of 118

marker, this very exhaustive research was to make our best—do best with what we knew how to use.

*Cooper:* And that did not include a GPS?

*Jeff King:* That's correct.

*Cooper:* Or a compass?

*Jeff King:* The answer is no.  A compass in willows 8 feet tall—and I don't know how to use a compass, I'm a little embarrassed, but I don't.

*Cooper:* Or a map?

*Jeff King:* That I don't know how to use a map?

*Cooper:* No I'm asking you, you chose not to use a GPS, a compass, or a map, is that correct?

*Jeff King:* I had no need, Mr. Cooper.

*Cooper:* That's your statement?

*Jeff King:* That's my statement.

*Cooper:* Now, evidently when you shot the moose the first time, you're not sure you hit it or not, correct?

*Jeff King:* Correct.

*Cooper:* And you, as you testified, you've on previous occasions or maybe more than once you emptied a gun at an animal without hitting it, is that correct?

*Jeff King:* I never said such a thing, no.

*Cooper:* I think the record—

*Jeff King:* Empty a gun?

*Cooper:* Yes.

*Jeff King:* I've never have used those words, today sir.

*Cooper:* I think the record will show that you did, but—

*Jeff King:* Yeah, well check that one.

Case 4:08-cr-00008-JDR      Document 43-3      Filed 09/13/08      Page 94 of 118

*Cooper:* Isn't it true that you testified that you're not a great shot?  I wrote that down, did I get it wrong?  Not a great shot, quote unquote?

*Jeff King:* I recall reading that in the paper as well, sir.

*Cooper:* Did you say that today to the court under oath?

*Jeff King:* That I'm not a good shot?  I honestly don't remember saying that.

*Cooper:* Really?

*Jeff King:* That's correct.

*Cooper:* So you don't know whether you hit the moose the first time, correct?

*Jeff King:* I know I said that.

*Cooper:* Because it gave no indication that it had been hit, it ran, is that your testimony?

*Jeff King:* I said it disappeared instantly—

*Cooper:* Right.

*Jeff King:* And then you can see these big things moving and it was clear it was not mortally wounded.

*Cooper:* Or wounded at all?

*Jeff King:* That's true, I didn't know that.

*Cooper:* Okay.  And at that time you had no concern about whether you were in the park or not, you thought that you were in the clear?

*Jeff King:* By a long ways.

*Cooper:* By what some friend had told you previously?

*Jeff King:* That's why it was nice when the ranger pointed to the same ridge because there's no markers we could only go on—a ranger of the park would indicate that I was willing to gamble that I knew what it was, not gamble, I was going to go forward with the same mindset we've always used and when I had an opportunity for outside assistance, I asked for it and it confirmed what we had believed.

*Cooper:* Did you make a mental note or do you know, or do you recall which way that moose ran or how far after the first shot?

*Jeff King:* I know that I couldn't see it and I was relocated through the brush trying to find another clear view.

*Cooper:* When he darted away out of your site, which way did he go?

*Jeff King:* Downhill.

*Cooper:* Downhill, what compass direction would that be—oh I'm sorry you don't use a compass—what -- ?

*Jeff King:* I don't need a compass to know north and south, sir and it clearly was moving south.

*Cooper:* South, okay. Not southwest, south?

*Jeff King:* Definitely not south.

*Cooper:* Do you know which ways the gulleys run in that area? Don't they run southwest?

*Jeff King:* I don't know that either.

*Cooper:* Wasn't that the direction you went down the hill to stalk that moose, was down the gulley? I think you told Mr. Leonard on the tape down the gulley, wouldn't that be southwest?

*Jeff King:* I believe I was headed due south down into the gulley but if there's a significance there, I know that we were not at the end of the gulley, the end of the gulley is where the bone piles eventually ended up. We were to the right of that and we went down into the gulley.

*Cooper:* So your testimony now is that it was running straight south the whole time?

*Jeff King:* I couldn't see it, sir, I never said I knew which way it was going except downhill. When it reappeared it was downhill from where I last saw it.

*Cooper:* Okay, so when—after the first shot then, I want to get where it went after that. Your best indication is that you didn't see it for more than a split second or so but which way was it headed?

*Jeff King:* Downhill which was pretty close to south, plus or minus—it might have been a little southwest.

*Cooper:* And disappeared in the brush again, correct?

*Jeff King:*   It was mostly disappeared.

*Cooper:*   And then you followed it and saw it, is that correct?

*Jeff King:*   That's correct.

*Cooper:*   How far do you think you went from the time of your first shot until the time that you saw it again and got in place again for a second shot?

*Jeff King:*   A hundred yards.

*Cooper:*   And so then at that point, then, you aimed at it, shot it, and that was the kill shot?

*Jeff King:*   That's correct.

*Cooper:*   So, a hundred yards between the first and second shots and the second shot was which direction?

*Jeff King:*   Due south, downhill.

*Cooper:*   You think that was a 125 yard shot?  Oh I'm sorry that was the first one.  How long was the second shot?

*Jeff King:*   I have no idea but I knew that as soon as I could see it again I needed to shoot.

*Cooper:*   I see.  So not thinking you were in the park, you weren't thinking as you testified here that you had to follow it no matter where it went because you didn't want it to suffer.

*Jeff King:*   That never went through my mind.

*Cooper:*   So the issue about what you were supposed to do if it runs into the park wasn't in your mind or your thinking at all?

*Jeff King:*   That's correct.

*Cooper:*   Now you looked across the valley and you saw a ridge on the other side and this ridge you believe had a marker on it and you showed us a picture I think it's photograph exhibit U.

*Jeff King:*   I don't consider that ridge the other side of the valley—you first call it a gulley and now you're calling it a valley.

*Cooper:*   Alright so it's down, it's down in the—

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 97 of 118

*Jeff King:*      It's the other side of the same gulley, it's the same gulley on the other side.

*Cooper:*      Right, in other words it's not over to the next mountainside, it's not that big of a ridge is what you're saying?

*Jeff King:*      That's correct.

*Cooper:*      Okay, that's fair, but it was on that ridge that you indicated that you saw this other marker and when did you see that marker?

*Jeff King:*      I first saw it when I chartered a helicopter to go out and try to find a park boundary.

*Cooper:*      You had not seen it before that time?

*Jeff King:*      I had not.  I wanted to know why we believed that boundary marker was there or that why the boundary was where I believed it was.

*Cooper:*      I see, so in other words when you chartered a helicopter that would have been in this summer sometime?

*Jeff King:*      Yes.

*Cooper:*      So within the past month or so?

*Jeff King:*      This summer sometime.

*Cooper:*      Okay because I think you indicated the picture that your daughter took across there with a 300 millimeter lens was taken on the first of August?

*Jeff King:*      That's correct.

*Cooper:*      Okay.  It shows you walking over there in a red jumpsuit.  At that time you had not yet ever seen this geostation marker?

*Jeff King:*      I did not say that.  That was the first time I got to it that day, the day that I was going into—

*Cooper:*      I'm sorry, I'm sorry I stand corrected.  You did see it from the helicopter before that day when you went in there?

*Jeff King:*      Yes, I did.

*Cooper:*      I got you, okay.  But that would have also been this summer sometime?

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 98 of 118

*Jeff King:*     Yes.

*Cooper:*     So you didn't see it either from the ground or the air prior to that helicopter trip?

*Jeff King:*     That's correct.

*Cooper:*     Now, was there someone who told you that there was a marker over there or did they just say that a line went across that ridge?

*Jeff King:*     Just—I don't recall such a conversation, believe me I wish I did. I don't recall such a conversation with anyone that said I saw a marker on that ridge but the ridge had been used consistently. It's a very high profile ridge as the trail hits.

*Cooper:*     You mean used as a land—someone told you not that there was a marker on that ridge, but that that ridge was a landmark to tell where the boundary went because their information to you is the boundary went over that ridge, right?

*Jeff King:*     That's correct.

*Cooper:*     Or went lengthwise along that ridge or something like that? East-west?

*Jeff King:*     Of course it would be—if it was going to go over that ridge—we know the point to the southwest, I've mentioned it several times so from my camp, the point we look at at the southwest is way down below us and there's lots of good hunting between here and there, between camp and there. That's not an issue.

*Cooper:*     Right, but the issue is where the park boundary was where your moose was, correct?

*Jeff King:*     Correct that's why we didn't go after the first moose we saw which was on the ridge that I had been led to believe and found a marker on that I am now confident was—why I was led to believe that and the same marker that you landed at and never told us about—I feel like I have been misled by the government.

*Cooper:*     You knew about that marker but you didn't know that we did, is that what you mean?

*Jeff King:*     That's correct.

*Cooper:*     I see.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 99 of 118

*Jeff King:*   In fact I had testi—hearsay from employees of the park that were in the helicopter that said there was no such landing.

*Cooper:*   So, now, it's clear then the photo in exhibit U it has a liiiiittle silver dot along that far ridge that you pointed out?

*Jeff King:*   That liiiiittle silver dot is real big in a spotting scope or binoculars. It's not small considering a marker.

*Cooper:*   Right but you had not ever seen that before the hunt in this case, correct?

*Jeff King:*   I will repeat my answer, affirmative.

*Cooper:*   Alright.  I have no other questions, Your Honor.

*Judge:*   Redirect ___ ?

*Angstman:*   You got that map from Mr. Walker, is that correct?

*Jeff King:*   That's correct.

*Angstman:*   Did he work for the park at one time?

*Jeff King:*   I think so, I know he's a fish and game officer.

*Angstman:*   Have you ever seen that map commercially available anywhere in the state of Alaska?

*Jeff King:*   I have not but he's a real park buff.  He as well as I adore the park.

*Angstman:*   Now you've seen numerous and I not going to go through them because I don't want to kill any more time than we already have but you've seen numerous commercially available maps from USGS, various companies that provide them in this courtroom, haven't you?

*Jeff King:*   Yes, I have.

*Angstman:*   Some we've brought.

*Jeff King:*   Yes, that's true.

*Angstman:*   Some they've brought?

*Jeff King:*   That's true.

*Attorney:*   Some of those commercially available maps don't have the park boundaries on them do they?

*Jeff King:* Some of them do, some of them don't.

*Angstman:* The ones that are called USGS maps do not, isn't that—

*Jeff King:* Not in the area, the smallest scale or the largest scale, depending on how you're supposed to know that stuff, the ones that show the most detail that have any value in the field do not have the line on it.

*Attorney:* I have nothing further, thank you.

*Judge:* And you re-cross?

*Cooper:* No, Your Honor.

*Judge:* Mr. King, you may step down. Any other evidence by the defendant?

*Angstman:* Yes, Your Honor. Would you step in front of the clerk here and then we'll swear you in as a witness.

*Clerk:* Raise your right hand. Sir, do you solemnly swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth so help you God?

*Lynn Thompson:* Yes.

*Clerk:* Thank you, you may have a seat up there. Sir for the record, could you please state your full name, and then spell your last name and also give your city and state of residence?

*Lynn Thompson:* Lynn Neil Thompson. T-H-O-M-P-S-O-N, Fairbanks, Alaska.

*Clerk:* Thank you.

*Angstman:* Mr. Thompson would you state for us what your occupation is.

*Lynn Thompson:* I'm plant manager for Golden Valley Electric Company, I manage 5 of their power plants.

*Angstman:* Okay, do you have a part-time occupation as well?

*Lynn Thompson:* I'm a guide.

*Angstman:* A hunting guide?

*Lynn Thompson:* I'm a class-a assistant hunting guide.

*Angstman:* Okay, are you acquainted with Mr. King, here?

*Lynn Thompson:*      I am.

*Angstman:*      We're here talking about a criminal case against Mr. King that I'm sure you're aware of and we want to ask you some questions about what you may know about Mr. King's hunting history. Can you do that?

*Lynn Thompson:*      Yes.

*Angstman:*      Alright, how long have you known Mr. King?

*Lynn Thompson:*      Since probably 1985.

*Angstman:*      How did you become acquainted?

*Lynn Thompson:*      I believe we both worked for ARA Services down in Denali Park.

*Angstman:*      Do you share an interest in outdoor activities with Mr. King?

*Lynn Thompson:*      Yes.

*Angstman:*      Did you ever start pursuing those interests with him?

*Lynn Thompson:*      Yes, I hunted with Jeff and his daughter, my family and I did.

*Angstman:*      And when did you start doing that?

*Lynn Thompson:*      Approximately 2000, the year 2000, 2001.

*Angstman:*      Alright, what kind of hunting did you do?

*Lynn Thompson:*      Moose hunting.

*Angstman:*      And where did you do that?

*Lynn Thompson:*      We did that on the north side of Denali Park, out the Rock Creek Trail.

*Angstman:*      Okay, are you familiar from talking with Mr. King on where the camp was that he, from which he got the moose that brings him here today.

*Lynn Thompson:*      I'm familiar with the area he was camped, yes.

*Angstman:*      Okay, I'm going to—I'm going to ask you to look at Exhibit T there that's on the board next to you and just for some perspective, I'll give you a hint. It's been represented that this was taken from a ridge near or right near the Rock Creek Trail looking to the south or southeast in a general area to Mr. King's kill site that's been the

Case 4:08-cr-00008-JDR      Document 43-3      Filed 09/13/08      Page 102 of 118

subject of this case today.  With that description, do you recognize the area?

*Lynn Thompson:*  Yes.

*Angstman:*  Have you been there?

*Lynn Thompson:*  Yes.

*Angstman:*  Okay, now that's an April photo.  Have you been there at various times in the year?

*Lynn Thompson:*  Yes, sir.

*Angstman:*  Next, I'll show you exhibit 20 and—

*Judge:*  You need to stand in front of the mike when you speak.

*Angstman:*  And I'll represent to you that this was taken from the approximate area of Mr. King's campsite, which was further to the west than the area where the first picture was taken.  Again, looking to the southwest, off the Rock Creek Trail ridge down into a valley. Have you—do you recognize that location?

*Lynn Thompson:*  Yes.

*Angstman:*  Okay, have you seen that in person before?

*Lynn Thompson:*  Yes.

*Angstman:*  Alright, have you hunted there?

*Lynn Thompson:*  Yes.

*Angstman:*  Now we've heard considerable evidence in this case that this entire area is both near the Rock Creek Trail and near the national park boundary, are you aware of both of those facts?

*Lynn Thompson:*  Yes.

*Angstman:*  Alright, before you went hunting with Mr. King, did you know the park was in the general vicinity of where you were going to be hunting?

*Lynn Thompson:*  Yes, sir.

*Angstman:*  And did you take any steps to prepare yourself to the possibility that you'd be near the boundary.

Case 4:08-cr-00008-JDR    Document 43-3    Filed 09/13/08    Page 103 of 118

*Lynn Thompson:*     Yes, sir.

*Angstman:*     And what did you do?

*Lynn Thompson:*     I called Park Service and asked them for the coordinates to the north boundary to the park.

*Angstman:*     And when was that?

*Lynn Thompson:*     The year 2000, I believe.

*Angstman:*     Alright and then what process did you use to call the Park Service, tell me how that works.

*Lynn Thompson:*     I called parks service—

*Cooper:*     Your Honor I have an objection of relevancy this is 7 years prior to the event in question.

*Angstman:*     Your Honor, the issue is tied in, of course, and I'll explain that to the court and how it will be tied in—he went hunting with Mr. King that year with incorrect coordinates provided by the Park Service.  He on the date in question punched those into his GPS which he has with him here today and he'll show the court, and the 2 of them went with that incorrect reading and found landmarks along this very route that Mr. King is now hunting and he kept those coordinates on his website for many years of hunting with Mr. King.  They came from the Park Service, they had no reason to doubt they were accurate and they utilized them to create a series of landmarks from which they could safely hunt near what they considered to be the boundary.

Now, the relevance of something that happened a few years earlier is very relevant if there is no reason for them to update their information or learn something different about the information that they were provided.  You don't have to call the Park Service every year to find out what the coordinates are because one can assume that they stay the same and if this information was incorrectly imparted to Mr. Swanson and shared with his hunting partner causing the belief of where a boundary existed is very relevant to this case, Your Honor.

*Judge:*     The only relevance I see is whether it was an intentional hunting in the park and I don't think the government is taking that position.  It doesn't have to be intentional to be a violation.  I think you have a hearsay problem as to what he was told by somebody—that's not going to come in.  He called somebody and got misinformation.  I don't see the foundation for this coming in.

*Angstman:* Okay well Your Honor, if a person calls a governmental agency on the phone  and gets somebody on the phone that reports information to them first of all it's not hearsay because the information we're not submitting for the truth of what they told them, but the fact that they called and got the information and acted on that information, that's the first step.  The second step then is that they act on it to their detriment and we will argue at the end of this case that they acted on it in their detriment in furtherance of a claim that we are making and that we're entitled to make that they were entrapped by estoppel.

The government committed entrapment by estoppel by providing false information to someone who acted on that to their detriment. They're not claiming intentional acts, of course they're not, but we're claiming that we were lured into this situation by the incorrect, improper information that we were provided by the government and I would certainly want to put an offer of proof on it if the court denies me the opportunity to bring this information.

*Judge:* Well, through this witness it's not going to come in.  If you have a government witness that can say something directly, that's one thing, but I don't know how you're going to proceed with it but so far it's not going to come in.

*Angstman:* You're saying that because it's hearsay, is that what your?

*Judge:* Well that's one of the problems, yes.

*Angstman:* If it's not presented for the truth of the matter stated it is not hearsay.  We are not submitting this for the truth that the park boundary is as he would testify, we're submitting it to the truth that the call was made and the incorrect information was provided to this—

*Judge:* It's still coming in for the truth of what the person told him, it's hearsay.

*Angstman:* Alright, Your Honor.  You will allow me to have him say what he would say for the record?

*Judge:* As a proffer, yes, you can go ahead.

*Angstman:* I'll do it for proffer Your Honor.  I will continue where I left off. Did you call the Park Service?

*Lynn Thompson:* Yes, I did.

*Angstman:* And what was the context of that call?  Who did you talk to?

*Lynn Thompson:*      I believe I was transferred to the rangers.

*Angstman:*      Okay and what did the ranger tell you when you asked him for the coordinates of the north boundary?

*Lynn Thompson:*      He said he would call me back with those.

*Angstman:*      And did you get a call back?

*Lynn Thompson:*      No sir.

*Attorney:*      Did you try again?

*Lynn Thompson:*      Yes, sir.

*Angstman:*      And what happened then?

*Lynn Thompson:*      I believe the 2nd time I called back he wasn't available, the 3rd time I called back I was able to talk to him and he gave me coordinates.

*Angstman:*      Did you record those coordinates?

*Lynn Thompson:*      Yes, sir.

*Angstman:*      Do you have them on your GPS today?

*Lynn Thompson:*      Yes sir.

*Angstman:*      Would you start up your machine and we'll just pass them to the judge so he can see what those coordinates are. You do that and I'll remain seated.

*Cooper:*      I'd like to see it.

*Judge:*      Mr. Cooper it's—

*Angstman:*      Read what's on there and explain a little bit about it then we'll pass it to the clerk.

*Lynn Thompson:*      It is labeled as a landmark it is called park, P-A-R-K, and the latitude is 63, 59, 31 north, longitude 148, 47, 46 west.

*Angstman:*      Okay and does your machine record a date when any information such as that is plugged into it?

*Lynn Thompson:*      Yes, sir.

*Angstman:*      And what date is plugged into that?

Case 4:08-cr-00008-JDR      Document 43-3      Filed 09/13/08      Page 106 of 118

*Lynn Thompson:*  7:26 pm, 25th of August, year 2000.

*Angstman:*  Did you use that device then to go to the area and hunt?

*Lynn Thompson:*  Yes, sir.

*Angstman:*  And did you assume that the information you had been provided was correct?

*Lynn Thompson:*  Yes, sir.

*Angstman:*  Did you make any steps yourself and with Mr. King to determine where, on the ground, there were references you could use to keep those numbers in mind?

*Lynn Thompson:*  Yes, sir. We walked up and down the valley with this GPS to find landmarks that we could use to establish what we believe was the line.

*Angstman:*  Okay, and that's the valley that is pictured in the 2 exhibits that I just showed you?

*Lynn Thompson:*  Yes, sir.

*Angstman:*  And you remember as part of that—utilizing any landmarks on this ridge that's at the top of this picture, can you see it from there?

*Lynn Thompson:*  No, sir.

*Angstman:*  I will come.

*Judge:*  Panoramic exhibit, number for the record.

*Angstman:*  Exhibit is T, and if I may excuse his microphone to—

*Judge:*  Yes and Mr. Cooper you can move if you need to see where he is pointing.

*Cooper:*  I would like to do that.

*Angstman:*  At the top right of this page is a marker that you don't have to concern yourself with the language on it but in that general vicinity did you determine that your GPS reading showed you the park boundary existed?

*Lynn Thompson:*  I believe that this showed me where the park boundary existed, yes.

Case 4:08-cr-00008-JDR  Document 43-3  Filed 09/13/08  Page 107 of 118

*Angstman:*  And can you point to where that would have been on that ridge that you're looking at on this quadrant of the map, if it did?

*Lynn Thompson:*  It's hard to tell from this angle but we used the creek bottom to beaver ponds down to the west and used a line going up the ridge.

*Angstman:*  And is that this ridge that I'm pointing to?

*Lynn Thompson:*  Yes, sir.

*Angstman:*  Okay and did you actually walk up on that ridge and do that?

*Lynn Thompson:*  Yes, sir.

*Angstman:*  Did you continue to use those geographic reference points for the period of time you hunted with Mr. King?

*Lynn Thompson:*  Yes, sir.

*Angstman:*  Did he utilize a GPS himself or did he trust yours?

*Lynn Thompson:*  We used mine.

*Angstman:*  Did he indicate to you that that was because he had any reason to believe that you were better at it than him?

*Lynn Thompson:*  I had the GPS, I was familiar with this unit.  I had operated it.

*Angstman*:  Okay did you know him to be competent with a GPS in that way?

*Lynn Thompson:*  No.

*Angstman:*  Okay did you ever see any boundary markers that you would consider to be or understood to be Park Service boundary markers?

*Lynn Thompson:*  I saw no markers that indicated they were Park Service boundary markers.

*Angstman:*  Okay, I have nothing further with the proffer Your Honor.

*Judge*:  You may cross-examine in the proffer if you choose.

*Cooper:*  Do you have any idea who you spoke to in the Park Service?

*Lynn Thompson:*  No, sir.

*Cooper:*  Do you even know that it was a ranger?

*Lynn Thompson:*  It was in the ranger section, they said let me transfer you to the rangers.  I assumed that it was a ranger that I was speaking with.

*Cooper:*  And this was in 2000 or 2001?

*Lynn Thompson:*  2000.

*Cooper:*  Did you ever verify on the ground any other location than just this one spot?

*Lynn Thompson:*  You mean as—the spot I actually used the latitude line to establish where the line was.

*Cooper:*  So you used that as an east-west line, you put an east-west line on that latitude?

*Lynn Thompson:*  Yes, sir.

*Cooper:*  And extended that, what, visually in just any direction?

*Lynn Thompson:*  Yes sir, we walked up and down the valley.

*Cooper:*  So as you hunt, what do you do?  You carry the GPS as long as numbers are bigger than 63 degrees, 59.31 minutes, you're in the clear as far as you were concerned?

*Lynn Thompson:*  Yes, sir.  I did not carry the GPS in my hand as I hunted, I established visual references as to where 63, 59, 31 was.

*Cooper:*  Did you ever have any of the maps that are in existence relating to the park boundaries, describing the park boundaries?

*Lynn Thompson:*  I had USGS maps, yes sir.

*Cooper:*  Did you have the USGS that's right in front of the witness box there, it's the large one if you want to turn that around and take a look at that exhibit.

*Judge*:  Assist him if he needs to.

*Cooper:*  It's JJ, is the exhibit number.

*Lynn Thompson:*  I can't say it was the exact map, but it was a map similar to that, yes.

*Cooper:*  And would you agree that if you looked at maps that give that location up there, you would have reason to doubt whether the number that was given to you was entirely accurate?

*Lynn Thompson:* I did doubt that the number was entirely accurate, yes.

*Cooper:* When did you develop that doubt?

*Lynn Thompson:* When I looked at my map program on my computer and saw that the number was different than what Park Service had given me.

*Cooper:* And when was that?

*Lynn Thompson:* In August of 2000.

*Cooper:* Did you—I guess anything you've told us now so far would only be relevant if you told that to Mr. King, sometime in the past before 2007—did you ever tell him that? What you've just told the court about these coordinates?

*Angstman:* Which part? The last part or the entire part?

*Cooper:* I'll clarify that. Did you ever tell Mr. King what you've told us about where you believed the boundary was from talking to someone you believed was a park ranger and yet that you doubted that that was accurate, did you ever tell him that?

*Lynn Thompson:* I told Mr. King where I came—where I got the coordinates and I told him that I had called them and said I doubted the relevancy of—or the accuracy of those coordinates and they had told me that that is what they believed the coordinates are.

*Cooper:* And that person that told you that was the same one that told you what they were in the first place?

*Lynn Thompson:* Yes, sir.

*Cooper:* And you still don't know who that was?

*Lynn Thompson:* No, sir.

*Cooper:* And why did you doubt them?

*Lynn Thompson:* Because the map program on my computer had it as 64,00 dot 00 and the coordinates given to me by Park Service were different than that.

*Cooper:* Right, farther south, correct?

*Lynn Thompson:* Correct.

Case 4:08-cr-00008-JDR    Document 43-3    Filed 09/13/08    Page 110 of 118

*Cooper:*            Did you change your hunting area as a resulting of finding the— finding on this program, that the latitude was farther north than what this ranger had given you?

*Lynn Thompson:*     No, sir I used the coordinates that I received from the ranger at Park Service,

*Cooper:*            And when was it that you told Mr. King that you had some doubts about the accuracy of that information.

*Lynn Thompson:*     It would have been in 2000.

*Cooper:*            Was that the last time you hunted with him or the first time?

*Lynn Thompson:*     That would be the first time.

*Cooper:*            How many times have you hunted with him since then?

*Lynn Thompson:*     Approximately 4 years.

*Cooper:*            Have you always hunted in accordance with these numbers you just gave the court, 64,59.31 as being the north boundary of the park?

*Lynn Thompson:*     Yes, sir.

*Cooper:*            Have you used that in this particular area, Rock Creek Trail, or all along that trail to the Teklanika or beyond?

*Lynn Thompson:*     I have used that beyond the Teklanika.

*Cooper:*            And any other parts of the Rock Creek Trail east of there?

*Lynn Thompson:*     Yes, sir.

*Cooper:*            No other questions, Your Honor.

*Angstman:*          I have none either, Your Honor.

*Judge:*             Alright this has been viewed as a proffer.  Mr. Cooper what is your view on whether any of it or all of it should come in?

*Cooper:*            Your Honor, I still have an objection to the relevance of this because if some other person who was not in position of authority told him on a hearsay basis that someone in a position of authority had told him that a number existed for a latitude that he suspected was not right, but was given by someone he believed to be a park official—that is not sufficient to ground any relevant finding that

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 111 of 118

this court could make regarding Mr. King unless we're talking about sentencing issues.  But, I believe that it is not relevant for the additional reason that there's no other evidence in the record that Mr. King ever considered anything like this when he hunted, he told us everything he considered but he never said he believed that he was hunting with reference to a park-supplied, erroneous, or park-supplied latitude line that led him to believe he was hunting in a lawful area.  So, both of those reasons—I think it's inappropriate and shouldn't be allowed.

*Angstman:*     Your Honor I was going to—first of all I'd like to approach and have the court read a memorandum on the questions of estoppel and I'll hand them to the government as well—

*Judge:*     Hand it to the clerk and she'll give it to me.

*Angstman:*     I didn't ask Mr. King questions about this subject because it would have been of course been very preliminary to do so I mean, then if the court is going to find that this witness' testimony is questionable, trying to shoehorn that in through Mr. King would have been very difficult to do without any basis for the court to decide what Mr. King was saying was a legitimate piece of evidence for his discussion about being unable to and misled by the government as to where the boundaries were.  It fits, however, with what he said which was that he had gone to this area with his hunting partner, Lynn Thompson, and they had determined that the park boundary went up over this ridge that is the focal point of this hunting escapade that we're here trying.  He didn't say that I did that because he got some numbers that turned out to be wrong from the government because it wouldn't have been proper for me to ask him that.

*Judge:*     I don't accept that statement, you could have laid the foundation for it if you chose.

*Angstman:*     Well I'll recall Mr. King if that's-

*Judge:*     Only if I allow it.

*Angstman:*     I'll ask that we recall him, Your Honor.

*Judge:*     Well, we're not going backwards.  We're going with this witness here as he is presented.  The most that could come in but I'm not sure it's worth much—his testimony as to what he claims he told Mr. King—you know that might be able to come in, but what I have a problem with is the accuracy of it—getting it from the government.  I mean that's, you know, there's not enough there for

me to accept that it was from the government to apply any kind of estoppel theory, just his testimony in that regard, he even stated that he had doubts himself as to the accuracy of the number and I don't know what that number was supposed to be anyway—I wouldn't have any problem in allowing in those statements that he said he told Mr. King.

It's not necessarily testimony from Mr. King that connects it up, but, at least that's his version of it, but in terms of acting upon what the government is claimed to have said—I don't think there's a sufficient foundation here for the court to give that any weight or accept that, I mean it's not enough for an estoppel to just claim that you called a government office and got that information.  We'd have estoppel in many cases all the time, people just saying I claim -- called security, social security, the IRS, everybody else and this is what they told me and that's not good enough to make out an estoppel argument—so that's where it stands.  If you want those statements out of the proffer of what he claims to have told Mr. King to come in, I don't have a problem with that.

*Angstman:*     Well I'll certainly move to admit whatever the court will allow in and I—

*Judge:*     Well that's the portion that I would allow in, those statements, what he says, what he told Mr. King.  And so that's the proffer and that's the ruling on this for that witness and you may step down.

*Angstman:*     Fine and I will move for—you may—I will move also for the application of the doctrine of estoppel and—of course the court has ruled on that but I want to make sure—

*Judge:*     Well you can argue that at the end of the case, we're not stopping in the middle of the case for the defense—

*Angstman:*     I understand that but I'm just letting the court know that I'm making the proffer that we just made was for that purpose and so that's why I brought it in and so it's on the record that it connected with that and I'll argue that at the end.

*Judge:*     Yes.

*Angstman:*     And we do not have any further witnesses, we will rest.

*Judge:*     Any rebuttal evidence by the government?

*Cooper:*     Your Honor there are a couple of points I wanted to review those with my witness—I realize it's near the end of the day but if I

could have just a few minutes to review that with him I could determine if—

*Judge:*   How much time do you need?

*Cooper:*   10 minutes.

*Judge:*   We'll take a 10 minute recess.

*Cooper:*   Thank you.

*Clerk:*   All rise.  This matter stands in recess for 10 minutes.

*Clerk:*   All rise.  His honor of the court, the United States District Court has reconvened.  Please be seated.

*Judge:*   The government is at the point where it has to decide if it has any rebuttal evidence to offer.

*Cooper:*   Your Honor for that purpose, I think the parties have a stipulation and that'll be the extent or what we have to offer.

*Judge:*   Alright either one may speak and I'll ask the other if he agrees.

*Cooper:*   Alright we would offer to stipulate, Your Honor, that the coordinates that are shown on the GPS that's pictured on the survey marker cap that's nearest the kill site, that being exhibit Double I, defense exhibit double-I, it shows a garmin GPS unit with some coordinates on the screen, sitting on that survey cap. Those coordinates that are shown on that screen were plotted on a map and we have that map in regard for that is exhibit 33, showing that the location of the coordinates in double-I is on the Parks Highway at the Nenana River, just where the park, where the Parks Highway leaves Denali National Park and when you're travelling north and there's a bridge over the Nenana River at that point and that is very near, within a mile of the McKinley Park air strip— excuse me.  I'm sorry, it appears to me that—while it may not be the—let me check something, Your Honor, if I may.  That's correct as I said it the first time.  Where the Parks Highway leaves the park as it crosses the river, the Nenana River, over the bridge within a mile or so of the McKinley Park strip.  That's where these coordinates that are on the screen in exhibit double-I are on the map.  And the GPS unit pictured in double-I is a different GPS unit from the one that is referred to on defendant's exhibit double-L which is a map on which there are surveyor's notes over on the right side—

*Angstman:*   We stipulate to this as well, Your Honor.

Case 4:08-cr-00008-JDR   Document 43-3   Filed 09/13/08   Page 114 of 118

*Cooper:*          Yes, that's part of the stipulation.  And the notes on the right side of exhibit Double-L indicate that the coordinates were plotted on this map based on coordinates provided by the NPS website and coordinates collected in the field by Mr. Jeff King utilizing a Garmin GPS map 295 handheld unit, which is not the GPS unit that's pictured in double-I, that's all we have.

*Judge:*          That stipulation is accepted?

*Angstman:*          I mean—I explained to Mr. Cooper, he had 2 GPS' on him that day and that explains it and I think that's fair to just add.

*Judge:*          Alright with that, then it closes the government's evidence as well. It brings us to the arguments in the case, I'm open to suggestion about whether you want to orally argue or submit briefs. Frequently 1 wants 1 and one the other.  But, it's after 5, how do you want to proceed?  If you want to submit, then I can give you some time to do that, if you want to argue orally I may have to set some time limits.

*Cooper:*          We'd be willing to write if you wanted to set a date for that.

*Angstman:*          I'm willing only because I know it's late Your Honor—I have to see to the time.

*Judge:*          Alright, generally then the government goes first because it bears the burden of proof, and then the defendant, then the government has a reply.  So, 15 days?

*Cooper:*          Very well, Your Honor.  _____

*Judge:*          And for the defense?

*Cooper:*          The 15—you have a calendar in front of you don't you, Your Honor?

*Judge:*          I'm sure we have one in the courtroom.

*Angstman:*          The 15 days would fall approximately—

*Judge:*          Well it looks like the first 15 days we hit around September 4 or 5, which is Thursday or Friday.

*Angstman:*          And I'd ask for 10 days after that, Your Honor, if that'd be fine.

*Judge:*          Sure.

*Cooper:*          Another 10 would be fine.

Case 4:08-cr-00008-JDR     Document 43-3     Filed 09/13/08     Page 115 of 118

*Judge:* Alright the 15th of September.

*Cooper:* So the 5th, 15th, and then 25th?

*Judge:* Okay.  And I don't envision any supplemental oral argument, just the briefing itself so put all your points in.

*Angstman:* I would ask one question Your Honor, now the motion that I filed orally today, the government gets to respond, will I get a couple days to put a very brief reply in?

*Judge:* Alright what I have is a memorandum of law on entrapment by estoppel, I didn't actually hear a motion made, you referred to a motion but—

*Angstman:* This morning's one, regarding notice and due process and you gave the government 3 days to respond, Your Honor.

*Judge:* Alright.

*Angstman:* Now actually you could probably give the government a few more days to respond, if you chose.  I certainly wouldn't object.

*Judge:* I am looking for that to see—maybe in chambers.  I think that's a memorandum but I said it would be treated as a motion—

*Angstman:* I orally—

*Judge:* Sure.

*Angstman:* made a motion and supported it with a memorandum.

*Judge:* I'm willing to go with the same time frame we have the September 5, 15, and 25.

*Cooper:* Perfect.

*Angstman:* I appreciate that, Your Honor.

*Judge:* And this memorandum of law on entrapment—

*Angstman:* I will make that part of my closing argument, Your Honor and so the court can just—

*Judge:* So it'll come in—the government's response will come in in the reply to the estoppel argument.

*Angstman:* Yeah.

*Judge:*        What I've allowed in then on the proffer is the testimony that  -- from the witness of what he told Mr. King.  I'm not going to consider the testimony that he offered about what the government told him in terms of establishing the boundary, I mean it doesn't estop the government—or in my opinion it doesn't provide sufficient evidence to address where the actual boundary is but in terms of an entrapment, there is more to it than simply just telling somebody, but you can cover that in your arguments and this brief addresses some of the elements of that defense, and basically I think that's most of what he offered in terms of entrapment evidence.  Some of it was explained why, where he got what he told but that doesn't necessarily go to the entrapment aspects of it.  In terms of relaying to the government, you can cover that in your briefing if you want, if you think the court should reconsider as to why that's sufficient to come in, all of it, if you want to do that.

*Angstman:*        I will do that Your Honor, thank you.

*Judge:*        The bail is continued as previously set, the matter will be taken under advisement after all of the briefing so it's not ripe yet for a decision.  And now we have the exhibits here and Mr. Cooper is probably the only resident of Fairbanks, Mr. Angstman, you reside in Bethel most of the time?  So the exhibits should stay here for viewing, it's probably the best place.  I hope the clerk will have a place to keep them or if not, the government will keep its own exhibits, but if you want to leave defense exhibits and leave them all together that's fine with me.  I will, at some point, look at the exhibits, I may wait until I get the briefing or I've had a chance to consider the case, I certainly would want to look at them in conjunction then, so looking at them now will not be the only time and I probably won't take the time this afternoon to do that.  So, I would like for them to available and the best thing—could we just have them in Mr. Cooper's office?

*Cooper:*        We can do that, Your Honor.

*Judge:*        Alright so if you want to look at the exhibits then you can go to his office and arrange for the application to do that and as far as I'm concerned you can take them to another room to study them if you want to do it but the exhibits should remain available for future use by the court or courts.  Anything else that we need to address?

*Angstman:*        The one exhibit that I haven't confirmed that you have is C, has that been admitted?

*Judge:*        I think so.

Case 4:08-cr-00008-JDR      Document 43-3      Filed 09/13/08      Page 117 of 118

*Clerk:*          Yes, sir.

*Angstman:*       Thank you, that's all I have.

*Judge:*          Anything else, Mr. Cooper?

*Cooper:*         No, Your Honor.

*Judge:*          Alright thanks for your patience in getting through this when we had other matters that interrupted it.  So Miss Haden is in the courtroom and we'll start that proceeding at 8:30 in the morning.

*Cooper:*         Your Honor, I think I just wanted to make sure 33 was in, it was by stipulation but that should be noted—

*Judge:*          Yes, the stipulation is approved and accepted, 33 is in.

*Angstman:*       Your Honor, I missed your comment just previously about 8:30 in the morning?

*Judge*:          Another case, another attorney in the courtroom just reminding her that we will start that it was a trailer of this case here that was set at 1 o'clock and we went ahead with this one, gave you the priority over it.

*Angstman:*       I was hoping I didn't have to show up in the morning.

*Judge*:          Well, not here.  You may recess court.

*Angstman*:       Thank, you.

*Clerk:*          All rise.  This court now stands adjourned subject to call.