NELSON P. COHEN
United States Attorney

STEPHEN COOPER
Assistant United States Attorney
Federal Building & U.S. Courthouse
101 12th Avenue, Room 310
Fairbanks, Alaska 99701
Phone: (907) 456-0245
Fax: (907) 456-0577
Email: Stephen.Cooper@usdoj.gov

Attorneys for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:08-CR-00008-JDR |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **PLAINTIFF'S CLOSING** |
| | ) | **(REBUTTAL) ARGUMENT** |
| JEFFREY PATRICK KING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff, the United States, here responds to defendant's Argument. The points defendant has raised do not alter the analysis presented by the United States in its Argument, establishing defendant's guilt of the charges.

1. **Neither Negligence Nor Any Level of Mens Rea is an Element of these Offenses**

Defendant argues, at p. 2 of his Argument (doc. 48), that the requisite mental state here should be negligence.  To support this he asserts that <u>Staples v. United States</u>, 511 U.S. 600 (1994), holds that "only" statutes regulating potentially harmful or injurious items should be classified as public welfare offenses requiring no mens rea.  <u>Staples</u> does not so hold.  It holds, 511 U.S. at 607, that "typically" the lack of a mens rea requirement is found in such cases. The lack of mens rea or even negligence is immaterial.  Simple ignorance or mistake is the basis for liability in a wide variety of offenses other than those involving harmful items, including, as here, acts committed on public land such as national parks and forests.  <u>Shevlin-Carpenter Co. v. Minnesota</u>, 218 U.S. 57, 68-70 (1910) (cutting timber on state land); <u>United States v. Wilson</u>, 438 F.2d 525 (9th Cir. 1971) (cutting Christmas trees in national forest); <u>United States v. Unser</u>, 165 F.3d 755 (10th Cir. 1999) (operating snowmachine in national forest); <u>United States v. Kent</u>, 945 F.2d 1441 (9th Cir. 1990) (occupying national forest lands); <u>United States v. Pardee</u>, 368 F.2d 368, 373 (4th Cir. 1966) (reckless driving in national park); <u>Ostrosky v. State of Alaska</u>, 913 F.2d 590 (9th Cir. 1990) (fishing without state-required permit).

## 2. **Relevance and Importance of Defendant's State of Mind**

Plaintiff is not entitled to, and does not here, respond to defendant's rebuttal arguments on his two pending motions regarding entrapment by estoppel, and lack of reasonable notice of the law (both intermixed in section II of defendant's Argument, labeled Entrapment by Estoppel, September 22, 2008, doc. # 48, pp. 2-9). In that section and elsewhere in his Argument, however, defendant raises issues relating to plaintiff's Argument (doc. # 42, September 12, 2008), particularly in the area of defendant's state of mind. His contentions that negligence must be proven to establish guilt of these charges, and that defendant was misled by the park into hunting in the area where he did, are contrary to both the facts and the law. As noted above, they suggest an erroneous legal standard governing the charged conduct. And they also suggest a theory of defendant's mental state that is overcome by the evidence showing defendant was not misled but rather that he has displayed guilty knowledge.

While publication of the laws constitutes sufficient notice to all members of the public of their obligations under those laws, resolution of the issue regarding defendant's state of mind is nevertheless important at this stage. Generally, the fact finder should know as much as reasonably possible about the level of

3

knowledge and responsibility with which the defendant acted.  Further, determining defendant's state of mind is also closely intertwined with assessing the truthfulness or untruthfulness of his testimony regarding the acts for which he is on trial, and with determining which version of the facts to accept among the several that he has given.  Therefore, to meet the suggestion of innocent mistake and of defendant's having been misled, defendant's contentions in that regard as well as the entirety of the evidence must be considered.

      a.  <u>Defendant Actually Possessed, and also Had Available, Fully Sufficient Accurate Information as to the Park's Northern Boundary</u>

Even if negligence were the controlling standard as to mental state, defendant exceeded that standard.  He admits he made the deliberate choice to ignore all available sources of boundary information and all the boundary information he actually had in hand, and to hunt in an area that he "felt comfortable with from prior years" (43.3 at 89, 79-80, 94).

However, even what he had "from prior years" was more than enough to advise defendant where the boundary was.  He admits that before this hunt he had repeatedly in previous years seen two markers, both just like the one in the photo,

4

exhibit 8, having a "cap with survey information on it," one being 5 miles west and the other being one mile west of the kill site (43.3 at 91, 92). He stated in camp on September 6 that he killed his moose "in an area he pointed to near a boundary marker that he'd seen. A national park boundary marker." (Id. at 29.) He expressly identified the marker as a park boundary marker (id.). He reaffirmed this by the context of his remark, that inexperienced hunters do not know where the park boundary is, but that he knows because he hunts with a GPS and has seen "a boundary marker" (43.3 at 31). In that context he could only have been speaking of a boundary marker for the national park, not any other kind of marker. Each such marker does indeed have a "cap with survey information on it" as defendant affirmed, and that survey information he had seen includes a cross representing the intersection of the east-west and north-south lines of the sections, townships and ranges that are identified by their numbers on the cap (ex. 13, photo of 3 such markers, which are the three nearest to the kill site). This enables anyone seeing it to tell where the east-west boundary line is and which way it runs, particularly defendant here, since he testified that he knows the boundary runs east-west in that area (43.3 at 87) and that he does not need a compass to know north and south there (id., 96). Having seen these markers that he knew to be

5

"boundary markers" and knowing the line they marked ran east-west, defendant knew exactly where the boundary was in the area of his hunt.  This is the least of what defendant agrees he knew "from prior years," and it was easily sufficient, standing alone, to make him aware of the boundary's location.

This prior information, however, did not stand alone.  It was combined with current information he possessed before he hunted in this case, consisting of the actual boundary coordinates that he obtained from the park website and had in hand, along with his GPS which he may also have carried that day.  Thus defendant had already seen both the survey information on the marker cap – the numbers of sections, townships and ranges with the east-west and north-south lines where they intersected – and also the latitude and longitude from the park's website.  Both these kinds of information – survey information, and also latitude-longitude – are given on any USGS map if he cared to look at one, whether or not he knew how to use a GPS.  His answer, "I don't do longitude and latitude" (43.3: 81), is not satisfactory.  It is not even candid.  He admits that 64 is the latitude shown on most maps for the park's northern boundary (id.).

If he had merely carried one of those maps, just the USGS map for the area he hunted, like exhibit 11 or 12 or even his own exhibit JJ which he has

6

withdrawn but about which there has been extensive testimony, he would have been instantly and correctly oriented. For reference, exhibit 12 contains the orange mark placed by Ranger Leonard during trial at the spot where the boundary marker shown in exhibit 8 is located, i.e., the one north of defendant's kill site. With this map defendant would have observed that any of the boundary markers he saw would depict his exact location on the ground since both the map and the marker contain the same range, township and section numbers and lines (compare exhibit 12 at the orange mark, with exhibit 8). That would have shown him where he was in relation to terrain features like the gully he hunted in, the low ridge to the south where he now claims he thought the boundary was, the creek flowing west in that valley toward the Teklanika River, and the ridge immediately north on which he was encamped.

This simple look at a minimal amount of the information defendant had available was all that anyone would need in order to stay within the law. But defendant chose to ignore that and everything else that was available to him. In the light of this evidence, it is meaningless to argue that defendant lacked the information he needed to identify the boundary.

7

### b. Defendant was Not Misled by any Park Information

Neither was defendant misled by any of the park actions he cites. Before he hunted he paid no attention to any of the accurate and publicly available information on the location of the park's northern boundary. Only after the hunt did he begin looking for deficiencies in such public information. His own Argument makes clear that no evidence connects any of the alleged defects in public information to this defendant prior to his hunt. Hence, he does not, and cannot, claim that any defects in that information misled him.

The setting for defendant's offenses provides a useful perspective on the fact that he was not misled. It also reveals the accuracy of the general public's knowledge of exactly where the boundary was. Defendant's use of the moose-hunting camp that he was headed for in 2007 began in about 2000 or 2001 when he accompanied Lynn Thompson to that area for the first time on a moose hunt (43.3 at 35, 102, 111). The campsite he occupied in this case was near that spot along the same ridge, on the edge of a steep drop-off overlooking what was mostly national park lands immediately to the southeast, south and southwest.

Defendant's camp was only one of numerous semi-permanent campsites clustered around and adjacent to the park boundary in the northeast area of Denali

8

National Park. A glance at exhibit 5, the aerial photo of this ridge and the southerly prospect of defendant's campsite perched on the edge of that south-to-southwest facing ridge, combined with exhibit 2, the map of the northeast area of the park showing the locations of these numerous hunting campsites, tells what was really going on in this case.

All those campsites are near the boundary. Some including defendant's are very near to it. And without exception, all are on the proper side of the published legal boundary line. None of the people who established those camps made any mistake about how to locate a camp near the park where the hunting was good, yet outside the park where it was legal. They all got it exactly right. If any park-generated information had misled the public into thinking the line was half a mile farther into the park than it was in fact, it is reasonable to expect that at least some of the campsites shown in exhibit 2 should be inside the actual boundary or proportionately closer to it than they are. But none are. It is evident that those who claimed and habitually used those campsites, as defendant did, were correctly informed about where the boundary was.

Further, it misstates the record to claim (defendant's Argument at 5) that Ranger Leonard said the park posted the boundary coordinates on its website "in

9

response to much criticism about difficulty in finding the boundary." Leonard never heard complaints about bad information (43.2 at 134). People had often asked where they could find the exact boundary (id. at 92), and the website method was deemed a better way to serve the public (id. at 134).). But defendant never used the park's information, even their website's boundary coordinates that he obtained, whose accuracy is unchallenged (43.3 at 79-80, 84; ex. 32). He chose not to use it, or to use a GPS, a map or a compass either (43.3 at 94). Defendant complained, after the hunt, about difficulty finding the boundary (see defendant's taped statement, ex. 25a), but he now says that his statement was untrue in that respect (43.3: 78, 87).

Defendant observes correctly that the USGS quadrangle maps, such as exhibits 11, 12, 22 and E, show boundary markings for areas other than the area where defendant hunted along the northern boundary. However, these are no factor at all in defendant's thinking because he chose not to use or rely on any map (43.3 at 94).

In any event, the boundaries shown on these maps are not incorrect as defendant claims (48 at 9); they are incomplete because not updated since the park was restructured in 1980. In the case of exhibits 22 and E, this incompleteness is

10

visually obvious, in that the northern boundary is depicted as open-ended, i.e., it stops without connecting to any other boundary. Those two maps are computer-generated composites of several USGS quadrangles including Healy D-5, and have the dates set forth on the bottom right, showing that the portion obtained from the D-5 quadrangle is dated "'73" while the left portion of the map where the partial boundaries are, is from D-6 which is dated "'88". Exhibit 11 and the lower half of 12 consist of the Healy D-5 quadrangle, explicitly bearing the date "1951   minor revisions 1973" immediately below the name of the map at the lower right. These two maps show the northern boundary of "Mount McKinley National Park" which is still the valid boundary (43.2 at 115) but in an area far removed southward from where defendant hunted and where he knew the boundary of "Denali National Park" to be. One might argue that these maps should have an updated visual boundary line at the northeast corner of the park. But they accurately locate the latitude, longitude and survey information, which are the terms by which the boundary is defined in the laws and on the park's website. Their lack of a visual boundary line was is a non-issue, however, since defendant did not rely on them.

Contrary to defendant's assertion (doc. #48 at 5) that the geo station marker on the low ridge south of defendant's hunting ground was "the ultimate source of

11

the confusion in the area of Rock Creek trail," it was no factor at all in any part of this case. Defendant had never seen it, and had not even known of its existence before his hunt (43.3 at 98-99). Thompson never mentions it. No other witness had seen or known of it before this investigation began. No rational inference can be drawn that anyone at any time leading up to defendant's hunt was confused or misled by anything relating to the geo station marker. It is of no use or relevance in weighing the evidence of the events of the hunt and defendant's truthfulness or untruthfulness about those events and about his knowledge of the boundary's location.

The disclaimer on the park's website about the unreliability of GPS maps, asserting the USGS maps provide the best information about boundaries, is likewise irrelevant to this case. Defendant never offered evidence that he saw this disclaimer before his hunt, much less that he relied on it to his detriment.

Equally irrelevant is the new matter defendant has filed, from outside the trial record, regarding a subsequent revision of the disclaimer. It is impermissible to import matter extrinsic to the evidence produced at trial. It should therefore be stricken and disregarded. Defendant's claim that plaintiff has brought in matters outside the record is incorrect, as plaintiff's references were solely to information

12

contained in the testimony and exhibits already in evidence and to comparable

precedent in a previous decision of this Court.

### c.  Defendant's True State of Mind

Because defendant's assertions about public information that could have

been misleading are all unconnected to him, they bear no relation to his actual

state of mind.  Yet he insists that he acted innocently and was misled, positions

that can only be addressed by reviewing evidence other than the alleged

misinformation defendant cites.  The evidence in its entirety shows what he

actually knew and thought, and it strongly refutes defendant's present suggestions

that he was misled.

Defendant claimed he believed the boundary ran along the low ridge well

south of his camp and kill site (43.3 at 99).  Thompson said he believed the same

(43.3 at 107-108).  Such a position for the boundary puts it nearly half a mile south

of the actual boundary (see exhibit 12, the USGS map with orange dot at the

location of the boundary marker shown in exhibit 8 which was 600+ feet north of

the kill site; the low ridge defendant referred to is apparent by the shape of the

2500 foot elevation line that points abruptly to the southwest in Section 6 just

13

south of the orange dot; Thompson's latitude coordinate of 63 degrees, 59 minutes, 31 seconds, or alternatively 59.31 minutes (43.3 at 106) computes to at least 2000+ feet south of the true boundary (59.839 minutes), at one minute of latitude per 6,076-foot nautical mile (43.2 at 101-102)).  Defendant and Thompson both said defendant relied on Thompson to identify the boundary by GPS (43.3 at 40, 108).  Thompson said he did this by using GPS at the stated latitude that ran through this ridge south of the kill site, and visually identifying landmarks that were along an east-west line at that same latitude (43.3 at 109).

Such a line, regardless of how far south of the true boundary it was, was quite clearly an east-west line.  Thompson put it at a constant latitude (id.), that is, parallel to the true boundary.  By definition, therefore, it cannot possibly have gone northwest (an increase in latitude) to intersect the boundary marker which defendant had seen only one mile west of his kill site.  Defendant seems to recognize the inconsistency of this marker with Thompson's testimony.  His acceptance of that marker as marking the park boundary demolishes his claim that he relied on Thompson's plotting of the boundary line farther south.

To overcome this problem, defendant relies on Thompson only selectively. Thompson probably did tell defendant that the line was on the ridge south of the

14

kill site, and defendant accepts that because it would legalize his moose kill.  But he rejects the east-west alignment of Thompson's line because he (defendant) has made statements that commit him to having seen the marker which he knows to be on the true boundary line.  He tries to put together these two incompatible facts by drawing a somewhat northwest-southeast line between the ridge and this boundary marker, on his exhibit LL.

But Thompson's testimony that he plotted a constant latitude, i.e., exactly east-west, is essential to the viability of Thompson's claim that he believed that specific latitude marked the actual east-west boundary line.  Thompson's line has to be true east-west, or he has no claim to its plausibility and believability as the park boundary.  This absolutely excludes the possibility that Thompson ever gave defendant the skewed line on ex. LL running northwest from the ridge.

And defendant, by rejecting Thompson's true east-west alignment, has destroyed his own claim to having reasonably relied on Thompson.  Either defendant accepted Thompson's east-west line well south of the true one and parallel to it, or he relied on the boundary marker west of the kill site which was nearly half a mile north of the line Thompson plotted, and which renders the moose kill illegal.  The facts themselves prevent defendant from having it both

15

ways.  His attempt to have it both ways is necessarily false.

Even defendant's own testimony that he knew the line was east-west and that he did not need a compass to know where north and south are in that area, controverts his proposed line connecting the boundary marker with the ridge south of the kill site.  By asserting his false claim that he relied on Thompson, and suggesting a false boundary line that even Thompson never gave him, defendant gives further evidence that he was not misled about the boundary, but that he knows, and had ample indications when he hunted, that his moose kill was inside the lawful boundary.

This conclusion is materially corroborated by defendant's falsifications the day after the kill on September 6, and three weeks later at the time of the warrant execution (which was in "late September", doc. 43.2 at p. 85; the search warrant, #3:07-mj-00195-JDR is dated September 26, 2007).  Those early contacts are significant indicators of his state of mind, coming as they did before he had devised what his position needed to be.

On September 6, before his kill site is discovered, defendant drives away all suspicion of a violation in hopes of avoiding an investigation, by his strong assertions that he knows where the boundary is, and has reliable means of

16

knowing, and by falsifying the situs of his moose kill and the date of the kill.  He claims:

    – he knows exactly where the boundary is,

    – hunts using a GPS,

    – has seen a boundary marker, the one which is a mile west of the kill site (43.2 at 31, 29), and

    – his moose kill was in the area of that boundary marker (43.2 at 29).

Later in September, after the kill is discovered, he confirms what he told the officers about the location of the kill, but otherwise directly controverts his first position.  He asserts his ignorance of where the boundary is and the virtual impossibility of finding it by any reasonable efforts.  He also admits a one-shot kill.  He claims:

    – he has never seen "any kind of indication" where the boundary was,

    – had no GPS with him on the hunt,

    – had wanted to bring a GPS to find the boundary by using the park's published boundary coordinates (clearly implying that he knew how to do this), but did not bring it because,

    – he could not find the coordinates on the website, and

17

– when he shot the moose "it dropped where he shot it" (ex. 25a, 2-4).

By trial time, he developed the new position that he was firmly convinced the boundary was well south of his kill site, and that if he is mistaken it is because he lacked sufficient information and was also misled; he both strongly denied his September 6 falsification of the kill location and controverted his late September reconfirmation of that falsification; and he said he shot at the moose twice. He claimed:

> – he had "no reason to question where the boundary was" (43.3 at 78), believing it to be on a ridge well south of his kill site (43.3 at 97, 98, 99),
>
> – he had found the coordinates of the boundary on the park's website but they were "quite foreign" to him (43.3 at 79-80),
>
> – he may have had a GPS on the hunt but he did not know how to use it to locate the boundary, even while having the coordinates in hand, so chose to ignore it and to hunt where he had hunted before (43.3 at 79-80), and
>
> – he "absolutely" did not falsify the kill location or tell the officers anything about where the kill site was (43.3 at 76), adding,

18

"There's no way that I would not remember" (43.3 at 40).

– he changed the position from which the stalk began (43.3, 96), shortening its distance within the park, and claiming two shots before the moose fell (43.3 at 37-38).

In this trial version, defendant abandoned virtually the entirety of his second position, that he was ignorant of where the boundary was, had planned to bring a GPS on the hunt to find it, but did not bring the GPS because he could not locate the boundary coordinates on the website. In this he also controverted both his first and second positions that he hunted using a GPS and knew how to use it to locate the boundary by use of coordinates. He also controverted both his first and second positions in denying what he had affirmed on tape, that he pointed west or southwest to indicate his kill location (which was a falsification). And he altered the location and length of the stalk and added another shot before the killing shot.

The significance of these turnabouts is that if defendant's final version were the truth and he acted wholly in good faith, falsifications would have been unnecessary. He never would have considered using them. He could only have resorted to falsifying the event if he deemed it necessary to turn away suspicion and thereby prevent discovery of his crime. That would negate any notion of an

19

innocent mistake.  That he resorted to lying right at the start, therefore, both with respect to what he now claims was his then inability to use GPS to find the boundary, and particularly the lie regarding his kill location, is the clearest evidence of his guilty knowledge.

On the second contact, his total abandonment of his initial claim of full knowledge where the boundary was reveals rather too much readiness to try any story that might work at the time.  And even then he still maintained what he now agrees was a fiction, that he knew how to use GPS to find the boundary.  Quite possibly he knew all along how to find the boundary with a GPS.  But if he didn't know how, the only reason for saying he did was that it would support his further falsification that he wanted the boundary coordinates and couldn't find them.

Also on that contact, before he understood the significance of the kill location, he reaffirmed (audibly on tape recording) his having (falsely) indicated that location to be toward the one-mile-west boundary marker.  Defendant's claim now (43.3, 40-41) that he did not and would not have revealed his kill location because of the common reluctance of hunters to reveal where they have taken game is patently false.  If his real purpose for falsifying the kill location on September 6 had only been to keep secret a good moose hunting spot, once the kill

20

has been found, that reason no longer exists and he should have no trouble admitting that he had falsified the location for that reason. Yet he still denies in the strongest terms that he falsified it or said anything about it, going so far as to assert, "There's no way that I would not remember" having done so (43.3, 40). Two reliable witnesses and a tape recording have proven false the defendant's emphatic testimonial denials of that event on September 6. For him to continue maintaining that falsehood now is only consistent with his awareness that by lying to cover up the evidence of his illegal kill, he showed that he knew at that time that the kill was in the park and was trying to prevent its discovery.

Material falsifications in an investigation, followed by proven material falsehoods during trial, entirely overshadow all suggestions of mistake, misleading information, and even of negligence. Rather, they are reliable indicators of defendant's guilty knowledge that he hunted illegally in the park, as charged.

3. **The Evidence Proved the Charges Beyond a Reasonable Doubt**

      a.  The Evidence Proved the Kill Site Was Located in the Park

Defendant argues (48 at 9-10) that location of the kill site within the park

21

was not established because the GPS units that measured the distance from the marker were not shown to have been calibrated, and further because no testimony showed that the BLM survey markers were accurately placed.

Defendant stipulated (43.2 at 75) to all the distances shown on exhibit 21, the map of the hunt area with lines connecting the camp, boundary marker, kill site and bone pile, with the respective distances noted, and showing that the kill site is 605 feet south of the boundary marker (photographed in exhibit 8). Moreover, defendant's exhibit LL shows both Park Service coordinates for that boundary marker and defendant's own GPS-derived coordinates for it, both being at a latitude within about 30 feet of each other, based on the fact that one minute of latitude equals a nautical mile - 6,076 feet (43.2 at 102). It is stipulated that defendant's kill site was 605 feet south of that marker. This eliminates any need to argue about the accuracy of the several GPS units involved, including defendant's. Further, Ranger Leonard physically paced off the distance south from the boundary marker into the park as far as the kill site, and came up with a distance somewhat greater than shown by GPS due to uneven terrain and brush obstructions (43.2 at 68), and apparently also due to the paced distance being on a slant that follows the sloping ground, whereas the GPS would give the horizontal

22

distance which is shorter. Distance within the park is not an element of the charge in any event, but it has been well established by stipulation and evidence.

Defendant argues that the BLM 1981 cadastral survey markers are insufficient evidence of the location of the boundary, unless supported by another survey to find out if the survey markers are placed properly. He offers no authority at all for so contending. Neither does defendant show that any reason appeared in the evidence to believe the markers were not where the BLM survey placed them. He apparently does not attack the legal basis for recognizing these BLM markers as locating the park boundary, as it is defined by statute.

Moreover, the USGS maps in evidence, particularly exhibits 11 and 12, show not only the line between Townships 10 and 11 South, which by statute constitutes the northern park boundary, but also the latitude of that line in degrees, minutes and fractions thereof measurable by use of the degree and minute notations on the borders of the maps along with the indicated scale of those maps. The park's website likewise contains the latitude of the northern boundary in degrees, minutes and decimal fractions thereof, which can be cross-checked with the USGS map indication of the latitude of that line. Defendant himself measured that latitude with his own GPS, and got the figure which is displayed along side

23

the park's figure, on his map, exhibit LL.  The difference between defendant's and the park's GPS readings of that latitude is 30 feet which is immaterial here.  Both appear to conform reasonably well to the latitude depicted on the USGS maps for the township line which by law constitutes the northern boundary.

Defendant's contention lacks legal and evidentiary support.  It must be deemed without merit.

### b.  The Evidence Proved Defendant Took the Moose in the Park

Defendant argues that no evidence places either defendant or the moose in the park on the first of the supposed two shots, or on the killing shot (48 at 10-13).

Defendant mistakes plaintiff's argument on these issues.  As seen above, there is strong reason for the Court to conclude that defendant's testimony altering his version of the stalk and the kill from what he said on tape about 3 weeks after the hunt (ex. 25a) was contrived, and what he said on that tape a year ago before he had as much time and motivation to think about it, is more reliable.  This is especially true in light of defendant's other deliberate falsifications, of the kill location, of the fact that he had falsified that location to the officers on September 6, 2007, of what he knew about the boundary location, of what information and

24

resources he had for locating the boundary and of what Thompson had told him about where the boundary line ran.

Defendant has been tape-recorded saying he started from right where he later threw down the bones, followed the moose down the gully that runs down to the southwest  from that position, spooked it (i.e., scared it off, <u>not</u> hit it), it trotted a little way down the same gully, and he shot it, whereupon it dropped where he shot it (ex. 25a at 3).  Now he says he started from nearly half a mile west of the bone pile area, halfway between camp and the bone pile, from a point at which the entire stalk was "due south" from the ridge (43.3 at 15, 96), followed the moose due south, and shot twice.

These recent alterations are material.  Following the ridge line straight from the bone pile along the ridge toward the campsite, to a point due north of the kill site, shortens the total length of the stalk from at least 2600+ feet to about 2000 feet.  More importantly, it also decreases significantly the proportion of the stalk that must have occurred inside the park from more than 1500 feet to a mere 605 feet (<u>see</u> the map showing distances, exhibit 21).  This created for the first time the opportunity to argue, as defendant now does, that the moose might have been shot outside the park, at least when defendant's new version is taken alone without

25

reference to other testimony.

But these self-serving alterations of defendant's story are impossible to reconcile with his daughter Cali's testimony.

Cali agrees with defendant about the point from which the stalk began, and that he fired twice. But she denies that he fired at all before he reached the "bottom of the hill" and "got into position where he could see the moose from the bottom of the hill" (43.3 at 7, 15). This would readily fit with defendant's taped statement of having gone down the gully from the bone pile area, far enough to where he "could see the moose from the bottom of the hill" before he fired, as Cali said. And starting at the bone pile and going southwest down the gully would easily put him inside the park before reaching the "bottom of the hill" and therefore before he ever fired a shot.

But his testimonial version readjusts all this to permit making his present argument. It has him going nothing but due south down hill toward the moose which puts the moose always below him with thick high brush between him and the moose when it was in place at the kill site. See the maps and photos (ex. 20, 21 and others), which reveal only steadily descending ground, and through heavy brush, from the ridge due north of the kill site down to the kill site. It appears

26

there would be no "bottom of the hill" clear of brush which defendant would have reached if he had come to the kill site from due north of it. Cali says she "only saw him once he appeared at the bottom because of the angle of the slope, I couldn't see him in the brush until he reached the bottom" (43.3 at 15), "in a relatively clear area" (id. at 7).

The Court may well ask how these significant discrepancies in defendant's own accounts are to be explained. But defendant leaves the question hanging. There is no accounting for it, except as a self-serving fabrication. The conflicts between defendant's testimonial version and Cali's, plus his contradiction of his first description on tape, with no adequate accounting for the difference and no apparent means of reconciling his stories, make his latest version unworthy of acceptance. One or the other version has to give way. The later version is too obviously one more attempt by defendant to tailor facts to fill a perceived need.

The difficulties are eliminated by accepting defendant's original version, on tape, about a one-shot kill, starting from the bone pile area and going down the gully which even now he agrees comes up to the ridge at that location (43.3 at 96): "[T]he end of the gully is where the bone piles eventually ended up." This makes the stalk a good half-mile (map, ex. 21), a large part of it within the park, and

27

thereby renders hopeless any attempt to argue that the moose might not have been in the park when shot. It is plain to see why defendant chose to abandon his earlier uncontrived account of the stalk. He has done the same thing here as he clearly did regarding his knowledge of the boundary line, his ability to use a GPS, and the location of his kill. He has changed his version of the "truth" to meet the apparent need of the occasion, with no sufficient accounting for the change.

Defendant's notion that it cannot be shown where the moose was at the time of the killing shot, is not consistent with the evidence, viewed in its entirety rather than piecemeal. First, when tape recorded one year ago, defendant said the animal dropped where he shot it (ex. 25a, p. 3), and that he had stalked it by following it down the gully (which is not necessarily the same as simply following it downhill). Cali testified that defendant shot twice, but not until he got to the bottom of the hill to where he could see the moose from the bottom of the hill in a relatively clear area (43.3 at 7, 15). Fair interpretation of this evidence, in conjunction with the maps and with defendant's more reliable first taped version, reasonably supports only the conclusion that both defendant and the moose were well inside the park before any shot was fired. Defendant's argument has not shown this understanding of the evidence to be other than reasonable and

28

compelling.  Neither Cali nor defendant saw any indication that the animal was wounded at all after the supposed first shot (43.3 at 7, 26, 95).  Defendant's first version, that he "spooked" it, i.e., scared it or startled it, and it ran down the gully, is not consistent with his having actually hit it.  The first version eliminates any suggestion of more than one shot.  Even the second version eliminates any rational possibility that the moose was hit on the first of the supposed two shots.

Finally, defendant implies that the moose could have been outside the park for the killing shot, that it fell down, got up again, ran into the park and died there.  The evidence excludes this far-fetched notion.  Defendant's taped statement says the moose "dropped where he shot it" (ex. 25a at 3).  He testified he "saw it lunge but it disappeared instantly" (43.3 at 38).  Cali says defendant "shot it and it hit the ground" (43.3 at 26).  She says she picked up defendant with the Argo and drove "to the location where the moose had fallen" (43.3 at 8), and defendant adds that they went "to where the moose was" and at that spot they "[found] a dead moose" (43.3 at 38).  Both defendant and Cali agree that the moose was still lying "where it had fallen" because they went to the place "where the moose was," meaning where they last saw it and knew it to be, and found it at that location.

The distance inside the park that defendant had to have traveled before he

29

shot, coupled with the fact that the moose was seen to fall when the killing shot

was fired and was found at that same spot, prevent any doubt or reasonable

possibility whatever that it moved anywhere after it fell from the killing shot.  The

evidence proves defendant killed the moose well inside the park, no matter which

version of the stalk and number of shots fired is accepted.


4.  **The Evidence Proved the Subsistence Exception Did Not Apply**

Defendant argues (48 at 13-15) that he "qualifies" for the subsistence

exception because he claims he hunted in what are now park areas before they

became part of the park.  He contends essentially that this is automatic, based

simply on defendant's assertion that he hunted there before, and based on

President Carter's Proclamation No. 4616 (December 1, 1978), providing that "the

opportunity for local residents to engage in subsistence hunting is a value to be

protected and will continue under the administration of the monument."

> The law is otherwise.  To begin with, the Court ruled as follows during trial:
> On Subsistence, the government relies upon the officer's and ranger's
> testimony this morning that he's not aware of any exception applying
> and gave consideration to it.  I think that meets the government's

burden.  If there's other evidence that puts that into question then it may be rebuttal of something else, but at this point, I think the government has satisfied its burden of showing that there was no subsistence exception that applied. __

Transcript of morning of Day 2 of trial, August 19, 2008, to be lodged in connection with this rebuttal argument, at page 30.

Following that ruling, the only further evidence was defendant's testimony that he had hunted "the Rock Creek area" in 1977, before he moved out of that area in 1978 (43.3 at 33, 32).  This changed nothing regarding the Court's ruling, even if the testimony could be stretched to say that defendant hunted in areas that later became part of the Monument or Denali National Park, which it does not say. A person's simply saying that he has hunted in such an area before it became park land does not constitute legal authorization to hunt in the park.

The regulation underlying the present charge in Count 1 prohibits hunting in the park except by "authorized hunting" under subsection (b).  36 C.F.R. §2.2(a)(1).  Defendant must be so "authorized" before he may lawfully hunt in the park, not simply conclude unilaterally that he is qualified to do so.

When ANILCA expanded and renamed Mt. McKinley National Park, it abolished the Monument that was the subject of President Carter's 1978 Proclamation #4616, and rescinded the Proclamation as to all land included in such Proclamation that was not included in the expanded park, and also rescinded it and superseded it by the new park legislation as to all land included in the Proclamation that was included in the expanded park.  16 U.S.C. § 3209(a).

As for the 1980 Denali National Park addition, ANILCA provides that subsistence uses by local residents shall be permitted under certain conditions "in accordance with the provisions in subchapter II of chapter 51 of this title."  16 U.S.C. § 410hh-1(3)(a).  Located within subchapter II of chapter 51 is 16 U.S.C. § 3126(a), providing:

> All national parks and park monuments in Alaska shall be closed to the taking of wildlife except for subsistence uses to the extent specifically permitted by this Act.  Subsistence uses and sport fishing shall be authorized in such areas by the Secretary and carried out in accordance with the requirements of this subchapter and other applicable laws of the United States and the State of Alaska.

32

36 C.F.R. § 13.410 allows subsistence uses by local rural residents "pursuant to the regulations of this subpart" in the ANILCA addition to Denali National Park.  § 13.420 defines "local rural resident" as either a person who resides in the "resident zone" listed in applicable regulations, or one who is authorized to engage in subsistence uses in a national park by "a subsistence permit issued pursuant to § 13.440."  Defendant here resides in Denali Park, Alaska (43.3 at 31), which is not one of the "resident zones" listed in the applicable regulation, 36 C.F.R. § 13.902, listing as resident zones for the Denali National Park addition only the communities of Cantwell, Minchumina, Nikolai and Telida.  Therefore, to be an authorized subsistence user of the park addition, defendant must first obtain "a subsistence permit issued pursuant to § 13.440."  36 C.F.R. § 13.420(2).

Ranger Leonard testified that it was part of his duties to know, before presenting this case for criminal charges, whether defendant was authorized by an exception to the hunting prohibition to be hunting within the park, and that he knew that defendant was not so authorized by virtue of qualifying as a subsistence hunter in the park (tr. vol. 2A, August 19, 2008, at 5-6).  Defendant's testimony that he hunted in 1977 in "the Rock Creek area" whether or not within what is now

33

the park, said nothing relating to whether or not he was authorized to hunt in the park by virtue of compliance with the regulatory requirements, i.e., "resident zone" residence or a permit. Neither that testimony nor any other evidence therefore constituted, as this Court said, "other evidence that puts that into question." (Tr. vol. 2A at 30.)

Defendant's mere assertion that he hunted there in the past is insufficient to "authorize" his having hunted in the park in this case, notwithstanding the now-rescinded Proclamation #4616 (December 1, 1978) on which he relies.

## 5. __The Evidence Established the Defendant's Guilt of Count 2__

Defendant challenges the evidence of aiding and abetting as to Count 2, operating a motor vehicle in the park. Defendant misinterprets the elements of aiding and abetting under 18 U.S.C. § 2, and also does not deal with the entirety of the evidence supporting Count 2.

The evidence first established that the offense of operating a motor vehicle in the park outside of designated areas occurred, and it connected defendant to the commission of that offense. When contacted at his camp on September 6, defendant said he was "pretty tired from just retrieving his moose" (43.2 at 28).

34

Then and there, in camp, was a multi-wheeled Argo with tires having a chevron tread pattern (43.2 at 37). On the Argo and on the ground right next to it were the parts of a freshly killed moose, some of it exposed to view, and some in game bags with blood visibly seeping through the bags (43.2 at 25, 27, 28). Leonard observed these same overlapping chevron tire tracks at the kill site inside the park and at the bone pile about a mile up the trail east of camp, and could follow these tracks aerially and on the ground between the kill site and the bone pile (43.2 at 36, 37, 41, 42, 71, 72). A portion of these tracks were photographed (ex. 19a). The Argo was photographed at the kill site with defendant's daughter Cali (ex. FF).

In his testimony defendant admitted he and his daughter had used the Argo to retrieve the meat and horns from the kill site, which was later determined to be in the park (43.3 at 74).

Beyond a reasonable doubt, the evidence shows that defendant, the only licensed hunter involved with that hunt at that time, carried out his obligation to salvage his own moose meat by transporting it by Argo from the kill site in the park to his campsite on the ridge, that he was physically tired from doing so at that time, and that he did so with the assistance and participation of his daughter. At

this point it is immaterial which one of the two drove the vehicle which was operated as a means of accomplishing defendant's purpose, i.e., to use a motor vehicle to transport his moose meat from that location to the camp.  However, defendant was the principal in commission of the offense of operating the vehicle in the park even if Cali drove the entire time, since she did so only in aid of defendant's unlawful use of the vehicle to retrieve his moose.  The act of driving in an unlawful area does not necessarily in all cases make the driver the principal in the offense, unlike drunk driving in which the driver is responsible for his condition.  The driver may, as here, be driving in an unlawful area solely in aid of the other party whose intent and purpose was to utilize the vehicle in that manner and place regardless of who might drive it.  Neither defendant nor Cali could recall who had driven down to the kill site on the second day, the 6th (2-27; 2-74). It was of no consequence under applicable law.  It was solely defendant's need and his purpose that the vehicle should be so used.  That was accomplished with their joint participation.

Whether Cali is deemed to have been the principal and defendant the aider and abettor, or vice versa, is immaterial.  Defendant misreads the applicable authority.  His contention that the mens rea element of aiding and abetting driving

in the park is higher than the mental state necessary to the underlying offense –

i.e., that it requires specific intent that Cali should violate the law – is incorrect.

Defendant's theory would make commission of the offense and aiding its

commission two different offenses, which could not be charged together in one

count without running afoul of the prohibition of duplicitous charges. Rather,

"aiding and abetting [is] a theory of liability" for the offense charged. Aiding and

abetting is "embedded" in every federal substantive charge. It "is a different means

of committing a single crime, not a separate offense itself, for otherwise it could

not be implicit in the substantive charge." United States v. Garcia, 400 F.3d 816,

820 (9th Cir. 2005).

For this reason, an aiding and abetting jury instruction need not be tied to a

specific count of the charges. This does not create a unanimity problem because

the offense is one. Some jurors may find that defendant performed the offense

himself and some may find he aided and abetted. "[E]ither way, [his] liability is

the same: as a principal, for committing the acts charged." Id. See 18 U.S.C. § 2.

Hence, even though aiding and abetting has the added "element" of

"specific intent to facilitate the commission of a crime by someone else" it does

not alter the mens rea level for the offense and does not require jurors to agree

37

unanimously on it, for it is but an alternative means of committing the crime. Garcia, at 819. This "element" therefore does not require specific intent to violate the law, but specific intent to facilitate someone else in doing the act(s) which constitute the substantive offense:

> Thus, unlike the mens rea for attempts, an aider and abettor's intent regarding the substantive offense is the same intent required for conviction as a principal.

Id.

It is therefore immaterial whether defendant here committed the offense as a principal, or aided and abetted his daughter's commission of it, since either way, he accomplished his purpose of operating the vehicle in the place where the moose carcass fell, to haul out the meat, and that place was in fact inside the national park whether or not either he or his daughter knew that. He either did every act himself that was necessary to accomplish this, or he facilitated Cali's performance of some of the acts necessary to accomplish it. It matters not which it was. No intent to violate the law need be found either way. Count 2 was established both legally and factually beyond a reasonable doubt.

38

## CONCLUSION

For all the foregoing reasons, both the charge of hunting in a national park and that of driving a motor vehicle in the park have been established beyond a reasonable doubt.  The Court should accordingly find the defendant guilty as charged in both counts.

RESPECTFULLY SUBMITTED this  2nd  day of October, 2008, at Fairbanks, Alaska.

NELSON P. COHEN
United States Attorney

/s/ Stephen Cooper
STEPHEN COOPER
Assistant United States Attorney
Federal Building & U.S. Courthouse
101 12th Avenue, Room 310
Fairbanks, Alaska  99701
Phone: (907) 456-0245
Fax: (907) 456-0577
Email: Stephen.Cooper@usdoj.gov

**CERTIFICATION**

I certify that a true and correct copy of the foregoing is being sent to the following counsel of record on the filing date hereof via court's electronic filing notice:

Myron Angstman
Bethel, Alaska

/s/ Stephen Cooper
Office of the U.S. Attorney

Case 4:08-cr-00008-JDR    Document 54    Filed 10/02/08    Page 39 of 39