*Clerk:* All rise.  His Honor the court, United States District Court for the District of Alaska is now in session.  The Honorable John D. Roberts presiding.  Please be seated.

*Judge:* Back on the record, second day of trial, U.S. v. King.  Defendant and counsel are present.  Did you want to discuss the exhibits at this time or proceed with testimony?

*Angstman:* Let's go with testimony because perhaps we can clear up a bunch of the exhibit questions with Mr. King's testimony.  So, we might as well wait.

*Judge:* All right, then let me get some idea of the extent of the testimony that we need to finish the trial so that I can have some guidance in determining whether to set over the suppression motion, which is scheduled for this afternoon.  I'd like to finish the trial today.  I'll hear from each counsel as to how much time you think we might need based on what you have to present.

*Cooper:* Your Honor, I just spoke with Mr. Angstman.  We would like to recall Ranger Leonard for just a few questions.  That should take, I should think that asking the questions and getting the answers would only take probably three, four minutes.  And then after that, I believe that we would rest and so it would be up to Mr. Angstman to talk about the schedule after that.  I think it's a good idea to see if we could get some more foundation for some of the exhibits that have been offered by the defense before we try to . . .

*Judge:* Are there any stipulations that the parties have reached that have not been placed on the record?

*Cooper:* No, I don't believe so.

*Angstman:* We're stipulating that they can recall the witness.  Other than that—

*Cooper:* Yes.

*Judge:* That—I understand that.  You had given notice about an expert witness.

*Cooper:* We had a stipulation yesterday and so we don't need to pursue the expert testimony.  It would cover the same subject matter that we stipulated to regarding the identity of the moose parts.

*Judge:* All right.  So, it sounds like I would be able to get to the 1:00 o'clock suppression hearing.

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 1 of 30

*Angstman:*     Well, we need to talk about how long we're gonna take though, and—

*Judge:*     Right, you have—the defendant may testify.

*Angstman:*     We will have about three or four witnesses.  I would expect Mr. King's testimony to take an hour and a half.  That's anticipating cross-examination, that was my estimate of what he would be asking.  His daughter's testimony would take 20 minutes to a half an hour.  A third witness, a hunting partner of Mr. King's I expect a half an hour.  And potential fourth witness would be half an hour to 45 minutes.  And I haven't added those up.  And maybe somebody has while I was talking.

*Judge:*     All right, thank you.

*Angstman:*     Okay.

*Judge:*     Let's go ahead with the testimony then.  You want Ranger Leonard recalled.

*Cooper:*     I do.

*Judge:*     I'll have the oath administered anew, and the better practice is to stand in front of the clerk when the witness is sworn in, and you go to the witness box.

*Clerk:*     Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth and nothing but the truth, so help you God?

*John Leonard:*     I do.

*Clerk:*     Thank you, you may be seated.  Sir, could you please state your full name for the record and spell your last?

*John Leonard:*     John David Leonard, L-E-O-N-A-R-D.

*Clerk:*     Thank you.

*Judge:*     You may proceed.

*Cooper:*     Thank you, Your Honor.  Mr. Leonard, just a couple of things from yesterday there was mention regarding the fact that not all the photos that you had taken on that helicopter trip in June had been produced.  Have you, since the time of your testimony, located the—the—the electronic source that those photos were on?

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 2 of 30

*John Leonard:*     Yes, I have.

*Cooper:*     And did you produce those for the defense just a few minutes before this proceeding began?

*John Leonard:*     Yes, I did.

*Cooper:*     And is—is there—tell us what the series consists of, how many pictures there were and what pictures you have on that thumb drive.

*John Leonard:*     There—I believe was approximately 25 photos.  The sequence, for some reason, starts at picture 5.  And I—I don't know why that is.  As you recall when we were out in the field I was having quite a bit of trouble with it, the helicopter—or excuse me, the camera caused a bit of frustration.

*Cooper:*     Were you even asking me how to make it work?

*John Leonard:*     Yes I was.

*Cooper:*     And I didn't give you any help did I?

*John Leonard:*     No, you didn't.  You reverted to pen and paper I believe.

*Cooper:*     Okay.

*John Leonard:*     But—

*Cooper:*     And, so when that trouble regarding the—whether—how to work the camera was occurring, where were we situated?

*John Leonard:*     When that was happening, it was near the what was reffered to as the Geostation.

*Cooper:*     Up on the ridge where that geostation marker was?

*John Leonard:*     That's correct.

*Cooper:*     And so were you able—were you attempting to take a picture of that geostation marker?

*John Leonard:*     Yes, I was.

*Cooper:*     Okay.  Were you able to take a picture of it?

*John Leonard:*     No, I was not.

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 3 of 30

**NPS**        **Day 2 Testimony**        **Page 4 of 30**
**US v. King, 4:08-cr-8-JDR**
**Trial Transcript, Vol. 2A: Day 2 – August 19, 2008**

*Cooper:*      And so the next place where you found—finally got the camera to actually start working was where?

*John Leonard:*      After we landed near the park boundary and got out and were able to shut the helicopter down. I believe I even made the telephone call to somebody to figure it out.

*Cooper:*      If you'll reach right over the front of the witness stand look at the very first picture that's down there, can you tell us if that is perhaps the first one in the series that did—when you got the camera working?

*John Leonard:*      It's—it's very close to that one. So, the same location.

*Cooper:*      Okay, well you just pick it up and tell us what the exhibit number is on that one for reference?

*John Leonard:*      It's Exhibit 7 and it's a picture from a few feet away from the—the aerial marker and boundary marker.

*Cooper:*      Okay. All right. And so is there any other—once you got the camera working with picture number 5, is there any other—excuse me, photo in the series until you get to the end that's not present?

*John Leonard:*      Yes. There's one photo and all the photos are date and time stamped. And I believe it's photo 9, on the disk that skips from 8 to 10. And picture 8 was at 4:16 p.m. or listed at 4:16 p.m. Picture 10 was listed at 4:17 p.m. and they're both of this area, in different shots and close ups and views of these two things.

*Cooper:*      Oh, this and these two things, are you referring to the boundary marker and the aerial indentifying plate in Exhibit 7?

*John Leonard:*      Yes. Yes, I am.

*Cooper:*      So, it was in that same area where number 8 and number 10 were taken within a minute of each other and 9 is missing. Is that your testimony?

*John Leonard:*      Yes I—yes, it is.

*Cooper:*      All right. And do you know where 9 is?

*John Leonard:*      I have no idea.

*Cooper:*      Okay. Or why it's missing?

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 4 of 30

**NPS**          **Day 2 Testimony**          **Page 5 of 30**
**US v. King, 4:08-cr-8-JDR**
**Trial Transcript, Vol. 2A: Day 2 – August 19, 2008**

*John Leonard:*     I—honestly I don't know that it ever existed. I don't know how the stamping works.

*Cooper:*     Okay. Otherwise, all the pictures have been accounted for and available to the defense?

*John Leonard:*     Yes.

*Cooper:*     All right. And are the additional pictures that are not part of the exhibits here any different subject matter from the pictures that we have here as exhibits?

*John Leonard:*     No, they're not.

*Cooper:*     All right. Now, one other thing. With regard to the—you can put that exhibit down if you like. With regard to the charge that is contained in count one, it indicates that taking of wildlife is prohibited, except by authorized hunting and trapping activities conducted in accordance with paragraph b, which goes on to deal with exceptions. Was Mr. King within any of the exceptions and what exceptions are we are likely to be dealing with.

*Angstman:*     I'll object. This would call for testimony outside the expertise of this man. I believe that's a matter taken care of by an entirely different department of the government relating to subsistience activities.

*Judge:*     Mr. Cooper, if you would establish a foundation, for example, if a ticket were—is it this officer's decision to decide whether to recommend a ticket be issued or to issue a ticket for that, based on how he reads the statute, whether he finds an exception or not. Is this—is that part of his law enforcement duties?

*Cooper:*     Fine, Your Honor. Is it part of your duties to know whether the defendant in this case was otherwise authorized by an exception to be hunting within the park before you determined whether it was appropriate to pursue this as a criminal offense?

*John Leonard:*     Yes.

*Cooper:*     And what type of exception would you be required to consider if there were one?

*John Leonard:*     If, for instance, a hunter lives in a rural resident zone, they may quality for subsistence use in certain areas of the park.

*Cooper:*     And do you know whether the defendant was so qualified?

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 5 of 30

**NPS**         **Day 2 Testimony**         **Page 6 of 30**
**US v. King, 4:08-cr-8-JDR**
**Trial Transcript, Vol. 2A:  Day 2 – August 19, 2008**

*John Leonard:*     No, he was not.

*Cooper:*     You know that?

*John Leonard:*     Yes.

*Cooper:*     And you knew it at the time?

*John Leonard:*     At the time of submitting the report, yes.

*Cooper:*     Yes.  Qualified as a subsistence hunter in the park, you knew him not to be, is that what you're saying?

*John Leonard:*     Yes.

*Cooper:*     Okay.  So, was there any other exception that would be applicable to him that you are aware of?

*John Leonard:*     No, I'm not.

*Cooper:*     With regard to count two, regulation section 36 CFR 4.10(a) relating to operating a motor vehicle, it prohibits that, except from park roads, parking areas and on routes and areas designated for off road motor vehicle use.  Was the area in question in relation to the tracks you found near the kill site in any of these categories in this regulation, in other words, a park road or a parking area or route or area designated for off road motor vehicle use?

*John Leonard:*     No, it's not.

*Cooper:*     And were you qualified to or required as part of your duties to be knowledgeable with regard to that, whether it was in that kind of a designated or undesignated area?

*John Leonard:*     Yes, I am.

*Cooper:*     That's all I have Your Honor.

*Judge:*     Cross examination.

*Angstman:*     Just to clarify, you do acknowledge that the missing pictures at the start of the sequence are pictures that you attempted to take at the geostation?

*John Leonard:*     I tried to take pictures there.  I don't know why it started at picture 5, but I tried pretty hard to take pictures there.

*Angstman:*     Is this a camera you've used before?

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 6 of 30

*NPS*        *Day 2 Testimony*        *Page 7 of 30*
*US v. King, 4:08-cr-8-JDR*
*Trial Transcript, Vol. 2A:  Day 2 – August 19, 2008*

*John Leonard:*      It was the first time I've used this camera.

*Angstman:*      Okay.  And it's the kind of camera I take it that you can look and see if you've got pictures on it that you can check the record to see what you've got as you're taking them or shortly after?

*John Leonard:*      Yes.

*Angstman:*      And did you learn in the field that you did not have pictures of the geostation?

*John Leonard:*      I knew I hadn't taken pictures of it 'cause I couldn't get the camera to work.

*Angstman:*      And was there a discussion in the helicopter or outside the helicopter about returning to see if we could obtain pictures of the geostation?

*John Leonard:*      I don't believe so.

*Angstman:*      Was there a discussion as to whether or not the geostation was an important element of this case that may become a factor as the case wore on?

*John Leonard:*      At the time we were in the field I don't believe we realized what it was.

*Angstman:*      So there was no—was there later discussion between the time you're in the field and today about whether the geostation was an important factor in this case?

*John Leonard:*      We tried to figure out what it was that we found there.

*Angstman:*      Did you ever find out until yesterday?

*John Leonard:*      I heard from another park employee what he thought it was, but I never knew that for sure.

*Angstman:*      Okay.  As to the subsistence using, one of the ways you can get a subsistence permit for that zone is by having hunted there before it was a park preserve, isn't that right?

*John Leonard:*      People that are able to show use before ANILCA at times are able to qualify.

*Angstman:*      Okay, and investigating this case, you've learned that Mr. King used the park area before it was a park, for hunting.  You've heard that from him actually haven't you?

**NPS**        **Day 2 Testimony**        **Page 8 of 30**
**US v. King, 4:08-cr-8-JDR**
**Trial Transcript, Vol. 2A: Day 2 – August 19, 2008**

| | |
|---|---|
| *John Leonard:* | I've heard that from him. I've not been able to find any hunting record however. |
| *Angstman:* | Okay, I have nothing further, thank you. |
| *Judge:* | Any redirect? |
| *Cooper:* | No, Your Honor. |
| *Judge:* | You may step down. |
| *Cooper:* | I believe that if I may verfy with the clerk if all our exhibits which ones have actually been admitted.. |
| *Clerk:* | One through 31 have all been admitted. |
| *Cooper:* | So, we would rest at this time, Your Honor. |
| *Judge:* | And I'm just looking to see about the exhibits. So, exhibits 27 through 31, basically came in by stipulation. |
| *Cooper:* | I think that's right Your Honor, yes. |
| *Judge:* | All right. The government rests, the case in chief. Has the defense, -- did you want to make an opening statement or proceed with testimony? |
| *Angstman:* | I have some motions to make Your Honor. I would ask for the Court's consideration of this memorandum of law on some points that I would discuss and I'll pass a copy to the government as well. May I approach? |
| *Cooper:* | Yes. |
| *Angstman:* | The memorandum— |
| *Clerk:* | Sir—yeah. |
| *Angstman:* | I thought about it as I was walking back. The memorandum speaks to some issues that I'll address, but there are others as well. At this stage of the proceeding, Your Honor, the Court has opportunity to assess certain things in determining whether the case should go forward. And one of the factors is whether or not on any or all of the points there is sufficient evidence to proceed to the next stage of the trial. That would be a motion for a judgment of acquittal if this government's evidence taken in the light most favorable to them would leave the opportunity for a rational trier of fact to find the essential elements beyond a reasonable doubt. |

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 8 of 30

And on that point we have three areas we want to discuss. One is the entire case involving the use of the Argo within the park. The second is the evidence concerning the boundary, the legally established boundaries of the park. And the third now is the question of whether the government has submitted sufficient or adequate evidence on the question of whether Mr. King is a subsistence user. Qualified as a—under an exception to the regulation.

I'll address the first of those first, the Argo use. The evidence of the Argo use consists of substantial evidence that an Argo was present in Mr. King's camp and that there was an Argo track found between his camp and the kill site. And the government's contention, of course, that that's over the boundary and for the purposes of this discussion, the boundary question is not part of it and we're not raising the boundary question; here we're suggesting there's no evidence whatsoever that Mr. King operated a vehicle at any time.

I draw the court's attention to a drunk driving case, for instance, as an example of how woefully inadequate the evidence here is today. If an officer arrived at the scene of a recently called in drunk driving incident where there was all kinds of evidence that someone was drunk, and someone was driving and the vehicle in question was parked at the street corner and there were two gentlemen who exited the vehicle and they were in the vicinity of the vehicle when the officer arrived. And if there was no further evidence about which one had driven the vehicle to that location, despite whatever kind of evidence that could be established that each driver was drunk and that the vehicle had been driven and that it had been driven in an erratic fashion just prior to the arrival of the police, there isn't a chance that a prosecution could stand on either of the gentlemen without more evidence as to which one drove it.

Now, the government here asks the court to find that because there were two people in the camp, one of 'em seated in the lobby and one of 'em is seated at the defendant's table, that you should simply assume that the defendant was the one that drove the vehicle. There is no evidence that he did. He was not asked if he did. He did not offer that he drove the vehicle. No one saw a man as opposed to a woman drive the vehicle. No fingerprints were taken on the steering wheel. No—we haven't even established who owned the vehicle, which sometimes is suggested as evidence of who was likely driving. We don't even know who owned the vehicle in this instance.

So, on the question of whether or not a sufficient evidence exists in this case to uphold a conviction based on the state's evidence at this time, utter failure.  It's a complete guess.  They're just assuming that Mr. King drove the vehicle and we can't do that Your Honor.  This is a criminal case.  And while it's a petty misdemenor here, it's obviously a serious petty misdemeanor for—at least for us, it seemed to be for the government too.  With good reason, on both sides.  So, we can't relax the rules of criminal law and this one cries out to be removed from consideration for lack of evidence of driving.

I will ask the Court if some courts prefer to have these motions brought and responded to in order, rather than requiring the government to respond to all of them together.  Does the Court have a preference?

*Judge:*  I have no preference.

*Angstman:*  All right.  I'll proceed on then.  On the boundary issue, Your Honor.  I objected to the first map on the question of whether or not the government can simply say this is our boundary and by George you better honor it.  And the Court said well you'd accept the maps, but you'd consider the evidence that was produced as to how the maps ended up as they were.  And let's talk about how the evidence ended up as it appears on the maps.

The government maps are all created, we have heard, by a system that exports—excuse me, imports USGS maps which are the government's map making organization.  We acknowledge that.  And after importing those maps, the National Park Service does things with those maps to use them for their own benefit, for all kinds of benefits, but for this case, it used it to display their boundary and to place on it the events that are important to this case.

Well, that's all well and good, but we ask where those boundaries came from.  And the evidence on that point is that the explanation of those boundaries came from the USGS maps that establish the corners of certain sections and townships and the government has adopted those as its boundary.  And they've further gone to those corners apparently—this is rather scant evidence of this, because this was somebody who didn't know that this happened, but the government has gone to these corners and somehow established the latitude and longitude of those corners, transposed suppose those latitudes and longitudes onto the USGS maps, and we have a boundary.

Case 4:08-cr-00008-JDR   Document 56-2   Filed 10/06/08   Page 10 of 30

The only problem, Your Honor, is that the government then introduced USGS maps purchased for the purpose of this case to show where the boundaries are—or, no excuse me, to show how easy it is to determine the boundaries for Mr. King and others. And unfortunately the USG maps, USGS maps in the area do not reveal the boundaries in the location that the government believes they exist, but instead they reveal the boundary, in some cases in an entirely different area and none at all in the area where Mr. King had his camp and did his hunting.

So, we're left with—if you take the government's evidence in the light most favorable to it, we're left with a position as I stated at the beginning that they have created a boundary from USGS maps that portray a boundary in some areas, but not in this area.  The explanation of that is the maps haven't been updated.  That's— we'll accept that explanation.  If the maps have not been updated, who is it then that did update the maps?  It was the Park Service.  They extended the boundaries in a manner that they chose to do without legal authority, we have not heard one iota of evidence about the legal basis for the establishment of the park boundaries at Denali National Park.  Not one piece of information.  You do not create your own boundaryship Your Honor.

In federal law, boundaries are created by federal law.  I can tell you that there are many different situations where the government has created boundaries, none of them include the Park Service saying this is our boundary, which is what has happened here.  There simply is no evidence before this Court to determine that the boundaries that they have produced on their maps are legally justified in the law.  The latitude and longitude that they show on their website is a creation of their own doing.  They went to some corners, corners that say nothing about this being the boundary of the United States national park at Denali, and they have taken readings off those corners and said ah, this is our boundary.

So, markers say nothing about it and the USGS maps say nothing about it.  These are the authoritative definitions of boundaries in the United States.  USGS maps and the corner markers.  Neither of them say one word about where the boundary was that Mr. King is alleged to have violated.  So, again the evidence utterly fails on the question of boundaries whether or not the government has established the legal boundaries of this park.

Finally as a subsistence, this officer says that he knows that Mr. King did not qualify.  That's the status of the evidence.  I challenge that on the basis of whether or not he was in a position to know because it's not his field.  He doesn't determine if Mr. King is a

*NPS*        *Day 2 Testimony*        *Page 12 of 30*
*US v. King, 4:08-cr-8-JDR*
*Trial Transcript, Vol. 2A: Day 2 – August 19, 2008*

subsistent hunter. Someone else has to determine that. And you've heard at least some evidence of the fact that Mr. King claims he's hunted there for years.

But regardless of whether he hunted there ever or since he was born, the government has not established sufficiently that he was not entitled to that exception. And since the exclusionary language is included in the regulation itself, it must be disproved in order to proceed with this criminal trial. And the evidence the government established for that is again utterly lacking. It's a person's opinion that he didn't qualify. No basis for that opinion. Where did he go look? Who did he consult with? What kind of evidence did he consider to make that determination? I just know, is his testimony.

All right and that leads me to the memorandum of law on lack of notice and due process. The—this is not a judgment for acquittal, this is a motion to dismiss, Your Honor, based on the status of the evidence in relation to our constitution and requirements for going forward in a criminal prosecution. I will not address the law because it's addressed in the memorandum and I will address the facts that support our position.

The question that must be addressed is whether the reasonable person would have adequate notice of the location of the boundary at Denali National Park to meet our constitutional requirements for due process before a prosecution can continue or be successful. Now, what is the evidence that the government has? And this does not have to be taken in the light most favorable to the government. This is the basis of the evidence as it exists right now. What the Court feels the evidence is right now in this case, whether or not there's a binding belief on the Court's part that due process has been violated. And that's weighing the evidence. The Court can weigh the evidence in a motion to dismiss. It doesn't have to consider it in the light most favorable to the state. So, that's how I will address the evidence, that's how the Court should weigh.

We have an officer who is primarily responsible for enforcing the law and the boundaries in the area where Mr. King was tagged and he acknowledges several things that are very important to this case. Number one, he acknowledges that at the time of contacting Mr. King he himself the officer was mistaken as to the location of the boundary in the very area where Mr. King had purchased—excuse me, shot his moose.

And he was mistaken in a manner that's consistent with the existence of let's call it a extraordinary marker that exists near Mr. King's killsite. A marker that the government discovered and

didn't report to us.  A marker that sits high on a hill and can be seen for a long ways, and is in a situation that is relatively in close proximity to the—what the government believes is the actual boundary.  And this bound—this marker sits in a location that could easily, as admitted by the officer, confuse or deceive a hunter into believing that he was north of the boundary, when in fact he's not north of the boundary that the government believes exists in this case.

What else do we have?  We have corner markers that the government maintains are its boundary markers that say nothing about the fact that they are a boundary of the national park.  Someone coming upon them without any other information would look at 'em and say this is a survey marker having to do with sections and township.  It doesn't say anything about the National Park, we must have to look further for the National Park boundary.  Perfectly reasonable thought for a hunter that encountered one of those markers.

I might add, and very clear from the evidence that these markers— at least the closest marker to the kill site is buried in bushes and very difficult to see.  Hard to describe even from the air at 50 feet, Your Honor.  So, is that reasonable notice?  I think not.

Then we have the matter of the—the maps.  The government wants to rely on GPS and the law does not require or even suggest that GPS figures into this proceeding whatsoever.  The law was created—the first laws that we're here to talk about were created many, many years ago.  And the revisions to those laws all pre-date the GPS system.  So, to incorporate a GPS into this discussion, Your Honor, is illegal.  It would be handy for the government if Congress or somebody would pass a regulation that made GPS's and computer use and websites certainly part of their enforcement scheme, but that has not happened.  So, to suggest— to kind of move this out of the legal area and put it into a technological area that's not part of the law is not fair.  It's not due process, Your Honor.  That's the problem, it's not due process to do that.

So, we're stuck with what we do know.  We do know that the USGS maps for this very area show either no boundary or the boundary in the wrong place, depending on which maps you get.  But there is no delineation on the USGS maps for the area involved that show the boundary.  And low and behold if we want to use the government's website notice for how to hunt this area safely and legally, it tells you that the USGS maps are the best source of information on boundaries.  They tell us to go to the maps, you go

Case 4:08-cr-00008-JDR    Document 56-2    Filed 10/06/08    Page 13 of 30

*NPS*        *Day 2 Testimony*        *Page 14 of 30*
*US v. King, 4:08-cr-8-JDR*
*Trial Transcript, Vol. 2A: Day 2 – August 19, 2008*

to the maps, they brought the maps into Court and showed 'em to Your Honor. They don't have the boundaries on and where they do have 'em, they're in the wrong place. They're in the place that they existed before the additions to the park were made.

I understand how these mistakes happen. I'm always willing to admit that I make mistakes and I made several yesterday. Mr. King admits his mistakes as you'll here if this case proceeds and he admits those. Mr. Leonard was kind enough to admit some mistakes on the stand. You know, that's the way things work in the world. People have mistakes, they're supposed to admit 'em.

The mistake here was that the federal government hasn't gotten around to catching up with their own work to tell the world where the boundaries of the national park are on the maps. So, that leaves us with trail—excuse me, boundary marking. Whether or not it's reasonable for a government to allow problem areas like Rock Creek, Stampede, Cantwell or the Talkeetna area to exist without trying to mark those boundaries in a way that affords a traveler in the rural remote areas an opportunity to know where the boundaries are.

State law requires marking of boundaries if you expect to get somebody for trespass, but regardless of what a state law does, it's reasonable and common sense that you and I, if we're going to enforce our boundaries where we live, we have to tell our neighbors where our boundaries are. That just makes sense. And when we do that, we do it in a way that's reasonably calculated to give them a chance to know those boundaries.

Here, the government has put some markers up, we see they know how to do it, they put 'em up in locations nearby, Stampede and they put 'em up at—AHTNA property near Cantwell, but they haven't put up markers at Rock Creek area where they've had all kinds of difficulties with people not knowing where the boundary is and I return to the fact that neither did the ranger. It calls for a reasonable markers, it's the only reasonable way to get notice to someone. The ranger admitted that because of the geomarker and because of USGS map problem that it would be understandable if somebody were misled about where the boundaries where.

That's what happened in this case Your Honor. Due process requires reasonable notice. There is no reasonable notice in this case of where the boundaries are and Mr. King's case should be dismissed on that basis. Thank you.

*Judge:*       Mr. Cooper, it's your turn.

Case 4:08-cr-00008-JDR    Document 56-2    Filed 10/06/08    Page 14 of 30

*Cooper:* Yes, your honor, I haven't—but just a couple of minutes ago received the written notice of a—what is it?  A motion—defendant's motion—memorandum of law it is on lack of notice and due process.  So, I—I'm not fully prepared to answer that.  It's a written document—

*Judge:* So, let's talk about the Argo use.

*Cooper:* Yes, the analogy that the defense counsel draws is not applicable.  He's talking about a situation where you come across a vehicle and two persons and no evidence of which one operated the vehicle.  Here, we have the vehicle with the freshly killed parts of a moose partly on it and on the ground beside it and the defendant having stated to the officer—to the state trooper and the ranger who were present that he had just gotten back from retrieving the meat from the kill site.  So, he's admitted that he used the vehicle for that purpose.

And it's evident the vehicle was indeed used for that purpose.  Therefore, the vehicle was used for retrieving the defendant's moose from the kill site, whether his daughter operated it or he operated it is immaterial because either one or the other of them could have done so in aid of the defendant taking his moose.  She was not licensed, she couldn't be a hunter, it was his moose.  And therefore, if his daughter operated the vehicle, she was aiding and abetting his retrieval of the moose parts from the field as he admitted to the agents that he did.

So, I think it's clear that the defendant has, by his own conduct and actions and what the officers observed at the scene established that he either personally operated the vehicle or participated in the use of the vehicle to retrieve his moose parts from his kill site to his camp site.  So that particular charge easily meets muster under the standard that must be applied today.

*Judge:* Let me ask you about the participated in use of the vehicle.  Is that part of the proscribed activity?

*Cooper:* Well, under Title 18, Section 2, a person is chargable as a principal whether or not he committed every act constituting the commission of the crime if he aided and abetted, was involved in the commission of the crime as a person who wanted it to succeed.  So, it doesn't matter if he was aider or abettor or a principal, he's chargeable as a principal under that principle of law.

*Judge:* So, you're relying upon aiding and abetting statutes in Section 2.

*Cooper:* I'm relying secondarily on that, but primarily on his own statements that he had just done this, that he had just returned from retrieving the moose meet from the kill site and the moose meat was partly on his vehicle and was partly on the ground next to it. Clearly it would have had to use the vehicle to do that and tracks indicate that the vehicle was used in aid of accessing that kill site. The tracks were in the area leading to and away from it.

*Judge:* In your recorded statement that was made when the search warrant was served, was there any discussion in that about who drove the vehicle?

*Cooper:* I don't recall anything like that, Your Honor.  But of course if there were any such thing as that, I believe it would be cumulative of what is already sufficient based on what happened at the camp site on the 6th of September.  He does state that he followed the moose down there, that would be down the hill away from the bone pile area.  "Followed it down there, I spooked it—it trotted a little ways down that gully and I shot it.

I don't recall that it mentions in there or anything about driving the vehicle to pick up the moose meat parts so we'd be relying on the evidence presented as to what happened at the camp site, and I would respectfully submit that the analogy that's been provided has none of the characteristics that have just been described that apply to this event and therefore is not helpful in determining whether the defendant—whether there's evidence that the defendant operated the vehicle in the park.

*Judge:* How do you decide the due process argument in the brief?  There are two other issues that have factual components primarily the boundary issue and the subsistence.  So you would like to.

*Cooper:* Right.  The only evidence that's in the record is that he was not a subsistence hunter.  That's all that's there and there was an opportunity to cross examine and strikingly the questions that defense counsel asked the Court in his argument are questions that he withheld from the witness just 10 minutes before, didn't bring any of that up when the witness was on the stand they could have addressed those questions.  But the—so the only evidence and stands uncontested or unrefuted is the testimony of the ranger that the defendant is not a qualified subsistence hunter.

If further evidence was required, then that answer—if that had been suggested by the nature of the cross-examination, we would have produced further evidence.  Documentary evidence undoubtedly lies behind what the ranger testified to and could be

supported—could be produced, if necessary, to support what he said, but while there was no apparent need to do so, the questions, as I indicated, were not presented to the ranger and therefore the issue wasn't pressed as far as counsel now asks the Court to press it.  We have only the unrefuted, uncontested, unchallenged testimony by the ranger that the defendant is not a qualified subsistence hunter.

And of course if the Court wants to reopen on that issue, we'll do it and we'll go the rest of the way to produce the documentation.  But that was the short answer and that's the only one that's on the record at this time.

*Judge:*  Well, his argument is that the government hasn't met its burden of proof on that issue, that's a legal argument.  As far as reopening the case, the Court reacts to motions by parties, but it's not up to me, I'm not here to prove or disprove, but to rule on the evidence in the case presented.  So—

*Cooper:*  Right.

*Judge:*  —it's not what the Court wants that's pertinent there.  The other issue is the boundary issue.  Go ahead could you comment on that please?

*Cooper:*  Right.  I think there are a couple of components to that issue.  One is whether—whether the boundary is where the plaintiff has alleged it is, in fact, and the other is whether the defendant was on reasonable notice of that.  Now, we've already preliminarily briefed in the trial brief in this case the principle that it is not necessary that a defendant know that he is over the line in order to be convicted of the offense in this case.  This is not a case that requires Mens Rea.  It doesn't require knowledge that one is in the wrong in order to prove it.  It's not an element.  That's very clearly established in the case law that lies behind the ruling of this Court in a similar case about a year ago, which we cited in the trial brief.  I did not elaborate all the authorities in that respect.  And in order to establish that point but rather relied upon the Court's ruling in a similar case last year and I cited that document to the Court.

I believe that that holds and it is not necessary to show that the defendant in fact knew where the boundary was at this time.  Whether or not it was reasonable for the government to require him to be responsible, because the information was made available in any way is another issue, it's basically, I guess a constitutional issue of due process.  And considering the existence of multiple maps that both parties have produced showing that outline, the

*NPS*       *Day 2 Testimony*       *Page 18 of 30*
*US v. King, 4:08-cr-8-JDR*
*Trial Transcript, Vol. 2A: Day 2 – August 19, 2008*

square corner up there on the northeast. Not all maps had it, but most of them had it showing that line and showing Rock Creek being north of that line, which the defendant is clearly not misled about. He knows that Rock Creek is north of the boundary.

In fact, some of his statements, particularly the ones on the recording, at the time of the search warrant indicate that he knew that the lands where the park was were to the south of his position. And he knew they were close. And so we have numerous maps that are available as the evidence indicates from the map store to the university campus, from Beaver Sports from Sportsman's Warehouse, from several other locations, I'm not remembering the names of all of them, that sell maps that show exactly that point.

The defendant was on notice about where the boundary was in relation to geographical features. That is particularly Rock Creek and Rock Creek Trail which is north of Rock Creek. All of that is north of the boundary. In addition to that, there is a website. Now it isn't a question of whether the defendant is required to go to Beaver Sports and buy a map or that he's required to go to the Sportsman's Warehouse and buy a map, or that he's required to go to the mapping office or the map store at the campus and buy something or if it's required to get on the computer and find the website with the coordinates of the boundary mark, boundary line all laid out in detail on the website.

He's not required to do any of that. He's only required not to shoot, unless he knows that he's outside the park. And if he doesn't know that, he does so at his own risk, and that's the nature of the law in this area. And so, it's not an question of whether he's required to do this, the question is whether it was reasonable for the government to put out this notice and all these different forms and to hold the public accountable for its conduct in relation to the park because the park boundary was no secret. It was made reasonably and evident in a number of different ways.

It is true that some maps are older than others and don't have the boundary on them, that they're not the only resource. The USGS maps are the best resource with regard to exactly where geographical features and section lines are. But standing alone, they don't tell you where the boundary line is, and I don't think that the park website indicated that. The park website has just been referred to by counsel relates to maps and indicates that the base maps on GPS units are sometimes inaccurate. And that the best maps would be the USGS maps.

The best source of information about the boundary insofar as the subject matter of that paragraph is concerned, meaning maps, would be the USGS maps because they have the actual section lines on them and the park boundary follows the section line. How do we know that? Because if you look at the coordinates that are on the website, you can establish that those coordinates fall right on the section line.

And so the USGS map is in that sense the very best indicator of where geographical features are in relation to the section line which forms the boundary line. So, it's not as though any one item standing alone is going to answer this question, but it's one item in use, in conjunction with other things, with the defendant's knowledge that he was north of the line, with his knowledge and anybody in the public's knowledge that Rock Creek is north of the line and that Rock Creek Trail was north of the line and that it's near the line.

He managed to get down to exactly where it is, is made possible by use of further resources, particularly a GPS, which the defendant has told different ways. He said I have a GPS and always hunt with one. And then he said no I didn't have a GPS because I looked at the park website. This—this evidence is not that the defendant is too ignorant to look at the park website, he looked at it. And he said I just couldn't find the coordinates on there.

So, you have a GPS that tells you the coordinates and if you have the GPS with this USGS map, you can tell the coordinates because the latitude and longitude are written right along the margin of the map. And if a person knows that the—that the GPS—that the coordinates for the boundary line are on the section line as it's revealed in the park website and by use of the latitude, longitude, if a person knows that, they can look for that section line on the USGS map and there they have a line that shows the boundary.

If he has his GPS unit with him and he knows what the coordinates of that boundary on the USGS map are, then he can tell on the ground whether he's on that line or not. If he doesn't have a USGS map, but has the coordinates off of the park website, then they'll appear right on the screen of his GPS as exhibit 19 shows pertinent—it was 19 that shows a picture of a GPS screen at the kill site, it shows the coordinates exactly one-tenth of a nautical mile south of the section line, which is the boundary of the park.

So, all of these ways exist for a person to know where it is, where the boundary line is, and in addition I didn't even mention the boundary markers yet. These are survey markers that show the

section line.  And the section line is the boundary as indicated on the parks website.  And as indicated on all the maps that show the boundary line in that area.  Now all of 'em do, like the USGS.  But many of them do and the ones you buy at Sportsman's Warehouse or Beaver Sports of this other locations where hunters are likely to go for supplies and equipment, sell those maps and many of them show the boundary line.  I won't say all them do, but we've produced several that do.

The National Geographic puts out two different varieties of what they call a Trails Illustrated map.  The list of ways in which the park boundary has been shown to the public is rather multitudinous.  Those—both of those National Geographic maps, by the way, do show the boundary line and some of them, not all of them, will also show sections or ranges or townships around the boundary or the map so that a person could verify if he does see the marker on the ground, verify whether this is where the boundary of the park is by looking at a map that places the boundary along that section line.

So, I think that as far as the notice is concerned, that's overwhelmingly established that the defendant and all the public was on very ample notice of where the boundary line was in this area.  Whether the defendant was mistaken by virtue of another marker in the area is—I think is only—there's no evidence of that first of all.  There's no evidence presented that he was.  There's only questions raised about whether he could have been.  There's no evidence to that effect.

The evidence is that there is a geostation marker which doesn't purport to show, according to what we've been told so far, that there is any section line or a range or township information on it.  We don't have that in evidence yet, but there's no evidence that—there's nothing—there's no suggestion in the record that it contains any of that kind of information.  There's no suggestion that the defendant was in the area where that was.

The only suggestion that it could have been visible was one photograph that we don't have all the details of the origin of that was taken three weeks ago indicating a little speck that someone says could be one of those marker plates that identify where a marker is.  But, that is a pretty slim basis on which to say that the notice that the defendant had of where the boundary was through all these other means that have been mentioned was canceled out or overridden or confused by a little speck on the horizon that he saw that he claimed might have been another boundary marker that would have been different from all the notice that was given as to

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 20 of 30

the boundary being on the particular section line just south of his camp location. So, that is really a non-issue at this point. The evidence has not been brought out that there's been any such error made, there's only been a suggestion on cross examination that such could have been the case.

As far as where the boundary line actually is is concerned, the testimony is that this boundary was surveyed by the Department of the Interior in 1981. And that's written right on the boundary markers themselves. Every—there were three of them shown on three of the exhibits and those are Exhibit 7—not 7, not 7, 8, 8 is the closeup of the central boundary mark of the none that was right close to Mr. King's moose, that was 8. And then the map, Exhibit 13 was a map with the three boundary markers on it, I believe.

So, that shows that within a mile of his camp and about a mile in either direction, within a mile exactly of his kill site in either direction, there were other—two other boundary markers, one in each direction from the kill site they had the same kind of information, range township and sections with a line lining up with a section line corners that meet where that boundary marker was. So, even though those were on the ground, there are no trees there to put them up on, no place where a notice could be posted in a higher place where it's not likely to be missed, not as likely to be missed, yet, this one was between the defendant's camp and his kill site and it had all this information about a range and township and section lines and corners that could be verified if one had in his pocket one of these USGS maps.

Or if he had looked in advance at one of these maps, or had information off the website or any of the other sources of information that have been mentioned, finding the marker in the field would be one more way of establishing where he was. But that marker itself I think is presumptively evidence of the location of the boundary mark, of when compared with the rest of the data in the case including the maps and the evidence on the website as to the coordinates of that location.

So, where the marker was, where the boundary line in fact is established by the BLM survey and we've put that in fact 600 feet north of his kill site. Where it was insofar as reasonable notice to the public is concerned is the same. And whether or not there was a mistake on the defendant's part is—is—is wholly inadequately shown insofar as the present state of the evidence is concerned to negate a conclusion that there's ample evidence for this case to get beyond the present motion. Thank you.

*Angstman:*          Brief response Your Honor.

*Judge:*          Yes.

*Angstman:*          The argo issue, I believe the government has just switched its theory of why Mr. King should be charged with an Argo. There's nothing in the charge that suggests that being charges as a—this vehicle was used for an illegal purpose and therefore it was an illegal act to take it in and out of the park. He's charged simply with operating a vehicle within the park, under the rules that say you can't operate a vehicle in the park.

There are—and I'm not a federal expert by any stretch but assuming there are aiding and abetting statutes, he could have been charged with—correctfully charged if that was their theory, with using it to transport his moose out of the park, but he wasn't charged with that. And that's not the charge the Court is here to consider today as to whether there's sufficient evidence.

Okay, by the way the transcript says clearly that he walked down for the moose. It was a suggestion that he admitted driving down to the moose. The transcript page 3, "we spotted it on that hillside, walked down into that draw" was his testimony on the transcript. Okay, as to the subsistence, I didn't quite get the argument that we should have developed more evidence on subsistence when they put their witness on the stand to prove that he was not subsistence. That's not our burden to put that evidence forward. It's part of the regulation and it is not one of those situations where we might be able to come up with some defensive information about it. They have to prove he's not one of the exceptions and they have not done that.

Now, as to the due process question, there's a couple three factual points. Mr. Cooper argues that the section markers are the boundary and that's been the position of the government from the start. Who says? Two words answer that question. Who says that those section markers are the boundary? They do. There is not one piece of evidence in this case as to the legal authority for their position that those section markers are the national park boundary. It does not come from the USGS maps. We have seen that. That would be some authoritative source for such information. A USGS map if it said this is the park boundary, we would be not talking about this issue.

If the markers themselves had on it something that said this is the park boundary or this is the national park service boundary marker, that would be sufficient evidence to get by this stage of the

proceeding for sure.  'Cause we understand that those were placed by the government.  It's not seriously considered here.  We don't—we're not talking about whether those corner markers were put in officially and by the government.  But it doesn't say a word about the National Park Service boundary.

They need you to find that those markers are their boundary and they keep talking about their boundary markers.  Those are section boundary markers and they have to prove to you, Your Honor, with some kind of valid evidence that somewhere in the federal system is a document or a law or a finding that creates a national park boundary on those lines.  And all they've done is draw a line on their map and say this is our boundary.

There are some maps that show a boundary there.  Those cannot be known cannot be based on USGS markers—excuse me, information, because the USGS maps do not show a boundary in that location.  We don't know.  There's no foundation for any suggestion of how those commercially produced maps put a boundary marker in that area.  But I have a real good suggestion for the Court as to how they got there.  Because this is how commercial maps are made.  They contacted the park service and said where are your boundaries, we wanna put 'em on our map.  And so just like in Court here, the park probably sent 'em their boundaries created on their own system and it showed up on the commercial maps.  But the commercial maps are not law.

The USGS, we acknowledge is legitimate legal basis for finding places in America.  And since it is and since there's no boundary there, they fail in that point.  Mr. King wants me to point out that the USGS maps are not only the legal authority, but they are the best maps.  They're small scale, you can see stuff on 'em.  The boundaries are on 'em and we should prevail on that point.  Thank you, Your Honor.

| | |
|---|---|
| *Cooper:* | Your Honor I'm sorry to bring it up again, but I have a legal point that I should bring up and it's probably in response to the defendant's latest written motion that— |
| *Judge:* | Let me stop for a moment and ask the clerk, do we need to stop for the— |
| *Clerk:* | Yes, sir. |
| *Judge:* | All right, so we're going to take the recess for the other—I think the Ketchikan matters are going to come up here and I'll handle them from—from here.  So, we'll address that point afterwards and |

Case 4:08-cr-00008-JDR   Document 56-2   Filed 10/06/08   Page 23 of 30

that'll give you some time to read the document on the due process.

*Cooper:* Thank you.

*Angstman:* And I have one question Your Honor about how much housekeeping do we need to do before the next people get in? Is it clearing the table sufficient?

*Judge:* I think it's mostly via video-telephone.

*Clerk:* It's by phone.

*Judge:* So, you can leave everything there.

*Angstman:* Thank you, thank you.

*Judge:* All right, so we'll let you know when we're back in on this case.

*Clerk:* All rise. This matter stands in recess. All rise. His Honor, the Court, this United States District Court is again in session. Please be seated.

*Judge:* Back on the record in the King case. Mr. Cooper you had the floor when we left off last and you had a comment to make.

*Cooper:* Yes, Your Honor. Trying to address the legal issues that appeared in the defendant's brief just before the last session started, and particularly the attack on the combination of the notice to the defendant, notice to the public, not to the defendant, notice to the public and the actual location, official location of the boundaries of the park in that area, and I'd like first to address the subject of the actual location of the park boundary in that area and that is first of all as of course the Court knows the park was expanded in December 1980 under ANILCA and that's founding Title 16 US Code and relating to this—to all the parks that were expanded by ANILCA.

The statute making the changes is 16 USC 3103(b). 3103, but particularly with (b) indicating that as soon as practicable after December 2, 1980, a map and legal description of each change in land management status effected by this act including the wilderness preservation system shall be published in the federal register and filed with the Speaker of the House and the representatives and the President of the Senate. And each such description that's referring back to the federal register shall have the same force and effect as if included in this act. And that it has

Case 4:08-cr-00008-JDR   Document 56-2   Filed 10/06/08   Page 24 of 30

an exception for clerical errors, typographical errors and so forth and so on.

All right that's 3103(b) of ANILCA bearing a date of December 2, 1980.  There was also—there's another provision in 16 US Code 410 hh-1 that refers specifically to Mt. McKinley National Park and says the following units of the park system are hereby expanded:  Mt. McKinley National Park by an addition of an area containing approximately 2,426,000 acres of public land, approximately 1,330,000 acres of additional public land is hereby established as Denali National Park and Preserve, both as generally depicted on map number DENA-90,007 dated July, 1980.  And the whole is redesignated as Denali National Park and Preserve.

And then—so you combine these two statutes, you have a map, and we have that map here in Court, referred to in 16 USC 410 hh-1(3)(a).  And it's the one described here, DENA-90,007 July 1980.  And it has a good portion thereof that covers the section in issue in this case, the northeast branch or thumb of the park that is the area where the offense occurred in the case.

*Judge:*  What's the exhibit number of that?

*Cooper:*  And I will—I will put that—

*Judge:*  What's your exhibit number of that?

*Angstman:*  Your Honor—

*Cooper:*  If we were to give it an exhibit number.  It's actually a point of law, but we can give an exhibit number and that would be the next one in order, I think 32.  If that's what's deemed appropriate for identifying it.  That's what we'd like to do—

*Judge:*  I'm not—

*Angstman:*  I  am a little confused to the procedure.  Are we reopening?

*Judge:*  No we're not.  He's responding to a motion that could have been brought prior to trial and I'm gonna give him a chance to file a written response if he wants to.  You filed something in writing.

*Angstman:*  I think he's talking about the Rule 29 motion on the question of whether the boundary was proven in the state's case Your Honor.  And he's wanting to put an exhibit in on that point.

*Judge:*  Well I think he's talking about the actual official location of park boundary.

*Angstman:*   Which is a Rule 29 motion.  If there was no evidence on that, our position is it should be a judgment of acquittal but I'll—

*Judge:*   Well, I don't think that's the law.  I don't think you have to prove—every time if you have it filed a criminal prosecution that doesn't have to go back and prove from the beginning all of the jurisdiction of the court.  But in terms of your motion on due process—

*Angstman:*   Okay, I—it's that—I don't have any problem with him responding to that now.

*Cooper:*   I believe I'm getting into the law now and—and I will address directly the defendant's memorandum that he handed me in just a moment.  But to give the Court the law, the legal basis for where the boundary really is so there's no confusion about that, I just cite the statutes, 16 USC 3103(b) and 16 USC 410 hh-1(3)(a) which refers specifically to expansion of Mt. McKinley National Park.  And the first statute cited 3103 as the one that cites this map.  It refers to the map, the map is made part of the law, the statute in essence.  And so it is part of the statute and it's cited, it's presented to the Court for that reason.

In addition to that 410 hh—or excuse me, the same statute that—let me reverse what I just said.  410 hh-1(3)(a) is the one that refers to this map.  3103(b) says that the Secretary is required as soon as practicable to provide a legal description of all these changes that are made, that legal—and to publish it, in the Federal Register.  That legal description was published in the Federal Register September 30, 1992 at 57 Federal Register 45166-1.  Cite at 57 FR 45166.

And that has the legal description of the expanded version of the park as shown on the map 90,000 -- 007.  And of all the—I've printed out a portion of the federal register, only the portion that starts in the beginning and goes up as far as, the boundary involved in the present case.  And I would cite to the Court that where this Federal Register provision relates to the present case, it refers to the boundary in terms of township lines.  The point that I'm referring to here is a point to the corner of Townships 10 and 11 and Ranges 8 and 9 west, Fairbanks Meridian.  And it says thence westerly between Townships 10 and 11 south to the meander corner of Sections 5 and 32 on the right bank of the Kantishna River, Townships 10 and 11 south, Range 18 west, Fairbanks Meridian.

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 26 of 30

So, it covers that line between Townships 10 and 11 south all the way from the line between Ranges 8 and 9 all the west to the line between—the line of Range 18 west. Therefore including the—where the marker in this case is, the line between Ranges 9 and 10 west, still along the line between Townships 10 and 11 south on an east west line. That's the description give in the Federal Register for where that north park boundary runs. And that, according to the statute, became—when it went into the Federal register, it became part of the statute is therefore this description I've just read giving the Township lines between 10 and 11 running along all the way west to the Kantishna River is the boundary, by statute, and is by reference included in 16 USC 3103(b).

And then as far as a notice to the defendant is concerned, his Exhibit JJ, which is leaning against the wall next to the clerk there, which the Court can probably see has a boundary on it, which exactly matches the description given in this statute. It follows that line from the northeast corner all the way west to the Kantishna River and is—until it takes up another description at that point. But it includes the area in this case that's on defendant's Exhibit JJ. So, I think that we have there both the official statement of a legal description of the boundary and we have the appearance of that boundary on defendant's map, as it's described in the statute.

Now, with regard to the issue of operating the vehicle, I have another of the defendant's exhibits that is related to that issue operating the vehicle in the park. And this is the photograph of his daughter next to the moose before the moose has been butchered, while its horns are still on and it appears to—that his body is in one piece, lying at the kill site and immediately behind it is the Argo in question.

*Judge:*          And that photo is not in evidence is it?

*Cooper:*          There's—I guess there's some confusion about that point. I don't know.

*Judge:*          Does it have a letter of identification?

*Cooper:*          I—the one I was given has no letter or identification on it, but I was handed this by the defense yesterday.

*Angstman:*          FF, Your Honor. FF

*Judge:*          FF.

*Cooper:*          Double F is that—

*Angstman:*          Yes.

*Cooper:*            Double F.  With reference to the defendant's Memorandum of Law on Lack of Notice and Due Process, the defense cites three legal provisions that would purport to require some type of posting of signs and notices in publications and such like.  None of those apply to this case.  The first one cited is 36 CFR 1.7(a).  And 1.7(a) by its express terms applies only to closures effected by the Superintendent under 1.5.  So, it starts out saying "Whenever the authority in Section 1.5 is invoked to restrict or control a public use activity, etc., etc."  And it prescribes the form of notice.

1.5 gives authority for the Superintendent to effect a restriction or a closure of an area for a particular public purpose.  This is not an act of the Superintendent restricting or closing an area that he has to give public notice of.  This is a regulation by the Secretary of the Interior.  It has nothing to do with the notice requirement of 1.7 of Title 36 CFR.

The next legal requirement that the defendant cited is  -- for notice is 25 CFR 11.411(b) which only applies on Indian reservations and it's clearly by its own terms not applicable to the park regulations.  And the third one that the defendant cites is an Alaska statute which requires a certain form of posting and signs in order to ground an action in trespass under Alaska statutes.  It's a creature of the Alaska statutory scheme.  It is not applicable to the federal government at all or particularly to the Park Service with regard to the Secretary of the Interior's regulations in the present case.

I note that the defendant does cite a case in which a person unlawfully entered a national park carrying a firearm and complained that there was no particular notice posted and the— that was the Lofton case cited on page 2 of defendant's memorandum, which is a Fourth Circuit case in 2000.  And the Court noted that the blanket proscription against carrying a weapon that was in the regulation 2.4 was notice enough, because there wasn't any additional ramification of that, or alteration of that that would have required more notice.  In other words, the notice of the law itself constitutes adequate notice to the public on what the rule of law is.

Then with regard to the adequacy of notice in general, part 2 of defendant's brief beginning on page 4 cites two federal cases, one in the Supreme Court, Lambert, which indicates that what the person does not have to have actual notice.  This had to do with a requirement that a person had to register as a felon.  And the Supreme Court held that actual notice is not required even if a

*NPS*        *Day 2 Testimony*        *Page 29 of 30*
*US v. King, 4:08-cr-8-JDR*
*Trial Transcript, Vol. 2A: Day 2 – August 19, 2008*

person does not have knowledge of the duty. But, the notice requirement must be generally knowable. I'm using the defendant's terms, I have not taken the language out of the case itself. But evidently, defendant contends that the Supreme Court held that it doesn't require actual notice, but the requirement that that notice be—the requirement is that notice must be generally knowable.

And the Ninth Circuit has brought this a little closer to home in the Vasarajs case I guess it is, cited also in the brief on pages 5 and 6 in which the Court is quoted as saying that due process does not require that citizens be provided actual notice of all criminal rules and their meanings and that the constitution is satisfied if the necessary information is reasonably obtainable by the public.

The Court also made clear that actual notice is not needed to satisfy due process and there's a suggestion that official description of parameters may be sufficient. What I just laid out to the court in 16 US Code 3103(b) and the Federal Register property description that is incorporated in 3103(b) by act of Congress gives notice—gives general notice in the form of an official description, if that's the language of the Vesaras case, official description setting the boundary line on that line between Townships 10 south and 11 south running east and west between Ranges 8 and 18 west. And that that is exactlry the line that has been presented to the court by the plaintiff in this case is the line in question.

So, I believe that with these points, Your Honor, that the United States has established a satisfactory response on every one of the defendant's points. Unless the Court has any further questions on any of it.

*Judge:*       No. I'll accept your oral presentation then as a response to what was submitted as a memorandum of law on lack of notice and due process.

*Cooper:*       Would the Court—

*Judge:*       I suppose—

*Cooper:*       Would the Court like to have a copy of the Federal Register description and the map to be made part of the record in support—

*Judge:*       If you want to submit a written response to this, I can give you an opportunity to do that. I deem it a motion to dismiss. I'm aware of the arguments that fall under the category of motion for judgment of acquittal. But the due process argument and all, even though it's not brought prior to trial, I will consider it 'cause it raises

Case 4:08-cr-00008-JDR     Document 56-2     Filed 10/06/08     Page 29 of 30

substantial matter that affects, I think, jurisdiction to some extent, at least the official location of the park.  Anyway, I will direct that it be filed and deemed a motion to dismiss.  And if you want time to respond, I can allow brief time for that.  Did you want to file any written response to it?

*Cooper:*　　I—I think the Court should have at least the text of those documents in front of it and of course the Court can look them up, but I can cite them better, perhaps, if the Court had a written document.  As far as I know, it wouldn't be any different from what I just stated here.  And that's—

*Judge:*　　All right, how much time do you need?

*Cooper:*　　Oh, I could have that later today probably.

*Judge:*　　All right.  Let's just say by—in the next three days.

*Cooper:*　　Very well, Your Honor.

*Judge:*　　It's a—it's my practice not to rule from the bench where we have a lot of issues and the court is the fact finder.  Some of these exhibits I've not actually seen.  They were not handed to me in copies, not all of them.  So, I would have to consider them.  With respect to the motions as to sufficiency of the government case, the Argo use is—is the—somewhat of a close call.  The government relies upon the statements and observations made in the field by the ranger and the trooper.  I've not had a chance to fine tune that.  And accepting the evidence most favorable to the government, I will rule at this point that there's sufficient evidence for the case to go forward.  And that doesn't mean that it's sufficient to convict if no other evidence on that issue is offered.

The boundary issue, I think there's enough evidence there to satisfy the government's requirements.  On Subsistence, the government relies upon the officer's and ranger's testimony this morning that he's not aware of any exception applying and gave consideration to it.  I think that meets the government's burden.  If there's other evidence that puts that into question then it may be rebuttal of something else, but at this point, I think the government has satisfied its burden of showing that there was no subsistence exception that applied.  And motion to dismiss due process is not ruled upon at this time and will—the Court will put out something on that in writing.  So, I deny the motions for judgment of acquittal, motion to dismiss is carried with the case at this point, so we'll go forward with the defendant's case.　　　*[End of Audio]*