# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA

                Plaintiff,

      vs.

JEFFREY PATRICK KING,

                Defendant.

4:08-cr-008-JDR

**MEMORANDUM OPINION**
**(Trial by Court)**

      This case was tried to the court on a two count information charging Jeffrey Patrick King with unlawful taking of wildlife in a park area in violation of 16 U.S.C. § 3 and 36 C.F.R. § 2.2(a)(1) (Count 1), and operating a motor vehicle in an designated park area in violation of 16 U.S.C. § 3 and 36 C.F.R. § 4.10(a) (Count 2). The offenses are alleged to have occurred within Denali National Park and Preserve in Alaska on or about September 6, 2007. Upon due consideration of the evidence and arguments of the parties the court finds that the government has met its burden of proof as to Count 1, but not as to Count 2.

MEMORANDUM OPINOIN
(Trial By Court)
Signed By Judge John D. Roberts

## Findings of Fact

Jeff King has lived in Alaska since 1975. He acquired a passion for the outdoors and dog mushing and chose to reside near the Denali National Park. On September 5 - 6, 2007 Jeff King and his daughter, Cali, who had just graduated from college, went and on a moose hunt near the Denali National Park in Alaska.

They traveled along the Rock Creek Trail and were disappointed when they found someone using their camp. they went back up the trail to find a campsite. The Rock Creek Trail at times comes very near the Denali Park boundary. There are hunting camps on state land nearby where it is legal to hunt as long as one does not cross into the National Park boundary to hunt. Mr. King's camp was located just to the south of the Rock Creek Trail as it runs along a ridge top. The camp looks down into Denali National Park. The Trail follows the topography and stays on top of the ridge.

After setting up camp the two traveled back along the ridge toward the direction they had come looking for moose. Cali King was curious about how they were suppose to know where the Park boundary was and asked her dad to explain it to her. He explained that the boundary ran up the creek a little ways, then started cutting across the ridge to the left and ended up on top of the ridge and continued on.

They saw three moose that day. The first moose was definitely in the Park boundary as it was known to Cali King. Jeff King knew that the Park boundary was close and he passed up shooting at this bull because it was too close to what he understood to be the Park boundary. Later that day, they watched a bull moving toward a cow moose. Cali King did not have a hunting license and stayed up on the hill to watch from above.

Jeff King started hiking down through the brush toward the moose. The brush was tall and on occasion he would break into a clearing where Cali could see him. By the time Mr. King got into position where he could see the moose from the bottom of the hill, both King and the moose were in a relatively clear area so that Cali King could observe them.

King shot once and the cow ran. The bull moose jumped and started running down hill. After Mr. King repositioned himself he shot again. This time the moose dropped.

Cali King hopped into their 8-wheeled amphibious Argo and started driving downhill towards her dad. She picked him up and they continued to the location where the moose had fallen. There, they gutted the moose. It was getting dark and they decided to return the next day to retrieve the meat. They traveled in the Argo back to the campsite that night.

The next day the Kings returned to the kill site and loaded the bones in the Argo and took them near a ridge where they disposed of them in an area they believed no one would camp in the event bears were to visit the site. Cali King admitted she did not drive the Argo the entire time. She testified that she drove the Argo down to the moose kill site and back from their campsite and that her father did not drive it either way.

On September 6, 2007, Alaska Wildlife Trooper Thomas Lowy and Denali Park Ranger John Leonard conducted a wildlife patrol on the Rock Creek Trail just north of the northern boundary of the Denali National Park and Preserve (DNP). They encountered defendant Jeffrey King and his daughter Cali at a camp site about 100 yards off the trail overlooking the Park. They observed a freshly killed moose laid out. Some of the moose meat was on the Argo, and some was on the ground next to it. There were also some game bags that had blood seeping through. A small moose rack lay next to the Argo. Mr. King was wearing a jacket that had his name on it and he introduced himself and his daughter. Trooper Lowy asked Mr. King for his hunting license and his harvest ticket. King presented both, but the harvest ticket had not been notched to show the date the moose was taken. Trooper Lowy allowed King to notch his harvest ticket in his presence.

During the conversation King indicated that he had killed the moose near a national park boundary marker and he pointed down the trail. Ranger

Leonard and Mr. King talked about the park boundary.   The parties dispute where King actually pointed.  Regardless of where King pointed, Ranger Leonard testified that King pointed southwest, to neither the geo station marker or the kill site.  It is clear this discussion did not suggest to the officers that the moose had been killed inside the Park.

After this contact, the officers continued their patrol along the Rock Creek Trail to the Teklanika River.  Several hours later they passed back by the King's campsite, and Mr. King and his daughter were sitting in some camp chairs.

The following Saturday Trooper Lowy returned to Mr. King's camp area. The camp site was "impeccably clean" and no one was there.  Using a GPS to navigate on the ridge Trooper Lowy observed how close he was getting to the northern boundary of the Park.  He was riding on an ATV.  He reached a spot where the ridge tapers off and one could drive an ATV southward.

There, he observed a pile of bones that appeared to be from a freshly killed moose.  The location was primarily treeless with brush no higher than knee deep and a lot of muskeg and dry tundra.  Trooper Lowy parked his ATV, walked off the ridge down to the bones, and saw a spinal column and hips from a hind quarter. The meat was odorless and had a fresh color to it.  The bones had not been picked over by animals.  Around the bones they observed chevron type tire tracks which

4:08-cr-008-JDR        MEMORANDUM OPINIOIN                    10/24/2008  Page 5 of 33
Case 4:08-cr-00008-JDR   Document 59   Filed 10/24/08   Page 5 of 33
                        (Trial By Court)
                  Signed by Judge John D. Roberts

appeared wider than the tracks of their four wheeled ATVs. The tire tracks had a tread pattern similar to those Trooper Lowy had observed in the King campsite.

At that point Trooper Lowy could not tell if he was in the Park or out of the Park. He walked down with his GPS and saw that the bones were outside of the Park. He realized there was no gut pile associated with the bones. Most of the edible moose meat seemed to have been butchered. Trooper Lowy and Ranger Parisal who accompanied him were able to see a trail that headed west. They followed the trail in a southerly direction.

The trial went to the west and curved down over another secondary ridge onto another hill where it dropped off and looked like it was going south into the Park. At that point the officers were not able to link up any trail that took them from the bone pile to a kill site. They returned to the Rock Creek Trail and headed out for the day.

Chief Ranger Armington decided that the situation warranted more investigation. On the following Monday Rangers Parisal and Scutter flew in a helicopter back to the GPS location of the bone pile and located the Kill site. A few days later Ranger Parisal and Trooper rode on ATVs to look at the kill site which they determined, by using a GPS, was about 600 feet inside the northern boundary of the Park.

4:08-cr-008-JDR          MEMORANDUM OPINOIN          10/24/2008  Page 6 of 33
Case 4:08-cr-00008-JDR   Document 59   Filed 10/24/08   Page 6 of 33
(Trial By Court)
Signed by Judge John D. Roberts

The rangers located near the kill site a circular disk on a pole. (Exhibit 7; close-up shown in Exhibit 8)  The disk, slightly larger than the diameter of a coffee cup, reads: "The United States Department of the Interior, unlawful to disturb." Along the bottom it reads "Bureau of Land Management, Cadastral Survey, 1981." Inside the labeling it reads above "Township 10 South, Range 10 West, Range 9 West" and "Township 11 South below.  A depiction of cross hairs illustrates the section markers for the Park boundary at that location. The four corners are depicted as Sections 36, 31, 1 and 6.  By using a U.S.G.S. map the rangers were able to determine that the boundary marker correctly depicted the Park boundary. To aid one in locating the steel pole, a silver marker is anchored in the ground nearby. The rangers also located a geo-station marker one mile west of the kill site.  This marker is of the same kind that was within 600 feet of Mr. King's moose kill site.

In late September 2007 Trooper Lowy and Ranger Leonard interviewed Jeff King at his residence.  Ranger Leonard asked King some questions about where the kill site was located.   Mr. King admitted that he did not have a GPS with him on this hunting trip.  He described how they had spotted  the moose on the hillside from the ridge where they had left the spinal column down in the draw.  From there he had followed the moose down the gully where he shot it.  Mr. King admitted that he knew that the boundary was close and believed that it came "this side of the creek."

4-08-cr-008-JDR                    MEMORANDUM OPINOIN                    10/24/2008 Page 7 of 33
Case 4:08-cr-00008-JDR   Document 59   Filed 10/24/08   Page 7 of 33
(Trial By Court)
Signed by Judge John D. Roberts

Mr. King commented that Ranger Leonard had told him at the camp site that pretty much everything up from the creek was out of the park. Ranger Leonard responded that when they had had that conversation he was under the impression that the animal had been taken towards the right where King mentioned he had seen a similar park sign. Ranger Leonard stated that he did not realize that the Park boundary came up that close but had no suspicion during their first contact that King might have taken a moose inside the park. Trooper Leonard admitted that he had been inaccurate when he told Mr. King at the campsite that he thought as long as a hunter was "on this side of the creek he was all right." Although Ranger Leonard made a mistake as to the location of the boundary when he pointed out to Mr. King where he thought the boundary was, this opinion was given after the moose kill. Ranger Leonard was not himself hunting or investigating an illegal hunt at the time; therefore he did not need to know precisely where the boundary was located on this particular hillside.

While at the King residence the rangers seized some of the moose meat which King voluntarily relinquished. A sample of this meat was sent to a lab for DNA testing and a comparison with a meat sample from the kill site. Mr. King also retrieved and turned over to the Rangers moose meat which he had sent to a processing plant. This meat came from one and the same moose that Mr. King shot on September 6, 2007.

4:08-cr-008-JDR          MEMORANDUM OPINOIN          10/24/2008 Page 8 of 33
Case 4:08-cr-00008-JDR   Document 59   Filed 10/24/08   Page 8 of 33
(Trial By Court)
Signed by Judge John D. Roberts

Exhibit C entitled "Denali National Park and Preserve Boundary Information" states: "The base maps that are provided with many of the commercially available GPS units do not accurately show the location of park boundary. Do not rely on these maps to determine if you are within the boundaries of Denali National Park and Preserve, the Denali wilderness or the area of the former Mt. McKinley National Park. The USGS quadrangle maps are the best source of information for the various park and preserve boundaries." The prior warning indicates that some maps on GPS devices may use information not provided by the Park Service and therefore be inaccurate. Nothing on this warning states that the latitude and longitude contained in GPS units is inaccurate. USGS maps that are generated from the cadastral surveys are considered accurate.

On this particular hunting trip, King was not misled by a map. Nor did he use a compass or a spotting scope to locate the Park boundary. Rather, he relied upon advice received from Lynn Thompson, a friend, from earlier years.

Jeff King testified that one marker close to his camp site occasionally provided a glimmer in the sun light. It was visible through a 300 millimeter spotting scope from the ridge. He had not gone to the marker. He knew to look for a large silver triangle from a distance to locate the marker. Apparently in his mind he tried to visualize the location of the boundary between two markers a mile apart. Mr. King

4:08-cr-008-JDR          MEMORANDUM OPINOIN          10/24/2008   Page 9 of 33
                                (Trial By Court)
Case 4:08-cr-00008-JDR   Document 59   Filed 10/24/08   Page 9 of 33
                    Signed by Judge John D. Roberts

did not recall that anyone including Lynn Thompson had told him that the ridge was the boundary.

Mr. King admitted that he never operated a GPS for coordinates to try and find the Park boundary. He had accompanied his long time friend and hunter Lynn Thompson who had used a GPS and shared information with him about the boundary. Mr. King had seen pages from the website, Exhibit 32, before he went out to hunt on this occasion. He did not feel comfortable with using a GPS and chose not to use one, but rather to stick with the landmarks familiar to him in an area he had previously hunted. He knew he needed to stay North of the boundary but he did not know exactly where the boundary line was. He had seen survey markers in the past when he had hunted further out from that area. He also observed a marker from a chartered helicopter after this hunting incident when he tried to locate the Park boundary.

Lynn Thompson first hunted moose with Jeff King and his family in the years 2000 and 2001. They hunted on the north side of Denali Park out the Rock Creek Trail. The King family and Thompson family had previously hunted an area successfully along the ridge which they called the "honey hole." On the September 2007 hunt Jeff King spotted a moose that was outside the "honey hole" on the edge of the ridge.

In August 2000, Thompson made a telephone call to the Denali Park Service Ranger Section and asked for coordinates to the North boundary of the park. Mr. Thompson punched into his GPS what he later learned to be the incorrect coordinates for the park boundary. He was unable to identify the person to whom he had talked.

Using his GPS with these coordinates, Thompson went into the hunting area to find landmarks that he could use to establish the boundary. He saw no marker that indicated that it was a Park Service boundary marker. Mr. Thompson doubted that the "number" that he had on his GPS was entirely accurate when he looked at the map program on his computer and saw that the number was different than what he thought the Park Service had given him. He told Mr. King where he had gotten the coordinates and that he doubted the accuracy of them. Nevertheless, Mr. Thompson and Mr. King apparently determined that the Park boundary went up over a ridge that is the focal point of the hunting trip in question.

## DISCUSSION

### Entrapment by Estoppel Defense

During the trial King raised the defense of entrapment by estoppel. He filed a supporting memorandum of law. Docket No. 52.[1] The government filed an opposition as part of its written summation. Docket No. 42.

---

[1] *See* also Docket No. 51.

The concept of entrapment by estoppel arises from the Due Process Clause and its prohibition against convictions based on misleading actions of government officials.  It is an affirmative defense that may be raised by a defendant as a defense to offenses that do not require proof of specific intent.  United States v. Batterjee, 361 F.3d 1210, 1218 (9th Cir. 2004).

In order to establish an entrapment by estoppel defense the defendant must show the following: (1) an unauthorized government official, empowered to render the claimed erroneous advice; (2) who has been made aware of all the relevant historical facts; (3) affirmatively told him the proscribed conduct was permissible; (4) that he relied on the false information; and (5) that his reliance was reasonable.  Id. at 1216 citing United States v. Brebner, 951 F.2d 1017, 1024, 1027 (9th Cir. 1991) and United States v. Tallmadge, 829 F.2d 767, 774 (9th Cir. 1987). Unlike an entrapment claim which turns on the subjective intent of the defendant, an entrapment by an estoppel defense focuses on the conduct of the government officials, not the defendant's mental state.  The five elements of proof are considered in turn.

King must show that an authorized government official empowered to render the advice advised him about the boundary.  King makes no claim that any government official told him anything about where he could hunt, or the location of the Denali Park boundary.  Even if he were entitled to rely upon the information from

4-08-cr-008-JDR KING Memorandum Opinion (TBC)_mtd.wpd

12

his friend Lynn Thompson who claimed to have received the erroneous coordinates from the Park Ranger Office the first element of proof has not been met. Thompson claimed to have obtained the coordinates of the Park boundary over the telephone from someone he could not identify. Thus, it is unknown whether the person providing the information to Thompson was a government official empowered to give advice as to the precise location of the Park boundary. Because the source of the alleged erroneous advice was not identified the government had no opportunity to cross-examine such person or challenge the reliability of the information. It is also unknown whether the person speaking from the ranger office understood the significance of the question about identifying the Park border. King has not established that the government spokesperson was made aware of all the relevant historical facts. The test for entrapment by estoppel requires that King show that he was affirmatively told the prescribed conduct was permissible. This element has not been met. *See* <u>United States v. Ramirez-Valencia</u>, 202 F.3d 1106, 1109 (9th Cir. 2002)(per curiam).

King must also prove that he relied on the false information. The evidence indicates that King had hunted in the same area for several years but did not rely upon Thompson's GPS information about the precise location of the boundary in determining where to hunt. Essentially, King relied on what Lynn

Thompson had told him about where Thompson thought the boundary line was. He did not rely on what a ranger had supposedly said.

After Thompson received numbers from the Ranger station he and King walked up and down the valley with a GPS to find land marks to establish the boundary line. Thompson saw no markers in the field that indicated where the Park Service boundary was located. Thompson tried to establish visual references as to where the east west line was located. Thompson admitted that he doubted that the number he was provided from his call was entirely accurate. He developed that doubt when he looked at the map program on his computer and saw that the number was different than what the Park Service had given him.

Both Thompson's reliance and that of Jeffrey King on the information Thompson received from the phone call to the ranger station were not reasonable since it could not be reconciled with the information Thompson obtained from his own GPS or saw in the field. Had King used a GPS on his 2007 hunt it would have shown him whether he was going south of 64. King testified that he did not know what to do with coordinates when he received them.

In previous years King had seen a marker cap with the survey information on it in the field when he hunted in a different location. In short, King relied upon his own understanding of the location of the Park Boundary influenced by what his friend Thompson told him rather than on anything he learned himself

from an authorized government official. A defendant's reliance is reasonable if he "sincerely desires [to obey] the law, would have accepted the information as true, and would not have been put on notice to make further inquiries." Ramirez-Valencia, 202 F.3d at 1109, quoting United States v. Lansing, 424 F.2d 225, 227 (9th Cir. 1970). A reasonable person would have been on notice to make further inquiry as to the exact boundary line of the Park before hunting close to the boundary. King has failed to establish an entrapment by estoppel defense.

The Hunting Violation

King is charged with violating 36 C.F.R. § 2.2(a) prohibiting hunting in a Park. For Count 1 the government must prove that King hunted, and that he did so in the Denali National Park and not under a subsistence exception. It is beyond dispute that Jeff King hunted moose near the boundary of the Denali National Park and that hunting in the Park was unlawful. Agent Leonard testified that he knew of no subsistence exception applicable to Jeff King and it was his duty to know the identity of persons who qualified as a subsistence hunter. The court accepts this testimony as sufficient. There is no evidence to the contrary that Jeff King was hunting with a subsistence permit.

When Mt. McKinley Park was expanded and renamed Denali National Park, the statute abolished the "Monument M" that was the subject of President Jimmy Carter's 1978 proclamation number 4616 and superseded it by new Park

4:08-cr-008-JDR        MEMORANDUM OPINION        10/24/2008 Page 15 of 33
(Trial By Court)
Signed by Judge John D. Roberts

legislation as to all land included in the Proclamation that was included in the expanded Park. 16 U.S.C. § 3209 (a). ANILCA provides that as for the 1980 Denali National Park addition subsistence uses by local residents is permitted under certain conditions "in accordance with the provisions in subchapter II of chapter 51 of this title." 16 U.S.C. § 410hh-1(3)(a) . Within that subchapter is 16 U.S.C. § 3126(a), providing: "All National Parks and Park Monuments in Alaska shall be closed to the taking of wildlife except for subsistence uses to the extent specifically permitted this Act. Subsistence uses and sport fishing shall be authorized in such areas by the Secretary and carried out in accordance with the requirements of this subchapter and other applicable laws of the United States and the State of Alaska."

Section 13.41 of 36 Code of Federal Regulations allows subsistence uses by local rural residences "pursuant to the regulations of this subpart" and the ANILCA addition to Denali National Park. Jeff Kings resides in Denali Park, Alaska which is not one of the "resident zones" listed in the applicable regulation. Therefore, he must have obtained a subsistence permit pursuant to § 13.440. *See* 36 C.F.R. § 13.420(2). According to Ranger Leonard he did not meet this requirement.

That Jeff King had hunted the rock creek area in 1977 does not qualify him as a subsistence hunter. Even that fact does not address whether he hunted in areas which later became a part of Denali National Park. It does not constitute

legal authorization to hunt in the park.  Hunting is prohibited in the Park except by

"authorized hunting" under subsection (b).  36 C.F.R. § 2.2(a)(1).  The defendant

must be so "authorized" before he may lawfully hunt in the Park; he cannot simply

conclude unilaterally that he is qualified to do so.  Although a statute allows a given

area of the Park to be opened to hunting for subsistence purpose, the evidence does

not support a claim by King to engage in subsistence hunting on the date in

question.

<u>Standard of Conduct</u>

King argues that a negligence standard is the appropriate standard for

criminal liability for the offenses charged.  He cites <u>Staples v. United States</u>, 511

U.S. 600 (1994).  In <u>Staples</u>, the court held the government should have been

required to prove beyond a reasonable doubt that the defendant knew the weapon

possessed had characteristics that brought it within the statutory definition of a

machine gun.  The National Firearms Act criminalized possession of an unregistered

firearm including a machine gun which was defined as a weapon that automatically

fired more than one bullet with a single pull of the trigger.  The court then faced the

issue of whether or not 26 U.S.C. § 5861(d) (the National Firearms Act) required

proof that a defendant knew of the characteristics of his weapon that made it a

"firearm" under the Act.

4-08-cr-008-JDR        MEMORANDUM OPINION        10/24/2008  Page 17 of 33
Case 4:08-cr-00008-JDR   Document 59   Filed 10/24/08   Page 17 of 33
(Trial By Court)
Signed by Judge John D. Roberts

The Supreme Court has long recognized that determining the mental state required for the commission of a federal crime is an issue for the court and requires "construction of the statute and . . . inferences of the intent of Congress." *Id.* at 605. The government argued in Staples that no *mens rea* element was required under the Act because the type of offense fit in the category of "public welfare" or "regulatory" offenses for which Congress imposed a form of strict criminal liability. *Id.* at 606. In rejecting the government's argument the court noted that any person who simply inherited a gun from a relative and left it untouched could be subjected to imprisonment under the Act despite ignorance of the gun's firing capabilities.

In the instant case, the activity of hunting, is significantly different from that situation. Staples is inapplicable. As a sovereignty the United States can determine when and where to allow hunting activities on its own land. The law expanding Mt. McKinley National Park to over three million acres and re-designating the area as Denali National Park and Preserve contains the stated purpose to include protecting the habitat and populations of wildlife including but not limited to moose. 16 U.S.C. § 410(h)(h)-1(3)(3)(a). The statutory and regulatory scheme promulgated to protect the Park provides adequate notice to the public with respect to any hunting activities allowed within the Park and Preserve. There is no *mens rea*

4-08-cr-008-JDR                    MEMORANDUM OPINION                    10/24/2008- Page 18 of 33
Case 4:08-cr-00008-JDR   Document 59   Filed 10/24/08   Page 18 of 33
(Trial By Court)
Signed by Judge John D. Roberts

requirement for hunting or driving a motor vehicle in a Park.  The court rejects the defendant's argument that a negligence standard should apply to this case.

<u>The Park Boundary</u>

King contends that the Park Service regulation, 36 C.F.R. § 1.7, requires public notice that hunting is prohibited by the posting of signs at reasonable intervals along the boundary of the affected areas. He contends that he was deprived of due process of law by lack of sufficient notice of the location of the boundary of the Park within which hunting was prohibited.

In <u>United States v. Lofton</u>, 233 F.3d 313 (4th Cir. 2000) the defendant was convicted for possession of a weapon on lands owed or administered by the National Park Service.  The Court of Appeals held that the government was not required to show that it gave specific notice as to the prohibition against weapons in the Park.  Like the instant case of hunting, the regulation in <u>Lofton</u> sets forth the general prohibition of such activities subject only to certain exceptions.  In <u>Lofton</u> the court noted that the general prohibition was not based on the Park Service's specific decision made pursuant to a separate regulation that would have triggered a notice requirement.  Under 36 C.F.R. § 2.2 the taking of wildlife is prohibited except for authorized hunting in areas where hunting "is specifically mandated by Federal statutory law," or in areas where hunting "is specifically authorized as a discretionary activity under Federal statutory law if the superintendent determines that such

activity is consistent with public safety and enjoyment, and sound resource management principles". 36 C.F.R. § 2.2(b)(2007). The publication in the Code of Federal Regulations of the general ban against hunting in national parks is sufficient notice to King of the criminality of his conduct.

As the court in <u>Lofton</u> noted, the demand for particularized notice runs headlong into the fundamental principle that "ignorance of the law is no excuse." 233 F.3d at 316. The fact that hunting is allowed in park areas where such activity is specifically mandated by federal statutory law, 36 C.F.R. § 2.2(b) or if the Superintendent determines that such activity is consistent with public safety and enjoyment, and sound resource management principles does not change the notice requirements in this case. King does not rely upon any federal statutory law or regulation specifically allowing hunting in Denali National Park or National Parks in general. Where limited hunting activities apply, appropriate methods for providing notice to the public may be applicable, but not here. The public notice addressed in 36 C.F.R. § 1.7(a) specifically addresses events where the authority of § 1.5(a) is invoked to restrict or control public use of activity, or to relax the existing restriction or control over a portion or all of the park areas otherwise closed.

The defendant argues by analogy that the government should be required to provide notice as in a trespass case either by giving actual communication or by posting in a manner likely to come to the attention of intruders

such as fencing.  King cites a regulation under the Bureau of Indian Affairs, 25 C.F.R. § 11.411(b) which describes the offense of criminal trespass as follows:  "A person commits an offense, if, knowing that he or she is not licensed or privileged to do so he or she enters or remains in any place as to which notice against trespass is given by: [means of notice]."  The regulation applies to Indian reservations and is inapplicable to national parks.  Likewise, reliance upon the State of Alaska's trespass statutes is of no avail to the defendant.

King argues that the government has failed to provide adequate notice of the boundaries and prohibited hunting activities thereby depriving him of his constitutional right to due process.  The Fifth Amendment to the U.S. Constitution provides: "No person shall be deprived of life, liberty, or property, without due process of law.  King cannot show that he has a property right to hunt or use the Park as he chooses.  The Constitution is satisfied if the necessary information is reasonable obtainable by the public.  United States v. Vasarajs, 908 F.2d 443, 449 (9th Cir. 1990) (affirming conviction for unlawful reentry onto military reservation holding that prosecution did not violate due process even though defendant contended that she did not know the boundaries of the reservation and did not believe she was on the reservation when she entered an access road leading to a guard shack).  The court held that the government's failure to exercise visible control over its property did not necessarily result in an inability to exclude others or the use

4:08-cr-008-JDR    MEMORANDUM OPINION    10/24/2008; Page 21 of 33
(Trial By Court)
Case 4:08-cr-00008-JDR  Document 59  Filed 10/24/08  Page 21 of 33
Signed by Judge John D. Roberts

of the property in any way seen fit.  The Supreme Court has held that whoever owns

a given parcel of land has the right of exclusive control.  <u>Texaco, Inc. v. Short</u>, 454

U.S. 516, 526 (1982).  Tolerance by the United States (National Park Service) of

certain uses by the public does not result in the loss of the right to exclusive use.

<u>United States v. Douglass</u>, 579 F.2d 545, 547 (9th Cir. 1978).  There is no issue here

that the National Park Service has not continued to exercise control over the Denali

National Park.

A criminal defendant's mistake of fact is only a valid defense if it

negates the existence of a requisite *mens rea* component of the crime charged and

if the crime allows for such a defense.  <u>United States v. Brooks</u>, 841 F.2d 268, 269

(9th Cir.) <u>cert</u>. <u>denied</u> 487 U.S. 1227 (1988).  The two charges brought against Mr.

King do not require proof that the defendant actually knew he was inside the Park.

These crimes do not require proof of specific knowledge.  The general intent

requirement is that the defendant must have entered the Park intentionally as

opposed to accidentally.  King's mistake about the exact boundary of Denali National

Park does not negate the requisite *mens rea* component of the two regulations.  The

evidence indicates that King purposely set out to shoot a moose at or near the kill

site.  He intended that the Argo be used to transport the bones to a different area

and later to transport the meat back to camp.

Generally, conduct is not criminal unless forbidden by law which gives advance warning that such conduct is criminal. The notice component of Due Process limits the rule that ignorance of the law is no excuse. Whether or not a citizen keeps abreast of statutory development, the statutes and regulations are published and available to the public with the result that citizens can fairly be charged with constructive notice of the laws that bind them. <u>Vasarajs</u>, 908 F.2d at 448. In this regard society justifiably demands that a hunter in the vicinity of a National Park learn what the law is. Here, there can be no reasonable argument that the prohibition against hunting in the Park gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. Due Process does not require that the government provide actual notice of all criminal rules and their meanings. 908 F.2d at 449. "The Constitution is satisfied if the necessary information is reasonably obtainable by the public." Id.

The pertinent park boundary for Denali National Park and Preserve is set forth at 57 F. Reg. 45178 (Sept. 30, 1992) as follows: "Thence Westerly, between TPS. 10 and 11 S., to the meander corner of sections 5 and 32 on the right bank of the Kantanisha River, TPS., 10 and 11, R. 18 W, Fairbanks Meridian." This description is given in surveying terms but it is not the only means of determining the location of the Park boundary. The cadastral survey markers relate to the Denali

National Park boundary lines. Used with the appropriate maps they also provide notice of the boundaries of the Park.

ANILCA requires that specified maps and legal descriptions be published in the federal register as soon as practical. 16 U.S.C. § 3101(b). Upon such publication, the legal description shall "have the same force and effect as included in this Act." A specific map is cited in 57 F.Reg. 45166, Sept 30, 1992, and sets forth the legal description of the entire boundaries of Denali Park and Preserve as shown on the map. The boundary line in the area involved in this case is described at 57 F.R. 45178, as the line extending west from "the corner of townships 10 and 11 South, Ranges 8 and 9 West, Fairbanks Meridian," [a point exactly 6 miles, i.e., 1 Township, east of and on the same latitude as, the boundary marker that is 600 + feet north of the kill site in this case] and running "westerly between Townships 10 and 11 South" [the same line of latitude shown on the said boundary marker 600 + feet north of the kill site] all the way westerly to "the right bank of the Kantishna River, Townships 10 and 11 South, Range 18 West [still the same latitude and 54 miles, i.e., 9 Townships west of the said boundary marker north of defendant's kill site]. (interpretation added from evidence).

The fact that survey markers had been placed in the field by the Bureau of Land Management (BLM) rather than the National Park Service was not something King relied upon or misled him in determining the Park boundary. The

BLM markers were placed there by surveyors to mark the corners of sections and townships in completing a surveying scheme. There is no evidence to indicate that survey markers in the vicinity of King's hunting trip were not accurate. It is reasonable for the National Park Service to rely upon survey markers in the field rather than posting signs to provide notice of the Park boundary in this wilderness area. Trees are not always located on the boundary.

The defense argues that once a shot has been fired the hunter is obliged to assume that the animal has been hit giving rise to the obligation to pursue it and kill it so that it will not suffer or constitute waste. King argues that the moose may have been outside the Park for the killing shot, then fell down and got up again and ran into the Park and died there. The evidence excludes this scenario. In his taped statement, King said that the moose "dropped where he shot it." After the final shot they went to the place where they last saw it and found the moose at that location.

The moose disappeared instantly and when he could see it again it did not appear to be mortally wounded. The moose traveled about a hundred yards between the first and second shots. King never considered that he had to follow the moose after the first show because it might have been wounded.

King testified that he did not know how to use a GPS well. He owns one but uses it for speed and distance for training sled dogs. He did not use it to find the

boundary because he claims he had no reason to question where the boundary was. Yet, he had been hunting in that area for years and had never seen any kind of boundary marker. He knew that the boundary line ran east west and that it was south of his camp and that he needed to stay north of the boundary line. He knew or believed he was near the boundary. A GPS properly used could have shown him whether he was south of the 64°latitude parallel. The government used two GPS units, one with an accuracy range of plus or minus 14 feet. The other had an accuracy within about ten inches.

One of the ways to locate a boundary is to compare the contour lines on a topography map with what is actually seen on the ground. The U.S. Geological Survey quadrangle maps give latitude and longitude around the Park boundary. A cadastral survey conducted by the Department of the Interior in 1981 identified the boundary by latitude and longitude. The Department of Interior survey references section lines, townships and ranges that are noted on the U.S.G.S. maps. Using the latitude and longitude information from the Park's website or just a USGS map, King could have determined his location.

The Congressional record designates the boundaries and legal description of the Park. The latitude and longitude of Denali National Park are noted on the Park website and in the cadastral survey.

The Denali National Park official web site also describes the applicable regulations. There is a website page on activities for hunting. This website has the coordinates for the boundaries. The web page describes the original Mt. McKinley National Park and the additions created by ANILCA.[2] Another page addresses off-road use. The Park is closed to off-road vehicle use except for a small area of the Park which subsistence hunters can use.

The NPS Website (http://www.nps.gov/findapark/index.htm) which is different than the Denali Park Website (http://www.denali.national-park.com/) contains a statement on the restriction of liability. It states in part "The National Park Service makes no claims, promises, or guarantees about the accuracy, completeness or adequacy of the contents of this website and expressly disclaims liability for errors and omissions in the contents of this website. Not all information on this website has been created or is owned by the NPS." A similar notice is on the Denali Park Website. The coordinates were put on the website after a 2005 case brought to the attention of the Parks Service that they needed to make it easier for the public to access boundary points.

King could have picked up a map that had the sections, townships and ranges on it. He did not have a map of where he had hunted in the past. From the

_____

[2] Alaska National Interest Lands Claim Act Public Law 96-487-Dec 2, 1980, 94 Stat. 2371.

4:08-cr-008-JDR       MEMORANDUM OPINION       10/24/2008  Page 27 of 33
Case 4:08-cr-00008-JDR  Document 59  Filed 10/24/08   Page 27 of 33
(Trial By Court)
Signed by Judge John D. Roberts

top of the ridge he had spotted some silver in the brush on a number of occasions and took that to be in alignment with the maps used in earlier years. Mr. King claimed that he did not know how to use a compass. King testified that he was willing to gamble that he knew where the boundary was. He did not know the location of the boundary and killed a moose inside Denali Park on or about September 6, 2007. King is guilty of unlawfully taking a moose in the Park as charged in Count 1 of the Information.

The ATV

Count 2 charges that King operated a motor vehicle in the Park in an area not designated for off-road motor vehicle use. There were no park roads or parking areas in the location of the hunt. The Argo was operated between the defendant's camp site on the ridge and the kill site which was inside the Park. None of that travel in the Park was in an area designated for off-road motor vehicle use.

The evidence establishes that the offense of operating a motor vehicle in the Park outside of designated areas did occur. Jeff King was connected to the commission of that offense. There was no eye evidence that Jeff King operated the Argo within the National Park on this hunting trip.

The Argo was photographed at the kill site and observed by Ranger Leonard in the defendant's camp outside the Park with moose meat. Both Jeff King and his daughter Cali agree that Cali operated the Argo to and from the kill site on

September 5 and from the kill site the next day, September 6 to haul the meat to camp. Neither could recall who had driven the Argo to the kill site on the second day. Proof beyond a reasonable doubt is lacking that King drove the Argo himself in violation of 36 C.F.R. § 4.10(a).

The government argues that it is immaterial whether Mr. King personally drove this vehicle on either of these occasions or simply participated in the use of the vehicle because he "aided and abetted" the commission of the offense by Cali. The act of aiding and abetting the commission of an offense is punishable under 18 U.S.C. § 2(a) and need not be alleged in the charging instrument. United States v. Vanndering, 50 F.3d 696, 702 (9th Cir. 1995). "Aiding and abetting may be implied in every substantive federal offense." Id. citing United States v. Armstrong, 909 F.2d 1238, 1241-42 (9th Cir.), cert. denied 498 U.S. 870 (1990). Section 2(a) provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

The elements of aiding and abetting are set forth in United States v. Garcia, 400 F.3d 816, 819, n.2 (9th Cir.), cert. denied, 546 U.S. 1080 (2005). To obtain a conviction under a theory of aiding and abetting the government must show the following: (1) that the accused had the specific intent to facilitate the commission of a crime by another; (2) that the accused had the requisite intent of the underlying substantive offense; (3) that the accused assisted or participated in the commission

of the underlying substantive offense; and (4) that someone committed the underlying substantive offense. United States v. Garcia, 400 F.3d 816, 819, n.2 (9th Cir. 2005). An aiding and abetting offense contains an additional element of specific intent, beyond the mental state required by the principle crime. United States v. Sayetsitty, 107 F.3d 1405, 1412 (9th Cir. 1997).

King argues the government must prove beyond a reasonable doubt that King intended that Cali King violate the law by operating the ATV. The government argues that it need only prove that an aider and abetter's intent regarding the substantive offense is the same intent required for the conviction as a principal. The government relies upon Garcia at 819. In Garcia the court held that aiding and abetting is not a separate and distinct offense from the underlying substantive crime, but rather is a different theory of liability for the same offense. The defendant could commit the offense by directly performing the illegal act himself of by aiding or abetting the procurement of the commission of the offense. Thus, the Garcia court reasoned, an aider and abetter's intent regarding the substantive offense is the same intent required for conviction as a principal. 400 F.3d at 819.

Under the government's theory it is sufficient to prove that King intended to facilitate Cali's driving of the Argo to and from the kill site in the Park regardless of whether either one of them knew it was on Park lands. The government's argument addresses the second element of aiding and abetting, namely the requisite

intent of the accused in committing the underlying substantive offense. It does not address the first element which requires proof that King had the specific intent to facilitate the commission of a crime by Cali.

In Sayetsitty, supra the court held that although second degree murder was not a specific intent crime, aiding and abetting second degree murder was a specific intent crime meaning in that case the voluntary intoxication could be established as a defense. In Garcia, the court also stated that ". . . to prove liability as an aider and abetter the government must establish beyond a reasonable doubt that the accused had the specific intent to facilitate the commission of a crime by someone else, and this is an 'element' that need not be established for conviction on the underlying offense." 400 F.3d at 819. The Garcia court relied upon a statement in Schad v. Arizona, 501 U.S. 624, 643 (1991) wherein the court reasoned that if two mental states are suppose to be equivalent means to satisfy the *mens rea* element of a single offense, they must reasonably reflect notions of equivalent blame-worthiness or culpability . . . ."

The law of aiding and abetting requires the government to prove more than that the defendant merely associated himself with the person committing the crime or unknowingly or unintentionally did things that were helpful to that person. The evidence must prove that King knowingly and intentionally aided, counseled, commanded, induced or procured Cali to commit each element of Count 2. To be

convicted as an aider and abetter the government must prove that King knew that the activity condemned by the law was actually occurring and must have intended to help the perpetrator. <u>United States v. McDaniel</u>, 545 F.2d 642, 644 (9th Cir. 1976). "The mens rea of aiding and abetting is 'guilty knowledge.'" This means that the government must prove that King knew that the activity constituted a violation.

The government is essentially seeking to hold King liable on Count 2 without fault. The general principles applicable to accomplice liability do not provide for liability without fault. It is not enough that the accomplice's acts in fact assisted or encouraged the person who committed the crime. Here, the aid was given without knowledge of the facts which make the principal's conduct a crime. King as an accomplice cannot be held criminally liability without fault because any crime committed by the principal (Cali King) was of the strict liability variety. The argument otherwise has been rejected. <u>Hicks v. United States</u>, 150 U.S. 442 (1893). In the instant case there is no statutory provision to hold one who is not an accomplice responsible for the conduct charged in Count 2. No legislation or regulation imposes liability without fault for the conduct at issue. The government cannot prevail under an aider and abettor theory as to Count 2.

## Conclusion

Accordingly, the court finds Jeffrey King guilty of unlawfully taking a moose in Denali National Park as charged in Count 1. The court further finds Mr.

King not guilty of operating a motor vehicle in the park as charged in Count 2.

Sentencing for Count 2 shall be set by a separate order.

DATED this 24th day of October, 2008, at Anchorage, Alaska.


/s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge